Case No. 23-1062

---

# United States Court of Appeals
# for the Sixth Circuit

---

**BROKERARTE CAPITAL PARTNERS, LLC,**

*Plaintiff-Appellant,*

v.

**THE DETROIT INSTITUTE OF ARTS**,

*Defendant-Appellee,*

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable George Caram Steeh
Case No. 2:23-cv-10066

_____

## APPELLANT'S BRIEF

_____

Aaron M. Phelps (P64790)
Neil E. Youngdahl (P82452)
Varnum LLP
Counsel for Plaintiff-Appellant
Bridgewater Place, P.O. Box 352, Grand Rapids, Michigan 49501-0352
(616) 336-6000
amphelps@varnumlaw.com
neyoungdahl@varnumlaw.com

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-1062                    Case Name: Brokerarte CP v. Detroit Inst. of Arts.

Name of counsel:  Neil Youngdahl

Pursuant to 6th Cir. R. 26.1, Brokerarte Capital Partners, LLC
                              *Name of Party*
makes the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the
      identity of the parent corporation or affiliate and the relationship between it and the named
      party:

No

2.    Is there a publicly owned corporation, not a party to the appeal, that has a financial interest
      in the outcome?  If yes, list the identity of such corporation and the nature of the financial
      interest:

No

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATION……………………………………i

TABLE OF AUTHORITIES ...................................................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...................................... vii

STATEMENT OF JURISDICTION....................................................................... viii

STATEMENT OF ISSUES ....................................................................................ix

INTRODUCTION ..................................................................................................1

STATEMENT OF THE CASE................................................................................3

    I.    STATEMENT OF FACTS. ...........................................................................3

    II.    PROCEEDINGS BELOW AND BEFORE THIS COURT...................................4

STANDARD OF REVIEW .....................................................................................6

SUMMARY OF THE ARGUMENT .......................................................................6

ARGUMENT ..........................................................................................................7

    I.    THE ACT'S PLAIN LANGUAGE, LEGISLATIVE HISTORY, AND PERSUASIVE CASE LAW FORECLOSE THE DISTRICT COURT'S DECISION TO GIVE ABSOLUTE DEFERENCE TO THE STATE DEPARTMENT. ......................................................................................7

    II.    ADHERING TO THE ACT'S PLAIN LANGUAGE AVOIDS CONSTITUTIONAL CONCERNS. .............................................................20

    III.    BEFORE THIS LITIGATION, THE DIA AND THE STATE DEPARTMENT AGREED WITH THIS COMMONSENSE READING OF THE ACT AND ON HOW THE BRANCHES OF GOVERNMENT ADMINISTER THE STATUTE.............................................................................................21

    IV.    THE ACT IS INTENDED TO PROMOTE CULTURAL EXCHANGE BY PROTECTING FOREIGN OWNERS' PROPERTY RIGHTS. ...........................25

V.    THE DISTRICT COURT DID NOT EXAMINE THE ACT'S APPLICATION
      NOR DID THE DIA ESTABLISH THAT THE ACT APPLIES. ......................32

CONCLUSION ...................................................................................36

CERTIFICATE OF COMPLIANCE.......................................................37

# TABLE OF AUTHORITIES

## Cases

*Admiral Ins. Co., v. Columbia Cas. Ins. Co.*,
    194 Mich. App. 300 (1992)...............................................................31

*Agnew v. BASF Corp.*,
    286 F.3d 307 (6th Cir. 2002) ...........................................................18

*Agudas Chasidei Chabad of United States v. Russian Federation*,
    798 F. Supp. 2d 260 (D.D.C. 2011)...................................................28

*ANA Intern., Inc., v. Way*,
    393 F.3d 886 (9th Cir. 2004) ...........................................................32

*Arangure v. Whitaker*,
    911 F.3d 333 (6th Cir. 2018) ...........................................................26

*Brilliance Audio, Inc. v. Haights Cross Comms., Inc.*,
    474 F.3d 365 (6th Cir. 2007) ...........................................................15

*Comm. On Ways & Means, U.S. House of Representatives, v. United States Dep't of the Treasury*,
    45 F.4th 324 (D.C. Cir. 2022).........................................................30

*Davis v. Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y 2013) ...............................................15

*Delek US Holdings, Inc. v. United States*,
    32 F.4th 495 (6th Cir. 2022) ...........................................................34

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975)........................................................................30

*Exxon Mobil Corp. v. Allapattah Srvs., Inc.*,
    545 U.S. 546 (2005)........................................................................29

*Freed v. Thomas*,
    976 F.3d 729 (6th Cir. 2020) ............................................... viii, 32

*Hamama v. Adducci*,
   946 F.3d 875 (6th Cir. 2020) ..................................................20

*Hamer v. Neighborhood Housing Srvs. of Chicago*,
   138 S. Ct. 13 (2017).............................................................20

*Henning v. City of Fort Wayne*,
   No. 1:08-cv-180, 2009 WL 2905482 (N.D. Ind. Sep. 8, 2009)..........................15

*Heydon v. MediaOne of Southeast Michigan, Inc.*,
   327 F.3d 466 (6th Cir. 2003) ....................................................6

*Keen v. Helson*,
   930 F.3d 799 (6th Cir. 2019) ...................................... 13, 14, 27

*Kraus v. Taylor*,
   715 F.3d 589 (6th Cir. 2013) ...................................................17

*Levin v. Dalva Brothers, Inc.*,
   459 F.3d 68 (1st Cir. 2006)....................................................15

*Magness v. Russian Fed.*,
   84 F. Supp. 2d 1357 (S.D. Ala. 2000) ........................... 18, 19, 23, 28

*Mannino v. Int'l Mfg. Co.*,
   650 F.2d 846 (6th Cir. 1981) ..................................................15

*Mata v. Lynch*,
   576 U.S. 143 (2015)........................................... 13, 19, 32

*McHenry v. Bond*,
   668 F.2d 1185 (11th Cir. 1982) ................................... 18, 19

*Mich. Bell Telephone Co. v. Climax Telephone Co.*,
   202 F.3d 862 (6th Cir. 2000) ....................................................6

*O'Bryan v. Holy See*,
   556 F.3d 361 (6th Cir. 2009) ...................................................32

*Roberts v. Hamer*,
   655 F.3d 578 (6th Cir. 2011) ....................................................9

*Russello v. United States*,
    464 U.S. 16 (1983) ...............................................................................12

*Smith v. Babcock*,
    19 F.3d 257 (6th Cir. 1994) ................................................................27

*United States ex rel. Jones v. Horizon Healthcare Corp.*,
    160 F.3d 326 (6th Cir. 1998) ..............................................................13

*United States v. Bedford*,
    914 F.3d 422 (6th Cir. 2019) ..............................................................15

*Wallace v. FedEx Corp.*,
    764 F.3d 571 (6th Cir. 2014) ..............................................................17

## Statutes

18 U.S.C. § 2314 .......................................................................................31

22 U.S.C. § 2459(a) ..........................vii, viii, 1, 9, 11, 14, 22, 24, 27, 31, 33, 34, 36

22 U.S.C. § 6501 .........................................................................................2

28 U.S.C. § 1291 ..................................................................................... viii

28 U.S.C. § 1332(a) .......................................................................... viii, 13, 32

Mich. Comp. Laws § 600.2920 ...................................................................4

## Other Authorities

*Black's Law Dictionary* (11th ed. 2019) ...................................................36

*Merriam-Webster's New Collegiate Dictionary* (7th ed. 1971) ...............34

*Van Gogh Exhibit's 'Incredible' Run at DIA Comes to End*, DETROIT NEWS,
    Jan. 23, 2023 ......................................................................................14

Zerbe, Rodney M., *Immunity from Seizure for Artworks on Loan to the
    United States Museums*, 6 Nw. J. In'l L. & Bus. 1121 (1984-1985) ...................29

vi

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellant respectfully requests oral argument.  This case presents questions of first impression regarding the interpretation of a federal statute and legal issues of continuing public importance.  Specifically, this appeal turns on how the Court interprets the Immunity from Seizure Act, 22 U.S.C. § 2459(a), a statute that few courts—and no federal courts of appeals—have examined.  Moreover, the Court's decision will have significant consequences for the property rights of art owners and the administration of foreign art loans.  Indeed, this case has already drawn amicus interest from the Association of Art Museum Directors, the American Alliance of Museums, and individual art museums.  Oral argument will allow counsel to fully explain the error in the district court's decision and the proper administration and application of the Act.

## <u>STATEMENT OF JURISDICTION</u>

This appeal derives from the district court's Order and Judgment, both of which it entered on January 20, 2023. (Rs. 15 and 16). The district court's judgment is a "final decision" under 28 U.S.C. § 1291. Appellant filed a timely notice of appeal on January 23, 2023. (Notice of Appeal, R. 17).

Because of the parties' complete diversity of citizenship and the value of the injunctive relief sought, (Ver. Compl., R. 1, PageID.2), federal courts have subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a). Moreover, as explained below, the Immunity from Seizure Act, 22 U.S.C. § 2459(a), has not deprived the courts of jurisdiction. In any event, courts have jurisdiction to consider the threshold question of whether the Act applies. *Freed v. Thomas*, 976 F.3d 729, 739 (6th Cir. 2020) ("Of course, a federal court always has jurisdiction to determine its own jurisdiction.").

## <u>STATEMENT OF ISSUES</u>

I.      Does the Immunity from Seizure Act require courts to automatically

dismiss cases without deciding whether the Act's requirements are met?

## **INTRODUCTION**

This case centers on a painting created by Vincent Van Gogh that is titled "Liseuse De Romans" (also known as "the Novel Reader;" referred to here as "the Painting"). Appellant Brokerarte Capital Partners, LLC purchased the Painting in May 2017, and stored the artwork with a third party. That person soon cut off all communications with Brokerarte, and Brokerarte was unaware of the Painting's location for years. The Painting resurfaced a few months ago at the Detroit Institute of Arts ("the DIA"), as part of an exhibition on Van Gogh's art in America. Once Brokerarte learned of the Painting's location, it instituted this replevin action against the DIA to recover possession of its rightful property.

Throughout the proceedings below, nobody disputed that Brokerarte purchased the Painting in May 2017. Nobody claimed that, since Brokerarte purchased the Painting, it transferred its ownership interest to anyone else. And everyone agreed that the Painting is currently in the DIA's possession without Brokerarte's permission. The DIA's sole reason for continuing to deprive Brokerarte of its property is that, in its view, courts cannot *compel* the museum to turn over the Painting because the State Department made certain determinations regarding this artwork under the Immunity from Seizure Act, 22 U.S.C. § 2459(a).[1] The district

---

[1] The Act provides a role for the "President or his designee." Through a series of executive orders, the President delegated his authority under the Act to the Office

court agreed with the DIA's broad interpretation of the statute, denied Brokerarte's motion for a preliminary injunction, and dismissed Brokerarte's suit for lack of subject-matter jurisdiction.

The district court's decision is inconsistent with the Act's plain language. The Act outlines various factual predicates that must be met before immunity attaches to a cultural object. Congress specifically defined which of these predicates can be examined by the State Department. The question of whether the rest are met remains firmly in the courts' purview. Because the district court defined the deference owed to the Executive Branch too broadly and did not require the DIA to satisfy each factual predicate, it incorrectly held that it lacked jurisdiction over Brokerarte's request for return of its property. Accordingly, this Court should reverse the district court's decision and remand for further proceedings.

---

of Public Diplomacy and Public Affairs, a component of the State Department. 86 Fed. Reg. 74208-02, 2021 WL 6126001 (Dec. 29, 2021); *see also* https://www.state.gov/bureaus-offices/secretary-of-state/office-of-the-legal-adviser/office-of-public-diplomacy-and-public-affairs/ (last accessed February 20, 2023). Below, the district court erroneously stated that the Director of the United States Information Agency ("USIA") currently administers the Act and that this agency issued the notice relevant to this case. (R. 15, PageID.141). This Court made the same mistake in its injunction pending appeal. (Order, CA6 Dkt 22-2). Congress abolished the USIA in 1998. *See* 22 U.S.C. § 6501.

# STATEMENT OF THE CASE

## I.   STATEMENT OF FACTS.

The relevant facts are set out in Brokerarte's Verified Complaint.  (R. 1).  The Verified Complaint's allegations were sworn to by Brokerarte's sole proprietor, Mr. Gustavo Soter.  (*Id*., PageID.6).  Brokerarte is an art brokerage company that buys, sells, and collects artwork, including paintings by world-renowned artists, and advises on art collections.  (*Id*., PageID.3).  In May 2017, Brokerarte purchased the Painting from Torrealba Holdings, Ltd., for $3.7 million.  (Bill of Sale, R. 1-1).  A third party immediately took possession of the Painting.  (Verified Compl., R. 1, PageID.4).  Brokerarte never transferred title or any interest in the Painting to this third party.  (*Id*.).

Since the third party took possession of the Painting, Brokerarte has not known the Painting's location.  (*Id*.).  Recently, however, Brokerarte learned that the Painting was in the DIA's possession, on display as part of the museum's "Van Gogh in America" exhibition.  (*Id*.; Photograph Taken By Plaintiff's Counsel, R. 1-2).  Once Brokerarte learned that the Painting was in Detroit, it feared that, when the exhibition ended on January 22, 2023, the DIA would dispose of the Painting, perhaps by returning it to the party who had deprived Brokerarte of the Painting in the first place.  Unwilling to lose its opportunity to recover this one-of-a-kind artwork, Brokerarte decided to avail itself of the American judicial system.

3

## II.    PROCEEDINGS BELOW AND BEFORE THIS COURT.

On January 10, 2023, Brokerarte filed suit in the United States District Court for the Eastern District of Michigan, asserting one count of "Replevin/Claim and Delivery" under Michigan law.  *See* Mich. Comp. Laws § 600.2920 (R. 1, PageID.4). Brokerarte simultaneously moved for a temporary restraining order and immediate possession of the Painting pending final judgment.  (R. 2).  The district court found "[b]ased on the allegations in the Verified Complaint and on the Bill of Sale," that Brokerarte had established good cause to order the DIA to "refrain from damaging, destroying, concealing, disposing, moving, or using as to substantially impair its value," the Painting until the court could hear argument on the remainder of the motion.  (Order Pending Hearing, R. 5, PageID.34).

The DIA filed a response to Brokerarte's motion.  (R. 12).  The DIA did not dispute Plaintiff's ownership of the Painting, asserting only that true ownership is "irrelevant" because the artwork is immune from judicial process under federal law. (*Id*., PageID.58).  The DIA argued for a broad interpretation of the Immunity from Seizure Act.  Under the DIA's view, courts have no role in determining the Act's applicability and must reflexively defer to the State Department's implicit opinion on how the Act applies in a given context.  (R. 12, PageID.54-55, 60-61).

Brokerarte filed a reply, explaining that, on the current record, the court could not decide that the Act applied to the Painting because the DIA had failed to show

4

that the Painting was imported "pursuant to an agreement entered into [with] the foreign owner or custodian thereof[.]" (R. 14, PageID.130-133).

On January 19, 2023, the district court held oral argument on Brokerarte's motion for preliminary injunctive relief. The next day, the court issued an "Opinion and Order Denying Plaintiff's Motion for Temporary Restraining Order and Possession Pending Final Judgment, Dissolving Order Pending Hearing, and Dismissing Case." (R. 15, Page ID.138). In its opinion, the district court adopted the DIA's broad view of the deference owed under the Act, denied Brokerarte's request for preliminary injunctive relief, and dismissed Brokerarte's suit for lack of jurisdiction because "the Court cannot grant the ultimate relief sought by plaintiff." (*Id.*, PageID.148). Brokerarte filed a timely Notice of Appeal on January 23, 2023. (R. 17, PageID.151).

When this Court docketed this appeal, Brokerarte moved for a temporary stay and an injunction pending appeal that would require the DIA to retain possession of the Painting until this Court could consider this appeal's merits. (CA6 Dkt. No. 10). The Court issued an administrative stay and ordered briefing on the motion for an injunction. (*Id.* Nos. 13 and 14). The parties fully briefed the motion, (*Id.* Nos. 18 and 19), and amici the Association of Art Museum Directors, the American Alliance of Museums, and Individual Art Museums filed a brief opposing Brokerarte's request for an injunction pending appeal. (*Id.* No. 21). Nonetheless, a motions panel of this

5

Court granted Brokerarte's motion for an injunction pending appeal, finding that "Brokerarte has shown a likelihood of success on its argument that the district court was not divested of authority to determine if the antecedent requirements were met," and that it would suffer irreparable harm if the DIA disposed of the Painting. (*Id.* No. 22-2). The Court ordered the DIA to maintain possession of the Painting pending a decision on appeal and further ordered expedited briefing. (*Id.*)

## STANDARD OF REVIEW

The district court dismissed Brokerarte's suit for lack of subject-matter jurisdiction. This Court reviews that decision de novo. *Heydon v. MediaOne of Southeast Michigan, Inc.*, 327 F.3d 466, 469 (6th Cir. 2003). The pivotal question in this case is one of statutory interpretation and application, which is also reviewed de novo. *Mich. Bell Telephone Co. v. Climax Telephone Co.*, 202 F.3d 862, 865 (6th Cir. 2000).

## SUMMARY OF THE ARGUMENT

Brokerarte's appeal depends on how this Court answers one question: Does the Immunity from Seizure Act require courts to automatically dismiss cases without deciding whether the Act's requirements are met? The answer is "no." Although Congress delegated certain inquiries under the Act to the Executive Branch, the statute's plain language requires courts to examine the existence of certain factual predicates before immunity may attach. The DIA, as the party asserting immunity,

bears the burden of satisfying these conditions.  Because the district court's view of the Act is fundamentally flawed and there is currently no factual basis to determine whether all of the Act's conditions are met, this Court must reverse the district court's order and remand for further proceedings.

## **ARGUMENT**

I.    **THE ACT'S PLAIN LANGUAGE, LEGISLATIVE HISTORY, AND PERSUASIVE CASE LAW FORECLOSE THE DISTRICT COURT'S DECISION TO GIVE ABSOLUTE DEFERENCE TO THE STATE DEPARTMENT.**

At no point during these proceedings has anyone argued that Brokerarte is not the Painting's legal owner.  But the district court concluded that Brokerarte's ownership interest in the Painting is irrelevant because the Immunity from Seizure Act places the Painting beyond the courts' reach.  The Act reads:

> Whenever any work of art or other object of cultural significance is imported into the United States from any foreign country, pursuant to an agreement entered into between the foreign owner or custodian thereof and the United States or one or more cultural, educational, or religious institutions with the capacity to appropriately curate such object within the United States providing for temporary storage, conservation, scientific research, exhibition, or display within the United States at any cultural exhibition, assembly, activity, or festival administered, operated, or sponsored, without profit, by any such cultural, educational, or religious institution with the capacity to appropriately curate such object, no court of the United States, any State, the District of Columbia, or any territory or possession of the United States may issue or enforce any judicial process, or enter any judgment, decree, or order, for the purpose or having the effect of depriving such institution, or any carrier engaged in transporting such work or object within the United States, of custody or control of such object if before the importation of such object the President or his designee has determined that such object is of cultural significance and

7

> that temporary storage, conservation, scientific research, exhibition, or
> display within the United States is in the national interest, and a notice
> to that effect has been published in the Federal Register.

*Id*.  In holding that the Act applied to the Painting, the district court relied largely on its perception of the Act's purpose.  (R. 15, PageID.145).  The court concluded that "[t]he purpose of the Act is not to protect the owner of the object inasmuch as it is to encourage the exhibition in the United States of objects of cultural significance from abroad."  (*Id*.)  Citing legislative history, the court determined that the Act "serves the important national interest of 'contributing to the educational and cultural development of the people of the United States'" (R. 15, PageID.145-146) (quoting H.R. Rep. No. 1070, 89th Cong., 1st Sess. 2. (1965)).  The court concluded that "[r]equiring an institution to ultimately bear the burden of proof in court that a foreign lender had a legal right to loan an object before it can assert that the objection is immune from seizure would be circuitous, would not further the Act's stated purpose and would likely result in a chilling effect on cultural exchanges."  (R. 15, PageID.146).  The court held that it was enough that "the Director of the United States Information Agency determined that each of the requirements of the Act were met" and "the agency's determination is entitled to deference."  (*Id*.).[2]

---

[2] *See* Footnote 1.

8

The district court's reading of the Act is untenable.  The "starting point" for "[a] matter requiring statutory interpretation . . . is the language of the statute itself." *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011).  The district court's interpretation ignores the Act's predicate phrase, which qualifies the scope of the statute's jurisdiction-stripping effect, and shuffles other clauses throughout the provision.  The result is an abdication of judicial authority that is simply not supported by the statute.

The statute can be broken into three parts.  The first part outlines factual predicates that must be met for an object to even be eligible for immunity:

> Whenever any work of art or other object of cultural significance is imported into the United States from any foreign country, pursuant to an agreement entered into between the foreign owner or custodian thereof and the United States or one or more cultural, educational, or religious institutions with the capacity to appropriately curate such object within the United States providing for temporary storage, conservation, scientific research, exhibition, or display within the United States at any cultural exhibition, assembly, activity, or festival administered, operated, or sponsored, without profit, by any such cultural, educational, or religious institution with the capacity to appropriately curate such object . . .

22 U.S.C. § 2459(a).  A few hypotheticals confirm that these are eligibility requirements that depend on the facts of each case.  If, for example, a foreign owner lives abroad but stores his collection of Native American art in the United States and decides to loan an object to a local museum, this object would not be eligible for immunity under the Act because it would not have been "imported into the United

9

States." *Id.* Similarly, if a foreign owner imported a cultural object into the United States for *permanent* display at an American museum, it would not be eligible for immunity because the loan arrangement would not be "providing for temporary storage . . . or display[.]" *Id.* And if a foreign owner loans a cultural object to generate profit for an exhibitor, the Act surely does not apply. *Id.*

> The Act's second part is the operative jurisdiction-stripping language:
>
> . . . no court of the United States, any State, the District of Columbia, or any territory or possession of the United States may issue or enforce any judicial process, or enter any judgment, decree, or order, for the purpose or having the effect of depriving such institution, or any carrier engaged in transporting such work or object within the United States, of custody or control of such object . . .

*Id.* And the Act's third part requires the Executive Branch to make certain judgment calls and to provide notice of those determinations before immunity attaches:

> . . . if before the importation of such object the President or his designee has determined that such object is of cultural significance and that temporary storage, conservation, scientific research, exhibition, or display within the United States is in the national interest, and a notice to that effect has been published in the Federal Register.

*Id.* Reading these sections together, the Act's plain language imposes at least nine requirements for immunity:

(1) **the Importation Requirement** (i.e., the object "is imported into the United States from any foreign country");

(2) **the Agreement Requirement** (i.e., that the object is imported "pursuant to an agreement entered into [with] the foreign owner or custodian thereof");

10

(3) **the Temporary Duration Requirement** (i.e., that the agreement is "providing for temporary storage, conservation, scientific research, exhibition, or display within the United States");

(4) **the Event Requirement** (i.e., that the object is to be used "at any cultural exhibition, assembly, activity, or festival");

(5) **the Without-Profit Requirement** (i.e., that the event be "administered, operated, or sponsored, without profit");

(6) **the Curator Requirement** (i.e., that the object be used "by any such cultural, educational, or religious institution with the capacity to appropriately curate such object");

(7) **the Cultural Designation Requirement** (i.e., that the Executive Branch make a preemptive determination that the object "is of cultural significance");

(8) **the National Interest Designation Requirement** (i.e., that the Executive Branch make a preemptive determination that the object's temporary use in the United States is in the "national interest"); and

(9) **the Notice Requirement** (i.e. that the Executive provide proper notice of its determinations before the object's importation).

*See, generally*, 22 U.S.C. § 2459(a). The Act's plain language not only defines *what* conditions must exist for immunity to attach, it also defines *who* decides that these conditions exist. The Act specifically provides that the Executive Branch "determine[s] that such object is of cultural significance and that temporary storage, conservation, scientific research, exhibition, or display within the United States is in the national interest." *Id*. Put differently, the Executive Branch's role is limited to the substantive inquiries underpinning the seventh and eighth requirements (i.e. whether the object is of cultural significance and its display is in the national

11

interest).  This limitation makes sense.  Cultural significance and national interest are policy decisions, for which courts of law are ill-equipped.

Congress did not, however, delegate examination of the Act's threshold or procedural conditions (denoted above as requirements (1)-(6) and (9)) to the Executive Branch.  The "determination" language comes too late in the statute for that reading to be plausible.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (brackets omitted).

Because Congress specifically limited the Executive Branch's role to certain determinations, the Executive Branch has no authority to "determine" whether the other factual predicates are met.  A contrary interpretation would require the Court to cut the "determination" language from the end of the Act and paste it to the beginning.[3]  Courts do not redline statutes, however, no matter how confident they

---

[3] Such a statute would read: "Whenever **[the President or his designee has determined]** any work of art or other object of cultural significance is imported into the United States from any foreign country, pursuant to an agreement entered into between the foreign owner or custodian thereof and the United States or one or more cultural, educational, or religious institutions . . ."  Regardless of whether this hypothetical scheme would provide greater comfort to borrowing institutions, it is not the language that Congress enacted.

are that the People's representatives could have written better language.  *Keen v. Helson*, 930 F.3d 799, 806 (6th Cir. 2019) ("[C]ourts are not at liberty to rewrite a statute just because they believe that doing so would better effectuate Congress's purposes.")

By placing this language where it did, Congress made clear that only two questions are answered by the Executive Branch.  The rest are simple questions of statutory compliance, which are answered by looking to the facts in the record.  Interpreting a statute, and applying that statute to facts, is "the bread-and-butter work of the federal courts."  *See United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 336 (6th Cir. 1998).  Courts therefore have a "virtually unflagging obligation" to examine the Act's requirements when doing so is necessary to decide a case over which it otherwise has subject-matter jurisdiction, such as in a dispute between diverse parties.  *See Mata v. Lynch*, 576 U.S. 143, 150 (2015); 28 U.S.C. § 1332(a).

Indeed, the questions that the court must answer under the Act are purely factual: Was the Painting imported into the United States?  Was the Painting imported pursuant to an agreement entered into with the foreign owner or custodian?  Does the agreement provide for the temporary exhibition of the Painting?  Was the Painting displayed at a cultural exhibition, assembly, activity, or festival?  Was the event administered without profit?  Does the DIA have the capacity to appropriately

13

curate the Painting?  Did the State Department determine that the Painting was of cultural significance?  Did the State Department determine that the Painting's display at the exhibition was in the national interest?  Did the State Department provide proper notice of its determinations?

These are run-of-the-mill factual findings that must be made for immunity to attach under the Act.  The only question that may require the exercise of some judgment is determining the DIA's capacity to curate the Painting.  As a policy matter, some might question why Congress wanted courts to determine if the borrowing institution has "the capacity to appropriately curate such objects." 22 U.S.C. § 2459(a).  However, this Court is not permitted to second-guess Congress in that way.  *Keen*, 930 F.3d at 806.  Moreover, the Curator Requirement is not at issue in this case because Brokerarte does not contest the DIA's qualification or capacity to curate the Painting.  By all accounts, the Van Gogh exhibition was a great success.  *See* Sarah Rahal and Hannah Mckay, *Van Gogh exhibit's 'incredible' run at DIA comes to end*, DETROIT NEWS, Jan. 23, 2023 https://www.detroitnews.com/story/entertainment/arts/2023/01/23/van-gogh-exhibit-ends-detroit-institute-of-arts/69823980007/ (last accessed Feb. 18, 2023).

And even if this Court had to squarely consider the Curator Requirement, it is not unusual for courts to examine a person's ability to perform tasks within their purported expertise.  For example, a "fundamental proposition" of the federal

14

judiciary is that "the determination of the qualifications of an expert is largely within the discretion of the trial court." *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 849 (6th Cir. 1981). District courts are often called to examine the qualifications of experts, whose areas of expertise can range from 18th-century French grandfather clocks, *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 79 (1st Cir. 2006), to dog behavior, *Henning v. City of Fort Wayne*, No. 1:08-cv-180, 2009 WL 2905482, at *4 (N.D. Ind. Sep. 8, 2009). Thus, it is not unreasonable that Congress decided to leave the question of the borrowing institution's capacity in the courts' hands. *See, e.g., Davis v. Carroll*, 937 F. Supp. 2d 390, 414 (S.D.N.Y 2013) (qualifying an "expert in the norms of the market of artwork").

The Act's text is plain, and the Court need only read its language to see that the Executive Branch's role in granting immunity is limited. But if—and only if—the Court concludes that the text is ambiguous, it can look to the Act's legislative history. *See United States v. Bedford*, 914 F.3d 422, 427 (6th Cir. 2019) (courts may only look to legislative history when "the language is ambiguous or leads to an absurd result"); *see also Brilliance Audio, Inc. v. Haights Cross Comms., Inc.*, 474 F.3d 365, 371 (6th Cir. 2007) ("Only if the statute is 'inescapably ambiguous' should a court look to other persuasive authority in an attempt to discern legislative meaning."). This history confirms that Congress contemplated that the Executive Branch would decide only cultural significance and national interest. In the

15

Judiciary Committee's Report to the House of Representatives on the Act, the Committee described the process for granting immunity as follows:

> The bill requires that the President of the United States or his designee, make a determination **that the objects sought to be imported for exhibition or display are of such cultural significance as to be in the national interest**, and publish notice of this effect in the Federal Register.

H.R. Rep. No. 1070, 89th Cong., 1st Sess. 2 (1965) ("H.R. 1070") (R. 12-3).  H.R. 1070 confirms that Congress intended to delegate only the cultural-significance and national-interest determinations to the Executive Branch because the report makes no mention of the President or his designee deciding any other statutory predicate.

Case law also confirms the plain-language reading of the Act.  As the district court noted at the motion hearing, "there's very little case law" that examines the Act.  (Transcript, R. 19, PageID.173).  Notably, however, the motions panel that considered Brokerarte's motion for an injunction pending appeal agreed with Brokerarte's view that the district court erred as a matter of law in deferring to the State Department on all of the Act's predicates.  (Order, CA6 Dkt 22-2).  The Court's analysis of the likelihood-of-success factor tracks the reasoning described above:

> The starting point for questions of statutory interpretation is the language of the statute itself; only if those terms are ambiguous will we consider other persuasive authority. *Tree of Life Christian Schs. v. City of Upper Arlington*, 905 F.3d 357, 367 (6th Cir. 2018).  Section 2459(a) delegates to the President or his designee (here, the USIA) only the factual findings that an artwork is of cultural significance and its importation for temporary exhibition is in the national interest. *See* 22 U.S.C. § 2459(a); Exec. Order No. 12047, 43 Fed. Reg. 13359

16

(Mar. 29, 1978), as amended by Exec. Order No. 12388, 47 Fed. Reg. 46245 (Oct. 18, 1982). The Act sets out several antecedent requirements including that the work be imported pursuant to an agreement entered into between the foreign owner or custodian of the artwork and the borrowing Institution before providing that no court may issue or enforce any judicial process against the borrowing institution if the State Department made its findings and caused notice to be published in the Federal Register. 22 U.S.C. § 2459(a). **Only the factual findings concerning the cultural significance of the artwork and whether its display is in the national interest are specifically delegated to the State Department. Although the application for immunity requires the borrowing institution to submit statements regarding many of the antecedent requirements including certifying the existence of the agreement outlined above Congress did not delegate these factual findings to the President or his designee, nor does it appear Congress contemplated doing so.** *See* S. Rep. 89-747 (1965); H.R. Rep. 89-1070 (1965). **Accordingly, Brokerarte has shown a likelihood of success on its argument that the district court was not divested of authority to determine if the antecedent requirements were met.** Moreover, we cannot determine at this juncture whether these requirements were met even if we afford the executive any deference it is due.

(*Id*. at page 3) (emphasis added). "While the decisions of motions panels are generally interlocutory in nature (and, thus, not strictly binding upon subsequent panels), they do receive some measure of deference." *Wallace v. FedEx Corp*., 764 F.3d 571, 583 (6th Cir. 2014); *see also Kraus v. Taylor*, 715 F.3d 589, 594 (6th Cir. 2013) (recognizing that, although orders issued by motions panels are "subject to revision," they "are rarely altered as a practical matter."). "Later panels cannot simply choose to disregard motions-panel decisions[.]" *Wallace*, 764 F.3d at 583. Moreover, to date, the motions panel's order is the only instance in which a federal court of appeals has squarely considered how to read the Immunity from Seizure

17

Act. The Court should therefore consider this order as at least persuasive authority. *See Agnew v. BASF Corp.*, 286 F.3d 307, 310 n.3 (6th Cir. 2002).

Without the guidance of any binding precedent, the district court relied on a decades-old, unappealed opinion from the Southern District of Alabama to support its decision to completely defer to the State Department and to close its eyes to the Act's factual predicates. *See Magness v. Russian Fed.*, 84 F. Supp. 2d 1357 (S.D. Ala. 2000). There, the plaintiff had obtained a default judgment against the Russian government and various Russian governmental organizations. *Id*. at 1358. In an effort to satisfy this judgment, plaintiff filed a petition for a writ of execution against assets owned by the Russian government that were on temporary display in Mobile, Alabama. *Id*. The district court examined the State Department's notice regarding these assets and—relying on *McHenry v. Bond*, 668 F.2d 1185 (11th Cir. 1982)—concluded that the "agency's determination is entitled to deference[.]" *Magness*, 84 F. Supp. 2d at 1360. The court decided that it could "not attempt to go behind that determination and, thus, put in jeopardy the Exhibition which was originally brought into this country in reliance on such a determination." *Id*. Based on this deference, the court dismissed plaintiff's petition. *Id*.

Before the district court issued its opinion below, no court had ever adopted *Magness*'s view that courts owe total and complete deference to the State Department under the Act. And for good reason: This deference theory is not only an abdication

of judicial power, *see Mata*, 576 U.S. at 150, it is also premised on irrelevant case law.  The *Magness* court relied on *McHenry*, a case where the Eleventh Circuit applied the Administrative Procedure Act's arbitrary-and-capricious standard to an agency's adjudicative findings.  668 F.2d at 1190.  Of course some level of deference is owed in that context.  But even *McHenry* does not require courts to reflexively defer to the Executive Branch.  There, the court held that the agency's decision was "lacking in a sound rationale" because "portions of the decision are not supported by substantial evidence," "[t]he [agency's] ultimate finding on a central issue is vague and unclear," and "the [agency] has failed to rationally explain its departure from [agency] precedent on another issue." *Id*.  The Eleventh Circuit vacated the agency's order and remanded for further proceedings, *id*. at 1190, 1195, a result that directly contradicts the *Magness* court's conclusion that it could "not attempt to go behind" the State Department's determination.  *Magness*, 84 F. Supp.2d at 1360. Accordingly, *Magness* is built on a faulty premise, and the absolute-deference theory advanced by the DIA and adopted by the district court below is unanchored to any relevant precedent.

In sum, the Act's plain language, the Act's legislative history, and this Court's prior sound reasoning confirm that the Executive Branch determines only cultural significance and national interest.  The rest of the predicates are left to the courts.

19

## II.  ADHERING TO THE ACT'S PLAIN LANGUAGE AVOIDS CONSTITUTIONAL CONCERNS.

Even if the Act's language is ambiguous (it is not), the Court should narrowly construe the Executive Branch's power to deprive the judiciary of subject-matter jurisdiction through the Act.  Such a reading avoids separation of powers and nondelegation concerns. "Only Congress may determine a lower federal court's subject-matter jurisdiction." *Hamer v. Neighborhood Housing Srvs. of Chicago*, 138 S. Ct. 13, 17 (2017).  Yet, under the district court's reading, Congress delegated its authority to determine subject-matter jurisdiction to the *Executive Branch*, which can now unilaterally declare certain objects beyond the court's jurisdiction and thereby deprive courts of their power to decide actions seeking possession of those items, such as cases arising in replevin or claim and delivery.  Given the constitutional questions that a broad interpretation raises, a narrower reading would be appropriate, even if the text was ambiguous. *See Hamama v. Adducci*, 946 F.3d 875, 880 (6th Cir. 2020) ("Constitutional avoidance permits a court to choose between competing plausible interpretations of a statutory text, one of which implicates constitutional problems the other would avoid.")

20

### III.    BEFORE THIS LITIGATION, THE DIA AND THE STATE DEPARTMENT AGREED WITH THIS COMMONSENSE READING OF THE ACT AND ON HOW THE BRANCHES OF GOVERNMENT ADMINISTER THE STATUTE.

Before this litigation started, Brokerarte's reading of the Act was not controversial.  In fact, both the State Department and the DIA itself understood the Executive Branch's limited role in determining immunity.  In a letter to the State Department regarding the Van Gogh exhibition, the DIA's Registrar of Exhibitions requested only that the State Department make the cultural significance and national interest determinations:

> **I hereby request that the Department of State make the determinations that the works coming from abroad for this exhibition are of cultural significance; that their temporary exhibition in the United States is in the national interest**; and that there be publication to that effect in the Federal Register no later than July 15, 2022, and in any event, prior to importation, which is expected to begin on or about August 29, 2022.  The exhibition will be exhibited solely at the Detroit Institute of Arts from October 2, 2022–January 22, 2023.  The museum wishes to be publicly identified as Detroit Institute of Arts.

Letter from Kimberly K. Dziurman to Assistant Legal Advisor for Public Diplomacy and Public Affairs, May 12, 2022 (R. 12-6, PageID.106) (emphasis added).[4]

-------

[4] Notably, this language largely tracks the sample language for applications found on the State Department's website, which further establishes that the government and art community at large understand that the State Department's role is limited.  *See*   https://www.state.gov/sample-application-and-contract-language/ (last accessed Feb. 20, 2023).

The Registrar then provided her understanding of how immunity would attach to the items displayed at the Van Gogh Exhibition, based on the Act's plain language:

> I understand that in any judicial proceedings involving these works of art, **if a United States court finds** the above determinations have been made, timely publication has occurred, **and that the other provisions of 22 U.S.C. § 2459 have been met**, **the court could grant immunity from judicial seizure to the work or works of art**.

(*Id*.) (emphasis added).  The Registrar plainly understood that a "United States court" would have to "find[] . . . that the other provisions of 22 U.S.C. § 2459 have been met," for "the *court* [to] grant immunity," (emphasis added), which belies the DIA's claim that judicial scrutiny of the Van Gogh exhibition is some sort of unexpected affront to the international art community.

The State Department also agreed with the DIA that its role in granting immunity was limited.  In response to the DIA's application for cultural-significance and national-interest determinations, the State Department issued a "Notice of Determination."  Understandably, this notice was limited to the cultural-significance and national-interest determinations:

**DEPARTMENT OF STATE**

**[Public Notice: 11783]**

**Notice of Determinations; Culturally Significant Objects Being Imported for Exhibition—Determinations: "Van Gogh in America" Exhibition**

> **Summary:**  Notice is hereby given of the following determinations: *I hereby determine that certain objects* being imported from abroad pursuant to agreements with their foreign owners or custodians for temporary display in the exhibition "Van Gogh in America" at the Detroit Institute of Arts, Detroit, Michigan, and at possible additional exhibitions or venues yet to be determined, *are of cultural significance, and, further, that their temporary exhibition or display within the United States as aforementioned is in the national interest*.  I have ordered that Public Notice of these determinations be published in the **Federal Register.**

87 Fed. Reg. 42258-01, 2022 WL 2714288 (July 14, 2022) (R. 12-8, PageID.117) (bolding in original, italics added).  Although the Notice mentions, in passing, "certain objects being imported from abroad pursuant to agreements with their foreign owners or custodians," the sentence's structure makes clear that this is not a "determination." (i.e. "I hereby determine that certain objects . . . are of cultural significance, and, further, that their temporary exhibition or display within the United States as aforementioned is in the national interest.").[5]

---

[5] Notably, the State Department used different language in this Notice than it used in the notice at issue in *Magness* (the case upon which the district court largely relied below).  The *Magness* notice included a sentence that read: "These objects are imported pursuant to a loan agreement with a foreign lender."  *Magness*, 85 F. Supp. 2d at 1360; *see also* 63 Fed. Reg. 30567-02, 1998 WL 284913 (June 4, 1998).  Although, as explained in Sec. I *supra*, the State Department has no authority to make this determination (and a "lender" determination is insufficient anyway, *see* Sec. V, *infra*), the *Magness* notice illustrates how the district court erred even under its own flawed interpretation of the Act.  If the State Department *can* make factual determinations, the *Magness* notice shows how it would do so.  The State Department did not make factual determinations here.  *Compare* 63 Fed. Reg. 30567-02, 1998 WL 284913 with 87 Fed. Reg. 42258-01, 2022 WL 2714288.

Below, the district court and the DIA made much of the fact that the State Department requires museums to submit certain paperwork and information before it issues its cultural-significance and national-interest determinations. (Opinion, R. 15, PageID.140-141, 144-145, 146; Def.'s Res. to Mot. For Temporary Restraining Order, R. 12, PageID.55-57). Putting aside the fact that this is the very paperwork in which the DIA confirmed that a *court* would decide whether the Act's factual predicates are met, (R. 12-6, PageID.106), the information that the State Department requests or is provided in making its statutorily mandated determinations is simply not relevant to the other predicates. The State Department's role in granting immunity is defined by the Act. *See* Sec. I. No amount of paperwork, applications, or questionnaires can amend the text.

Moreover, the State Department's Notice is simply not what the DIA or the district court portrayed it to be. This Notice does *not* examine all of the predicates for immunity under the Act. For example, nowhere in the Notice does the State Department determine that the DIA's Van Gogh exhibit is "administered, operated, or sponsored, without profit." 22 U.S.C. § 2459(a). If the district court's reading of the Act is correct and the State Department alone must find all factual predicates,

———————————————

Accordingly, even under the extraordinarily deferential view proposed by the DIA and accepted by the district court, the Act does not immunize the Painting.

this failure to determine the Van Gogh exhibit's profitability *forecloses granting immunity to the Painting*.  After all, to date, no one has pointed to any preexisting determination from anyone that the Van Gogh exhibition was "administered, operated, or sponsored, without profit."

As a matter of everyday museum administration, both the DIA and the State Department know how the statute is supposed to work.  The State Department makes the cultural-significance and national-interest determinations, and the court handles the rest.  The Court should follow this commonsense reading, not the one that the DIA crafted for the purposes of this litigation.

## IV.    THE ACT IS INTENDED TO PROMOTE CULTURAL EXCHANGE BY PROTECTING FOREIGN OWNERS' PROPERTY RIGHTS.

The district court and the DIA have spent much of this case contemplating the Immunity from Seizure Act's purpose and Congress's intent in enacting this statute. (R. 12, PageID.53-55 R. 15, PageID.145-146).  In support of the DIA's view that the Act prioritizes cultural exchange above all else—including judicial review—the museum has largely relied on a House Report from the Committee on the Judiciary ("H.R. Rep. No. 1070") (R. 12-3) and a secondhand anecdote about Senator Harry F. Byrd, Sr.'s reasons for supporting passage of the Act, retold to a law student in 1984 by the General Counsel for the now-defunct USIA, (R. 12, PageID.54-55; R. 12-5, PageID.83).

25

Relying on these sources, the district court concluded that Congress enacted the Act "to assist and encourage cultural exchange with other countries and their residents." (R. 15, PageID.143).  In response to Brokerarte's argument that the Act accomplishes this purpose by protecting a foreign art owner's property interest in loaned art, the court stated that "[t]he purpose of the Act is not to protect the owner of the object inasmuch as it is to encourage the exhibition in the United States of objects of cultural significance from abroad."  (*Id*., PageID.145).  The court further opined that "[t]he method chosen to achieve the Act's purpose is to provide the institution with the protection from seizure of such objects determined to be of cultural significance," and that "[r]equiring an institution to ultimately bear the burden of proof in court that a foreign lender had a legal right to loan an object before it can assert that the object is immune from seizure would be circuitous, would not further the Act's stated purpose and would likely result in a chilling effect on cultural exchanges." (*Id*., PageID.146).

Although the district court inferred certain purposes based on the Act's legislative history and its own perception of what would best promote international art exchange, this Court has made clear that Congress establishes a statute's purpose "by negotiating, crafting, and enacting statutory text," and "[i]t is that text that controls, not a court's after-the-fact reevaluation of the purposes behind it." *Arangure v. Whitaker*, 911 F.3d 333, 345 (6th Cir. 2018).

Here, one of the Act's requirements is that the object at issue is imported "pursuant to an agreement entered into [with] the foreign owner or custodian thereof."  22 U.S.C. § 2459(a).  The Court cannot ignore the words "foreign owner or custodian."  *Smith v. Babcock*, 19 F.3d 257, 263 (6th Cir. 1994) ("Interpretations which . . . render some portion of the text superfluous are to be avoided.").  By requiring that the "foreign owner or custodian" be involved in the loan, the Agreement Requirement shows that the Act is intended to protect foreign owners who lend cultural objects from seizure of those objects by non-owners.  In this way, the Act preserves the rightful owner's property rights in the object.  This preservation of ownership interest, in turn, encourages foreign owners to lend their property for the cultural benefit.  Put differently, the preservation of ownership is the means by which Congress intended to accomplish the Act's end of expanded cultural exchange. *See Keen*, 930 F.3d at 806 ("Every statute aims not only to achieve certain ends, but also to achieve them by particular means and vague notions of statutory purpose provide no warrant for expanding those chosen means.") (brackets and internal quotation marks omitted).

The Act's purpose of protecting foreign art owners is also borne out in practice.  The mine-run Immunity from Seizure case involves a domestic creditor seeking to satisfy a judgment against a foreign entity by seizing property that the entity loaned to an American institution.  *See, e.g., Agudas Chasidei Chabad of*

*United States v. Russian Federation*, 798 F. Supp. 2d 260, 270 (D.D.C. 2011) (determining whether plaintiff could execute a default judgment against the Russian Federation by seizing objects that would fall within the scope of the Immunity from Seizure Act); *Magness*, 84 F. Supp. 2d at 1360 (same). The plaintiffs in those cases attempt to create a new ownership interest in the cultural object, not enforce a preexisting interest.

Thus, the Act seeks to preserve the foreign owner's rights in cultural objects; it does not close the courthouse door to a foreign owner seeking to *recover* its property through judicial process, which is what is occurring here. This is why Congress included the textual requirement that the loan agreement be with the object's "foreign owner or custodian."

Even if the Court looks to the Act's legislative history, H.R. 1070 is perfectly consistent with Congress's decision to promote cultural exchange through preservation of property rights. H.R. 1070's description of the Act's purpose is "to provide a process to render immune from seizure under judicial process certain objects of cultural significance imported into the United States for temporary display or exhibition, and to provide machinery to achieve this objective." (R. 12-3, PageID.73). As shown by the enacted text, the "machinery" chosen was the protection of the foreign owners' property rights to encourage them to loan their artwork.

The Act's legislative history is also a good example of the adage that "[j]udicial investigation of legislative history has a tendency to become . . . an exercise in looking over a crowd and picking out your friends." *Exxon Mobil Corp. v. Allapattah Srvs., Inc.,* 545 U.S. 546, 568 (2005).  For example, when the Judiciary Committee favorably reported the Act to the whole House of Representatives in H.R. 1070, it relied on a letter submitted by Deputy Attorney General Ramsey Clark, who explained that the bill would "render immune from seizure under judicial process objects of art brought in the United States pursuant to an agreement between the U.S. Government (or a U.S. cultural or educational institution) and the *foreign owner* for temporary exhibition in the United States[.]"   (R. 12-3, PageID.74 (emphasis added)).  This again indicates that the bill was intended to protect foreign owners (in this case, Brokerarte).

The other evidence of legislative intent on which the DIA has relied to date is a decades-old law review note, in which a law student recounts Senator Harry Byrd's reason for supporting the Act—a recounting which is itself based on the then decades-old memory of Mr. John Lindberg, the former general counsel for the USIA. Rodney M. Zerbe, *Immunity from Seizure for Artworks on Loan to the United States Museums*, 6 Nw. J. In'l L. & Bus. 1121, 1124 n. 21 (1984-1985) (citing a "Telephone interview with John Lindberg, Esq., General Counsel of the U.S.I.A (Feb. 20, 1984)"); (R. 12-5, PageID.83).

According to this anecdote, Senator Byrd's "motivation for his staunch support of the bill was a pending exchange between a Soviet museum and the University of Richmond, through which the Virginia gallery sought to import several artworks that had been appropriated by the Soviet government from expatriots" and "as a condition to the loan, the Soviets insisted on a grant of immunity from seizure as protection against former Soviet citizens who had valid claims to the title of the works." *Id.* Based on this recollection from Mr. Lindberg, the note's author opines that "the enactment of the statute was stimulated in part by a desire to facilitate a pending exchange with the Soviet Union, despite the presence of valid claims to the title of the works," and that therefore "the statute can be seen to represent a legislative preference for the benefits of cultural exchange over the claims of United States citizens." *Id.*

Putting aside the reliability concerns apparent in a story that amounts to double hearsay, courts do not impute an individual member of Congress's motivations for supporting a bill to the whole of Congress, even when legislative history is a permissible consideration. *See Comm. On Ways & Means, U.S. House of Representatives, v. United States Dep't of the Treasury*, 45 F.4th 324, 333 (D.C. Cir. 2022) ("The courts do not probe the motives of individual legislators."); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 508 (1975) ("Our cases make clear that in determining the legitimacy of a congressional act we do not look to the

motives alleged to have prompted it.")   Accordingly, Senator Byrd's individual thoughts on why the Act should be passed, and how it would apply in a discrete instance, are irrelevant to the Court's current inquiry.

Finally, the district court's conclusion that the Act was intended to protect museums like the DIA is simply not accurate.  (R. 15, PageID.146) ("[T]he method chosen to achieve the Act's purpose is to provide the *institution* with the protection from seizure of such objects determined to be of cultural significance") (emphasis added).   The Act does not protect borrowing institutions, nor does it provide immunity from suit.  The Act would not, for example, bar a state law claim for monetary damages against a borrowing museum for civil conspiracy to transport stolen goods across state lines.  *See Admiral Ins. Co., v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 313 (1992) ("A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means."); 18 U.S.C. § 2314 (making it unlawful to transport stolen goods "in interstate or foreign commerce"). The Act merely immunizes certain *objects* when its requirements are met.  *See* 22 U.S.C. § 2459(a) (". . . no court of the United States . . . may issue or enforce any judicial process, or enter any judgment, decree, or order, for the purpose or having the effect of *depriving such institution* . . . of custody or control of such *object* . . .").

In this way, the Act protects cultural objects and their owners, not borrowing institutions.

## V. THE DISTRICT COURT DID NOT EXAMINE THE ACT'S APPLICATION NOR DID THE DIA ESTABLISH THAT THE ACT APPLIES.

When Congress immunizes actions from judicial review by statute, the party invoking the statute bears the burden to show its applicability. *See, e.g. O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009) (applying the Foreign Sovereign Immunity Act's burden-shifting framework, under which "[t]he party claiming FSIA immunity bears the initial burden of proof of establishing a prima facie case that it satisfies the FSIA's definition of a foreign state" and "retains the burden of persuasion throughout this process.").[6]  And because "a jurisdictional bar is not to be expanded beyond its precise language," *ANA Intern., Inc., v. Way*, 393 F.3d 886, 891 (9th Cir. 2004), the Court must require parties asserting the Immunity from Seizure Act to show that all nine statutory conditions are met before it cedes its jurisdiction, *see Freed*, 976 F.3d at 739 ("Of course, a federal court always has jurisdiction to determine its own jurisdiction."); *Mata*, 576 U.S. at 150 (["W]hen a

---

[6] If Brokerarte has a prima facie burden to establish jurisdiction, it has satisfied that burden by substantiating facts that show that the federal courts have jurisdiction to decide this case under 28 U.S.C. § 1332(a).  The parties are completely diverse and the amount in controversy exceeds $75,000.  (Ver. Compl., R. 1, PageID.2).

federal court has jurisdiction, it also has a virtually unflagging obligation to exercise that authority") (internal quotations and ellipses omitted).

The district court failed to find the existence of any of the Act's factual predicates, instead deferring to the State Department's non-existent determinations on these issues. (R. 15, PageID.146). As explained above, this was legal error, which requires reversal and remand for further proceedings. But in any event, the DIA failed to meet its burden under the Act in multiple respects. Most glaringly, it failed to show that the Painting was imported "pursuant to an agreement entered into between the foreign owner or custodian thereof and the United States or one or more cultural, educational, or religious institutions with the capacity to appropriately curate such object within the United States[.]" 22 U.S.C. 2459(a). Put simply, the Painting's "owner or custodian" must be on one side of the loan agreement for the Painting to be eligible for immunity. But to date, the DIA has not produced any agreement that purports to provide for the importation of the Painting, nor has it even identified who loaned it the Painting. This failure forecloses any examination of whether the Agreement Requirement is satisfied and therefore bars application of the Act.

Moreover, even if the DIA received the Painting from *someone*, that does not mean that the lender is the Painting's "foreign owner or custodian." As the Verified Complaint and Bill of Sale demonstrate, Brokerarte Capital Partners is the foreign

33

owner of the Painting. The DIA has never contested Brokerarte's ownership interest in the Painting, nor has it ever asserted that Brokerarte contracted with the DIA for the Painting's temporary exhibition (if it had, the DIA would have no reasonable basis to cite the Act, *see* 22 U.S.C. § 2459(c) (preserving jurisdiction for contract- based litigation between foreign owners and borrowing institutions)). So the only way for the Act to apply is if the DIA received the Painting from its "custodian."

The Act does not define the word "custodian," which means this Court gives that term "its ordinary meaning." *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 498 (6th Cir. 2022). A word's ordinary meaning is discerned "by reference to dictionaries in use at the time the statute was enacted." *Id*. A relevant Merriam-Webster dictionary defines "custodian" as "one that guards and protects or maintains; *esp: one entrusted with guarding and keeping property or records* or with custody or guardianship of prisoners or inmates." *Merriam-Webster's New Collegiate Dictionary* 205 (7th ed. 1971) (emphasis added). The definition's key word is "entrusted," which is defined as "to confer a trust upon; *esp: to deliver something in trust*" or "to deliver something in trust to." *Id*. at 277.

Read together, these definitions show that one is a "custodian" only to the extent that they possess property consistent with the owner's trust in them. Possession beyond the owner's authorization therefore strips them of the "custodian"

label; a thief is not a custodian of property, no more than a kidnapper is a child's custodian. Here, Brokerarte never granted possession of the Painting to any party for the purposes of lending out its property, so the Painting has no proper "custodian" under the Act.

In any event, the DIA has not disclosed any basis to conclude that the party it contracted with was the Painting's "custodian" under any definition of that word. This information is solely in the DIA's possession because the identity of the lender is not publicly available. The placard displayed next to the Painting stated only that it is on loan from a "Private Collection, Sao Paulo." (R. 1-2, PageID.10). Likewise, the DIA's "application for immunity from judicial seizure" noted only that the Painting was from a "Private Collection" in "Sao Paulo, Brazil." (R. 12-7, PageID.109). Of the 27 objects listed in the application, only one other work so vaguely describes its origin. (*Id.*, PageID.114) (describing *L'Arlesienne, Madame Ginoux* as being on loan from a "Private Collection" in "London, United Kingdom"). The others, without fail, identify their source. (*See, e.g.*, *Head of Peasant*, which comes from the "Royal Museum of Fine Works in Belgium", R. 12-7, PageID.109, or *Peach Trees in Blossom*, which comes from "The Samuel Courtauld Trust, the Courtauld Gallery," R. 12-7, PageID.114).

The closest that the DIA gets to satisfying the Agreement Requirement comes in the Declaration of Dr. Jill Shaw. (R. 12-2). There, Dr. Shaw asserts that the

Painting is "on loan to the DIA from a foreign lender." (R. 12-2, PageID.69). This testimony is circular: anything that is "on loan" is "from a lender." *See Black's Law Dictionary* 1085 (11th ed. 2019) (defining lender as "a person or entity from which something (esp. money) is borrowed"); *id.* at 1122 (defining "loan" as "an act of lending"). Accordingly, this assertion does nothing to establish that this anonymous lender can properly be considered the custodian of the Painting.

Absent the DIA's showing that the DIA is in possession of the Painting "pursuant to an agreement entered into [with] the foreign owner or custodian thereof," 22 U.S.C. § 2459(a), and that the other factual predicates are met, the Immunity from Seizure Act does not apply to the Painting.

## CONCLUSION

For these reasons, Brokerarte respectfully requests that this Court reverse the district court's judgment and remand for further proceedings.

Respectfully submitted,

VARNUM LLP
Attorneys for Defendants-Appellants

Date: February 21, 2023          By: */s/ Neil E. Youngdahl*
                                      Aaron M. Phelps (P64790)
                                      Neil Youngdahl (P82452)
                                 Business Address, Telephone, and E-mail:
                                      Bridgewater Place, P.O. Box 352
                                      Grand Rapids, MI 49501-0352
                                      (616) 336-6000
                                      amphelps@varnumlaw.com
                                      neyoungdahl@varnumlaw.com

36

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 9,253 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using 14-point type.


Date: February 21, 2023          By: */s/ Neil E. Youngdahl*
                                      Neil Youngdahl (P82452)
                                      neyoungdahl@varnumlaw.com

## **CERTIFICATE OF SERVICE**

I certify that on February 21, 2023, I electronically filed this document with the Clerk of the Court using the ECF system, which will send notification of the filing to all ECF filing participants.


Date: February 21, 2023                    By: */s/ Neil E. Youngdahl*
                                               Neil Youngdahl (P82452)
                                               neyoungdahl@varnumlaw.com

# ADDENDUM

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

The relevant documents to this appeal are part of the electronic record in the Eastern District of Michigan, Southern Division. To facilitate the Court's reference to the electronic record, said documents, as referred to herein above, are as follows:

| RECORD ENTRY # | DESCRIPTION OF DOCUMENT | PAGE ID # |
|---|---|---|
| 1 | Brokerarte's Verified Complaint | 1 - 6 |
| 1-1 | May 3, 2017 Bill of Sale between Torrealba Holdings Ltd. and Brokerarte | 7 - 9 |
| 1-2 | Picture of the Painting at the DIA, taken by Brokerarte's Counsel on January 5, 2023 | 10 |
| 2 | Brokerarte's Motion for Temporary Restraining Order and Possession Pending Final Judgment and Brief in Support Thereof | 11 - 20 |
| 5 | Order Pending Hearing | 33 - 34 |
| 12 | The DIA's Response In Opposition to Plaintiff's Motion for Temporary Restraining Order and Possession Pending Final Judgment | 48 - 65 |
| 12-2 | Declaration of Dr. Jill Shaw | 68 - 70 |
| 12-3 | H.R. Rep. No. 1070, 89th Cong., 1st Sess. 2. (1965) | 72 - 74 |
| 12-5 | Rodney M. Zerbe, *Immunity from Seizure for Artworks on Loan to the United States Museums*, 6 Nw. J. In'l L. & Bus. 1121, 1124 n. 21 (1984-1985) | 79 - 104 |
| 12-6 | May 12, 2022 Letter from the DIA's Registrar of Exhibitions Kimberly Dziurman to the Assistant Legal Advisor for Public Diplomacy and Public Affairs | 106 - 107 |
| 12-7 | Schedule of Works Lent from Abroad | 109 - 115 |
| 12-8 | Excerpt of Federal Register | 117 |

| 14 | Brokerarte's Reply Brief in Support of Motion for Temporary Restraining Order and Possession Pending Final Judgment | 126 - 133 |
|----|----|----|
| 15 | Opinion and Order Denying Plaintiff's Motion for Temporary Restraining Order and Possession Pending Final Judgment (ECF No. 2), Dissolving Order Pending Hearing (ECF No. 5) and Dismissing Case | 138 - 148 |
| 16 | Judgment | 149 - 150 |
| 17 | Notice of Appeal | 151 - 152 |
| 19 | Transcript of January 19, 2023 Hearing on Brokerarte's Motion for Temporary Restraining Order and Possession Pending Final Judgment | 154 - 175 |