CASE NUMBER: 23-1062

IN THE UNITED STATES COURT OF APPEALS FOR THE
SIXTH CIRCUIT

Brokerarte Capital Partners, LLC,
Plaintiff-Appellant,

v.

The Detroit Institute of Arts,
Defendant-Appellee,
and
United States of America,
Intervenor-Appellee.

ON APPEAL FROM THE EASTERN DISTRICT OF MICHIGAN,
Southern Division, Honorable George Caram Steeh,
Case No. 2:23-cv-10066

Brief *Amicus Curiae* of the Association of Art Museum Directors,
American Alliance of Museums, and Individual Art Museums in
Support of Defendant-Appellee

Stephen J. Knerly, Jr. (Ohio 0025280)
Dennis R. Rose (Ohio 0039416)
Katie L. Steiner (Ohio 0096933)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114
Phone:  (216) 621-0150
Facsimile:  (216) 241-2824

Elisé K. Yarnell (Ohio 0093996)
**HAHN LOESER & PARKS LLP**
65 E. State St., Suite 2500
Columbus, Ohio  43215
Phone:  (614) 221-0240
Fax:  (614) 221-5909

*Counsel for* Amici Curiae

14460953.6

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 6 Cir. R. 26.1, the *amici curiae* presenting this brief, whose identities are set forth more fully in Addendum I attached herein, state that none of them is a subsidiary or affiliate of a publicly owned corporation, and they are aware of no publicly owned corporation that is not a party to this appeal and has a financial interest in the outcome.

14460953.6

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iv

IDENTITY AND INTERESTS OF *AMICI* .......................................... 1

SUMMARY OF THE ARGUMENT .................................................... 2

FACTUAL BACKGROUND.................................................................. 4

    1.   Museums' educational and research missions are supported by temporary loan exhibitions. ...................................4

    2.   Mounting a temporary loan exhibition is a labor-intensive process..........................................................................5

    3.   Securing works from foreign lenders requires a loan agreement. .......................................................................6

    4.   Section 2459 immunity is essential to the process.......................6

    5.   The § 2459 immunity-application process is extensive. ..............8

ARGUMENT ....................................................................................... 10

I.     INTRODUCTION ...................................................................... 10

II.    SECTION 2459 DEPRIVES FEDERAL COURTS OF JURISDICTION OVER BROKERARTE'S LAWSUIT. ......................... 11

    A.   The State Department Has Conclusive Authority to Make All Necessary Factual Determinations and Discretion to Grant Immunity Under § 2459. .....................................................11

    B.   Section 2459 Does Not Protect the Interests of Individual Owners. ........................................................................17

III.   UNDERMINING § 2459 IMMUNITY HARMS U.S. MUSEUMS AND THE PUBLIC. ................................................................... 21

V.    CONCLUSION........................................................................... 22

CERTIFICATE OF COMPLIANCE ................................................... 24

CERTIFICATE OF SERVICE .............................................................. 25

ADDENDUM I ................................................................................... 26

ADDENDUM II ................................................................................. 38

ADDENDUM III................................................................................. 41

CERTIFICATE OF SERVICE ............................................................... 44

14460953.6

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Broad. Music, Inc. v. Roger Miller Music, Inc.,*
   396 F.3d 762 (6th Cir. 2005) ............................................................15

*Campbell v. Mueller,*
   159 F.2d 803 (6th Cir. 1947) ............................................................12

*City of Alexandria v. Helms,*
   728 F.2d 643 (4th Cir. 1984) ............................................................22

*Cooper Indus., Inc. v. E.P.A.,*
   775 F. Supp. 1027 (W.D. Mich. 1991) ............................................22

*Corley v. United States,*
   556 U.S. 303 (2009) ..........................................................................18

*Delocque-Fourcaud v. L.A. Cnty. Museum of Art,*
   No. 2:03-cv-05027-R-CT (C.D. Cal. 2003) ......................................20

*Deutsch v. Metro. Museum of Art,*
   No. 04 Civ. 8587 (S.D.N.Y. 2004) ...................................................20

*Griffin v. Oceanic Contractors, Inc.,*
   458 U.S. 564 (1982) ..........................................................................15

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ..........................................................................17

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ..........................................................................17

*Long v. Tennessee Valley Auth.,*
   No. 3:09-CV-114, 2009 WL 3784963 (E.D. Tenn. Nov. 9, 2009) ..................22

*Magness v. Russian Federation,*
   84 F. Supp. 2d 1357 (S.D. Ala. 2000) ........................................15, 16

iv

*Republic of Iraq v. Beaty*,
    556 U.S. 848 (2009)...................................................................14

*Romanov v. Fla. Int'l Museum*,
    No. 95-001285-CI-008 (Fla. Cir. Ct. Pinellas Cnty. 1995) ...........................20

*United States v. Curtiss–Wright Export Corp.*,
    299 U.S. 304 (1936)...................................................................14

*United States v. Portrait of Wally*,
    663 F. Supp. 2d 232 (S.D.N.Y. 2009) .................................................7

*United States v. Thomas*,
    320 F. Supp. 527 (D.D.C. 1970) .....................................................22

## Statutes and Rules

22 U.S.C. § 2459................................................................*passim*

Fed. R. App. P. 29(a)(4)(E)..........................................................2

Fed. R. Civ. P. 4(c) ..................................................................22

## Other Authorities

87 Fed. Reg. 42,258 (July 14, 2022) ..............................................13, 14

*Application Procedure and Checklist* (Revised April 2021), U.S.
    Dep't of State, https://www.state.gov/application-
    procedure-and-checklist-revised/..............................................8, 20

H.R. Rep. No. 89-1070 (1965) .....................................................19

Webster's New International Dictionary, Second Edition.............................12

Yin-Shuan Lue et al., *Countering a Legal Threat to Cultural
    Exchanges of Works of Art: The Malewicz Case and Proposed
    Remedies*, Hauser Ctr. for Nonprofit Orgs., Harv. U.,
    Working Paper No. 42, 24 (Dec. 2007), *available at*
    https://cpl.hks.harvard.edu/files/cpl/files/workingpaper_
    42.pdf?m=1440179710.........................................................9, 17

## IDENTITY AND INTERESTS OF *AMICI*

The Association of Art Museum Directors (the "AAMD") is a non-profit corporation founded in 1916 comprising over 210 directors of leading art museums in the United States, Canada, and Mexico.  The AAMD is joined in this brief by 72 of the most prominent art museums in the United States ("Museum *Amici*"), as well as the American Alliance of Museums, whose membership includes museums of all types, sizes, and foci ("AAM" and, together with the Museum *Amici* and the AAMD, collectively, "*Amici*").  Museum *Amici* have hundreds of years of combined experience in organizing and presenting international exhibitions from museums and other lenders around the world.  *Amici* have an interest in ensuring the proper construction and enforcement of the Mutual Educational and Cultural Exchange Program, 22 U.S.C. § 2459 ("Section 2459" or "§ 2459"), which is vital to exhibitions displayed by Museum *Amici* in the United States.

*Amici* submit this brief because § 2459 offers essential protections to U.S. museums that borrow works of art and culture ("works") from foreign lenders.  If those protections are weakened or eliminated by a reversal of the district court's dismissal for lack of jurisdiction, foreign lenders would be

reluctant to lend, compromising the ability of U.S. museums to mount culturally important exhibitions for the benefit of the public.

Pursuant to Fed. R. App. P. 29(a)(4)(E), *Amici* state that no party's counsel authored or funded this brief, in whole or in part, and no person other than *Amici*, their members, or their counsel funded this brief.

## SUMMARY OF THE ARGUMENT

Deciding to lend a culturally important work to a museum is an act of trust, particularly when the transaction is international. Foreign lenders to U.S. museums are often wary of a perceived American penchant for litigation and a confusing web of federal, state, and local court systems in a country not their own. In § 2459, Congress prioritized as a matter of policy the cultural benefit to the U.S. public of exhibiting works borrowed from foreign lenders over potential individual claims to those works. Since its passage, § 2459 has fostered the robust cultural exchange that Congress intended, and the works on exhibition from foreign lenders have not been subject to the jurisdiction of U.S. courts as a result of the State Department's determinations—until now.

Nothing in the text or history of § 2459 supports changing that approach. In this case, Plaintiff-Appellant Brokerarte Capital Partners, LLC

14460953.6

("Brokerarte") claims that the district court has jurisdiction to grant replevin of a work that has been granted § 2459 immunity, Vincent van Gogh's *The Novel Reader* (the "Painting"), under a theory that litigants can challenge, and courts have the authority to determine, the factual predicates for entitlement to immunity. Brokerarte's interpretation fails on both a textual and practical level: the State Department cannot make any determinations until it has evaluated the factual predicates, and the statutory language reflects that. Those factual determinations, resulting in the grant of immunity, are conclusive and preclude federal-court jurisdiction.

But even more significant for *Amici*, Brokerarte's interpretation would render a grant of § 2459 immunity meaningless. The statute's purpose is to assure borrowing museums[1] and lenders that a federal court will not interfere with the museum's ability to exhibit and then return the loaned property. To effectuate that purpose, § 2459 immunity must prohibit any court action that would deprive the borrowing institution (or any carrier) of its custody or control of the Painting—even the issuance initial process such

---

[1] Section 2459 also protects works in transit, including carriers along with museums, demonstrating Congress's intent that works should enter and leave the U.S. without interference.

as a summons or temporary injunction.  If Brokerarte's reading were accepted, a plaintiff could manufacture federal-court jurisdiction by merely claiming ownership.  Museums and lenders would be forced to litigate to defend their right to be immune from such lawsuits in the first place.  Such absurdity must be rejected, and the district court affirmed.

## FACTUAL BACKGROUND

Art museums typically maintain permanent collections for the benefit of the public.  Highly trained museum staff research, preserve, and interpret those works so that audiences can engage with them in person for years to come.  In addition to conserving and displaying a permanent collection, museums also regularly mount temporary exhibitions.  Temporary exhibitions often display a selection of works from the permanent collection together with objects loaned from other museums and private collections.

1. *Museums' educational and research missions are supported by temporary loan exhibitions.*

Temporary loan exhibitions enable museums to fulfill their educational missions.  Practically, they support museum operations by attracting visitors for a once-in-a-lifetime opportunity to view a specific selection of works.  Academically, temporary exhibitions advance

4

scholarship because they present an opportunity for exploration and discovery along innovative lines of inquiry—such discoveries are typically possible only by bringing together works that are normally housed in different and often distant locations. The Museum *Amici* are institutions on the cutting edge of museum scholarship and have global reputations for mounting exhibitions that break new ground on topics within art history and contemporary practice.

    *2. Mounting a temporary loan exhibition is a labor-intensive process.*

Organizing an international exhibition of fine art or other significant objects is often a yearslong and expensive endeavor for borrowing institutions and lenders alike. Lenders undertake significant activities that often include assessing the merits and feasibility of the initial loan request; reviewing the borrower's facility reports and insurance; preparing detailed loan conditions with specifications for handling, installation, environmental conditions (temperature, humidity, and lighting), security, and other requirements to minimize the risk of damage; contributing to an exhibition catalogue; de-installing the loaned works from the lenders' galleries or other locations; overseeing crating and packing; couriering works to and from the

14460953.6

borrowing institution; inspecting the condition of the loaned works before they leave and upon their return; and reinstalling the works.

### 3. *Securing works from foreign lenders requires a loan agreement.*

Borrowing a work for an exhibition usually requires a written loan agreement between the borrowing museum and the lender. The loan agreement typically requires the lender to provide a point of contact and the precise address where the borrowed work will be collected and returned. In a standard loan agreement, the lender represents that it has authority to enter into the agreement, and the museum agrees to return the work within a prescribed time after the exhibition ends. Other common terms address insurance arrangements, storage and display conditions, and copyright ownership. But as relevant here, loan agreements often require as a pre-condition for a loan that the borrowing museum obtain § 2459 immunity.

### 4. *Section 2459 immunity is essential to the process.*

Section 2459 immunity is a linchpin of the exhibition-organization process. Without it, objects critical to an exhibition's narrative would generally not be permitted to travel to the borrowing museum in the first place, nor would borrowing museums want the risk of lenders' works being subjected to the jurisdiction of the U.S. courts.

6

The most obvious effect of § 2459 immunity is its protection of foreign lenders' contractual right to have their works returned at the end of the exhibition. Separated not just by distance but also by geopolitical differences, foreign lenders depend on the assurances provided by § 2459 immunity. Without the assurance that the loaned works will be returned without interference from the U.S. court system, lenders have little incentive to take the risk of participating in the exhibition project.

At the same time, § 2459 immunity also protects borrowing museums. When museums borrow works, they undertake contractual duties under the loan agreement to return those works to their foreign lenders. Immunity provides borrowing museums with the security of knowing that litigation will not interfere with their ability to comply with their contracts. In the absence of such immunity, museums could find themselves tied up in costly, lengthy litigation, forcing them to divert limited resources to efforts that do not advance the museum's central mission.[2]

---

[2] The threat of such an outcome is very real. One need only look to the *Portrait of Wally* case, where a work loaned to the Museum of Modern Art by an Austrian lender that did not receive immunity under § 2459 was seized by the Federal government and MoMA had to litigate for years because it had a contractual obligation to return the work. *United States v. Portrait of Wally*, 663 F. Supp. 2d 232 (S.D.N.Y. 2009).

*5. The § 2459 immunity-application process is extensive.*

To obtain § 2459 immunity, museums must follow the application process outlined on the State Department's website.[3]  The application materials include a checklist of the works for which the museum seeks immunity; the dates of the exhibition and expected import and export of the relevant works; a statement outlining the cultural significance of the loans for which immunity is sought; and background information establishing that the museum is equipped to care for and present the borrowed works responsibly.  In addition, borrowing museums must certify that (i) the importation of each object on the application checklist is subject to a loan agreement, and (ii) the museum has undertaken professional inquiry — including independent, multi-source research — into the provenance of each object, and that it does not know or have reason to know of an ownership dispute with respect to those objects, except as otherwise disclosed.

The State Department recommends that museums submit § 2459 immunity-application materials at least 10 weeks before the loans' expected

---

[3] *Application Procedure and Checklist (Revised April 2021)*, U.S. Dep't of State, https://www.state.gov/application-procedure-and-checklist-revised/ (last visited Mar. 13, 2023).

date of import.  If the State Department determines that a grant of immunity is merited, then the State Department must publish a notice to that effect in the Federal Register.  (Application denials are not published and statistics on the rate of acceptances and denials are not available.)  Immunity attaches to a work after the publication of the notice—if, for example, a loan is imported to the U.S. before the notice appears, then the work is not entitled to immunity.

The use of § 2459 immunity has increased dramatically over the years. In the program's earlier years, from 1981 through 1999, the State Department published approximately 428 immunity notices in the Federal Register.[4] From 2000 to the present, program participation has increased, with nearly 2,200 immunity notices published according to the *Amici*'s review of the Federal Register.  Because each of these notices can include multiple objects, the works involved number in the many thousands.  Without the protection

---

[4] Yin-Shuan Lue et al., *Countering a Legal Threat to Cultural Exchanges of Works of Art:  The Malewicz Case and Proposed Remedies*, Hauser Ctr. for Nonprofit Orgs., Harv. U., Working Paper No. 42, 24 (Dec. 2007), *available at* https://cpl.hks.harvard.edu/files/cpl/files/workingpaper_42.pdf?m=144 0179710.

offered by § 2459, most members of the public would likely never experience these superb works in the United States.

DIA's "Van Gogh in America" exhibition, to which the Painting was lent, provides a prime example of the exposure to great works that § 2459 fosters.  That exhibition included 27 loans from 18 foreign lenders.  [Resp. in Opp'n to Pl.'s Mot. for TRO, Ex. F, RE 12-7, Page ID # 109–115.]   In the absence of the exhibition and the assurances that § 2459 provides to foreign lenders, a museum-goer would have had to visit 16 foreign, public collections in seven different countries to see the same works in person—an insurmountable feat for most people—and the public is unlikely to ever have viewed the two works from private collections.  [*See id.*]   Major loan exhibitions like DIA's offer the only practical opportunity for someone to experience in person the works lent from private, foreign lenders.

## ARGUMENT

## I.     INTRODUCTION

The text of § 2459 has served Congress's purpose for nearly 60 years.  It grants discretion to the President's designee to make factual determinations and issue a notice granting immunity from any form of judicial process.  The district court correctly applied § 2459 and dismissed

14460953.6

Brokerarte's lawsuit for lack of jurisdiction, because Brokerarte seeks exactly what § 2459 prohibits.  This Court should also reject Brokerarte's distorted, empty version of § 2459 and affirm.

## II.    SECTION 2459 DEPRIVES FEDERAL COURTS OF JURISDICTION OVER BROKERARTE'S LAWSUIT.

### A.    The State Department Has Conclusive Authority to Make All Necessary Factual Determinations and Discretion to Grant Immunity Under § 2459.

In enacting § 2459, Congress granted the President and his designee—in recent years, the State Department—authority to determine certain threshold requirements and grant immunity status to a qualifying loaned work.  When the State Department determines that a work meeting those threshold criteria "is of cultural significance" and that the display or study is in the national interest, and publishes a notice of that determination in the Federal Register, no United States court "may issue or enforce any judicial process" affecting the borrowing institution's "custody or control of such object":

> Whenever any work of art or other object of cultural significance is imported into the United States from any foreign country, pursuant to an agreement entered into between the foreign owner or custodian thereof and [a cultural institution] . . . for temporary . . . exhibition . . . , no court of the United States . . . may . . . depriv[e] such institution, or any carrier engaged in transporting such work or object within the United States, of

11

custody or control of **such object** if before the importation of such object the President or his designee has determined that such object is of cultural significance and . . . in the national interest [to exhibit], and a notice to that effect has been published in the Federal Register."

Section 2459(a) (emphasis added). The key to the statute is the State Department's determination—a matter of discretion, as there is no statutory or regulatory obligation to grant immunity even where all requirements are met.

The subject of the State Department's determination is summarized in the phrase "such object." Grammatically, the word "such" modifies the noun that follows it—in this case, "object." "Such" refers to the qualities of the object previously described in § 2459, *i.e.*, one that has been imported from a foreign country pursuant to a loan agreement for temporary exhibition at a U.S. museum. *See, e.g.*, *Campbell v. Mueller*, 159 F.2d 803, 806 (6th Cir. 1947) (quoting the definition of "such" in Webster's New International Dictionary, Second Edition: "Of this or that kind, character or measure; of the sort or degree previously indicated or contextually implied").

For the State Department to determine that "such object" has cultural significance and national interest, it must first determine that the factual predicates—*i.e.*, foreign lender, loan agreement, and museum exhibition—

12

will be satisfied.  Only in light of these factual findings are the determinations of cultural significance and national interest ripe to make.  The notice granting immunity must be published prior to the work's importation into the United States in order to be effective.  Based on this chronology, when Congress gave the State Department authority to grant immunity, it necessarily delegated the evaluation of § 2459's factual predicates as well.

The State Department does in fact evaluate and determine those factual predicates; Brokerarte's suggestion to the contrary is belied by the immunity-application instructions and the Federal Register notice the Department issues.  The § 2459 immunity-application instructions require applicants to certify that each object will be imported from a foreign country, that it is the subject of a loan agreement with the foreign lender, and that the purpose is for temporary exhibition.  And in the notice granting immunity to the Painting, the State Department "determine[d]" that it was an object "being imported from abroad pursuant to [an] agreement[] with [its] foreign owner[] or custodian[] for temporary display . . . at the Detroit Institute of Arts."  87 Fed. Reg. 42,258 (July 14, 2022).  Those determinations came *before* the State Department concluded that the Painting's loan was culturally

significant and in the national interest.  *Id.*  Those threshold factual determinations are therefore logically the State Department's to make.

All of the State Department's determinations — the threshold facts and the ultimate decision to grant immunity — are entrusted to the sole discretion of the executive, as neither § 2459 nor any other statutory or regulatory authority requires the State Department to grant immunity.  That broad discretion is consistent with executive discretionary authority in other areas of foreign affairs.  *See, e.g.*, *Republic of Iraq v. Beaty*, 556 U.S. 848, 856–67 (2009) (citing *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 322–324 (1936)) (recognizing that the President's ability to suspend valid law "is well established, at least in the sphere of foreign affairs," and holding that where the President had granted a foreign country immunity from certain claims under a particular statute, federal courts lacked jurisdiction to hear those claims).

The immunity that the executive grants as a matter of discretion renders improper any judicial inquiry into its factual predicates.  Once the State Department publishes a Notice of Determinations in the Federal Register, "no court of the United States . . . may issue or enforce any judicial process . . . for the purpose or having the effect of depriving" a United States

14

borrowing museum of "custody or control" of that work.  If courts could review the State Department's determinations, then § 2459's protections would be rendered meaningless.  Just as Brokerarte did here, any litigant seeking judicial review would logically need to restrain the borrowing museum from returning the work to the foreign lender during the pendency of the litigation.  But even that temporary exercise of jurisdiction deprives the museum of control over the work, namely, the control required to return the work to the lender, in direct contravention of § 2459.  To adopt Brokerarte's reading of § 2459 would contradict Congress's very purpose in passing § 2459 and conflict with the fundamental interpretive principle that a statute should be given a meaning that does not produce absurd results. *See, e.g.*, *Broad. Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 773 (6th Cir. 2005) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

At least one other federal court has found that the State Department's predicate factual determinations are final and dispositive, and, therefore, not subject to judicial review.  In *Magness v. Russian Federation*, 84 F. Supp. 2d

15

1357, 1358–60 (S.D. Ala. 2000), plaintiffs sought to execute a money judgment issued by a federal Texas court against works loaned by a foreign state to an Alabama exhibition, even though the loans received § 2459 immunity. Plaintiffs cited a finding in the underlying case that the Alabama exhibition was undertaken "for profit," contrary to the requirement of § 2459.[5] *Id.* at 1360. But the Southern District of Alabama disagreed: Because the determination of the President's designee was entitled to deference, the court refused "to go behind [the Executive's] determination and, thus, put in jeopardy the Exhibition which was originally brought into this country in reliance on [it]." *Id.* *Magness* illustrates that § 2459's protections apply even in the face of contrary judicial fact-finding.[6] *Id.*

In short, in light of Congress's delegation of authority in § 2459, courts have no role in reviewing the State Department's determinations or its evaluation of the factual predicates for those determinations. Judicial review

---

[5] One of § 2459's threshold factual requirements is that a museum borrower must exhibit a loan for non-profit purposes. *See* § 2459(a).

[6] Brokerarte remarked in its Brief that, prior to the district court's decision in this case, "no court had ever adopted *Magness*'s view that courts owe total and complete deference to the State Department" under § 2459. [Appellant's Brief, Doc. 25 at 18.] But by the same token, *Amici* are not aware of any post-*Magness* court that has taken issue with *Magness*.

16

of the State Department's determinations would run afoul, not just of the text and the purpose of § 2459, but also principles of administrative law. Where the statute has "'committed' the decisionmaking to the agency's judgment absolutely[,]" the agency's decision-making is not subject to judicial review. *See Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). *Amici* therefore urge the Court to affirm the district court's dismissal of this case for lack of jurisdiction.

### B. Section 2459 Does Not Protect the Interests of Individual Owners.

Although the text of § 2459 is clear, Brokerarte tries to cast doubt on that interpretation by suggesting that the purpose of the statute is to protect individual owners. There is no support in the statute or the case law for such an assertion. To the contrary, in passing § 2459, Congress made a policy decision to promote the public's direct exposure to great works over the potential rights of individual claimants.[7]

---

[7] Congress is not alone in its policy determination. Many foreign countries—including France, Germany, Switzerland, Austria, Ireland, Israel, the United Kingdom, and five Canadian provinces—have passed legislation protecting works loaned by foreigners for exhibition in those countries. Lue et al., *Countering a Legal Threat*, *supra* n.4, at 15–20 (citing statutes).

17

Congress's policy decisions are reflected in § 2459's plain language. The immunity it provides a work prohibits "any judicial process . . . for the purpose or having the effect of depriving *[the borrower] institution*" of its custody or control of the work. Section 2459(a) (emphasis added). If the goal were protecting an alleged owner or custodian of the loaned work, then § 2459 would read that no court may deprive the *lender* of its right to regain possession of the work. The borrower institution is the entity giving the public the opportunity to view the work, hence making it the proper subject of protection. To the extent that the statute protects another party in the loan process, it is the lender, not the alleged owner.

Brokerarte's argument that § 2459 is intended to protect the foreign owner's property rights [Appellant's Brief, Doc. 25 at 27] suffers from at least two flaws, one statutory and the other practical. First, § 2459 applies to loans from a "foreign owner *or custodian*," meaning that the lender may be someone with possession, whether legal or otherwise, other than the owner. A contrary interpretation would conflict with the surplusage canon of statutory construction. *See, e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009) (describing as "one of the most basic interpretive canons" the principle that "'[a] statute should be construed so that effect is given to all

18

its provisions, so that no part will be inoperative or superfluous, void or insignificant'") (internal citation omitted).  Second, a U.S. museum is hardly in a position to prove the foreign lender's ownership or legal possession of a loaned work.  Imposing a higher burden on the borrowing museums is more than unfair; it would frustrate the exchange of works, thereby undermining the very purpose of § 2459.

As Congress indicated in enacting § 2459, its passage "is to encourage the exhibition in the United States of objects of cultural significance which . . . would not be made available" in the absence of the assurances contained in the legislation.  H.R. Rep. No. 89-1070, at 1 (1965).[8]  These comments communicate that the lender is the party requiring the assurances.  Nothing is said about ensuring the lender is a lawful owner, especially given that, as noted above, the lender may be merely a custodian.

Since the statute's passage, Congress's policy decision to promote the interests of the museum-going public over the rights of individual owners is

---

[8] Although Brokerarte asserts that § 2459 is not ambiguous and, therefore, analysis of legislative history is inappropriate [Appellant's Brief, Doc. 25 at 15], Brokerarte cites to this House of Representatives report in its Brief, suggesting that such legislative history does, indeed, illuminate § 2459's meaning.

also reflected in the State Department's immunity-application instructions.[9] The instructions require applicants to disclose knowledge of possible competing ownership claims. But even if competing claims are present, no statutory or regulatory authority requires the State Department to withhold a grant of immunity.[10]

Section 2459 was designed to—and does—prohibit this very type of lawsuit, namely a property dispute between Brokerarte and the Painting's foreign lender. Because the necessary determinations were made pursuant to § 2459 with respect to the Painting, the district court had no power to hear Brokerarte's claim. Neither does this Court.

---

[9] *Application Procedure*, *supra* n. 3.

[10] In fact, there have been four previous attempts to claim works on loan protected by § 2459, only one of which involved a creditor. Like this case, the others involved claimants alleging they had an ownership interest; two were dismissed under § 2459, and one was voluntarily dismissed after the Department of Justice intervened. *See* First Am. Compl., Mot. to Dismiss, & Notice of Voluntary Dismissal, *Delocque-Fourcaud v. L.A. Cnty. Museum of Art*, No. 2:03-cv-05027-R-CT (C.D. Cal. 2003) (Add. II at 1, 18, & 45); First Am. Compl. & Judgment, *Deutsch v. Metro. Museum of Art*, No. 04 Civ. 8587 (S.D.N.Y. 2004) (Add. II at 52 & 94); Compl. for Return of Faberge Easter Egg & Final Order of Dismissal, *Romanov v. Fla. Int'l Museum*, No. 95-001285-CI-008 (Fla. Cir. Ct. Pinellas Cnty. 1995) (Add. II at 97 & 132).

### III. UNDERMINING § 2459 IMMUNITY HARMS U.S. MUSEUMS AND THE PUBLIC.

For decades, U.S. museums mounting international exhibitions have depended on the assurances that § 2459 provides international lenders that their works will be returned following the exhibition.  Section 2459 incentivizes lenders to engage in the loan and exhibition-planning process because the resulting immunity reassures the lender that its considerable investment of time and resources will not result in the confiscation of the work.  Without the assurances by § 2459, a U.S. museum's ability to mount major exhibitions will be severely curtailed—and the public's cultural enrichment will suffer.

A decision requiring the district court to hear Brokerarte's lawsuit would have much the same effect as repealing the statute altogether.  Eschewing the statutory prohibition on "judicial process . . . for the purpose or having the effect of depriving" the borrowing museum of control of the work would communicate to the world that § 2459 immunity means nothing once someone claims to be entitled to the work or disputes another factual predicate of immunity.  To say that would erode foreign lenders' confidence in § 2459 going forward would be an understatement.  If foreign lenders

21

cannot trust that the statute means what it says—that a loaned object granted § 2459 immunity will, indeed, be immune from judicial process[11] in the United States—then they will likely refuse to support U.S. museums' exhibition projects.  The entire U.S.-museum community, with its reputation for mounting groundbreaking loan exhibitions, will suffer and Congress's purpose of encouraging cultural opportunities for the museum-going public will go unfulfilled.

## IV.    CONCLUSION.

*Amici* urge the Court to dissolve the injunction and dismiss Brokerarte's appeal for lack of jurisdiction.   Because § 2459 expressly prohibits any form of judicial process that deprives DIA of its custody and

---

[11] Indeed, even the district court's summons—a form of "judicial process"—violated § 2459.  *See* Fed. R. Civ. P. 4(c); *United States v. Thomas*, 320 F. Supp. 527, 530 (D.D.C. 1970).  More concerning, an injunction should not issue until the issuing court has determined whether it has jurisdiction to act in the first instance.  *E.g.*, *Long v. Tennessee Valley Auth.*, No. 3:09-CV-114, 2009 WL 3784963 (E.D. Tenn. Nov. 9, 2009) ("The Court may not grant a preliminary injunction if it lacks jurisdiction over the claim before it.  *See Cooper Indus., Inc. v. E.P.A.*, 775 F. Supp. 1027, 1036 (W.D. Mich. 1991); *City of Alexandria v. Helms*, 728 F.2d 643, 645–46 (4th Cir. 1984).  Therefore, the Court must decide the jurisdictional question before evaluating plaintiffs' request for preliminary injunctive relief, as the latter issue is moot if this Court is without jurisdiction.").

control of the Painting, the Court cannot grant Brokerarte's request for relief and must therefore dismiss the case.

Respectfully submitted,

    */s/ Dennis R. Rose*
Stephen J. Knerly, Jr. (Ohio 0025280)
Dennis R. Rose (Ohio 0039416)
Katie L. Steiner (Ohio 0096933)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114
Phone:  (216) 621-0150
Facsimile:  (216) 241-2824
Email:  sjknerly@hahnlaw.com
            drrose@hahnlaw.com
            ksteiner@hahnlaw.com

Elisé K. Yarnell (Ohio 0093996)
**HAHN LOESER & PARKS LLP**
65 E. State St., Suite 2500
Columbus, Ohio  43215
Phone:  (614) 221-0240
Fax:  (614) 221-5909
E-mail:  eyarnell@hahnlaw.com
*Counsel for* Amici Curiae

14460953.6

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 4,677 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(ii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(g)(1) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 Version 2109 in 14-point Book Antiqua.

Dated: March 14, 2023

Respectfully submitted,

*/s/ Dennis R. Rose*

*Counsel for* Amici Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system, which will cause a copy of said document to be electronically transmitted to all counsel of record.

*/s/ Dennis R. Rose*
*Counsel for* Amici Curiae

14460953.6

## ADDENDUM I

Pursuant to Fed. R. App. P. 26.1 and 6 Cir. R. 26.1, the *amici curiae* presenting this brief state as follows:

The Association of Art Museum Directors ("AAMD") is a non-profit corporation organized under the laws of the District of Columbia. The AAMD's general nature and purpose is to support its members, consisting of more than 210 directors of art museums located throughout the United States, Canada, and Mexico, in the contribution of art museums to society.

The American Alliance of Museums ("AAM") is a non-profit corporation organized under the laws of the District of Columbia. The AAM's general nature and purpose is to support its members, consisting of over 35,000 museums and museum professionals, and enhance their contributions to their communities through leadership, advocacy, resources, and services.

The 72 *amici* other than the AAMD and AAM are all non-profit organizations or governmental entities operating as, *inter alia*, museums of art (the "Museum *Amici*"). None of the Museum *Amici* have shareholders, and no parent company, subsidiary, or affiliate of any of the Museum *Amici*

14460953.6

has issued shares to the public.  Specific information for each of the Museum *Amici* follows:

a) The Allen Memorial Art Museum is part of Oberlin College, a non-profit corporation organized under the laws of the State of Ohio.

b) The Amon Carter Museum of Western Art is a non-profit corporation organized under the laws of the State of Texas, d/b/a The Amon Carter Museum of American Art.

c) The Art Institute of Chicago is a not-for-profit corporation organized under the laws of the State of Illinois.

d) The Asian Art Museum of San Francisco is a public/private partnership existing as a Charitable Trust Department of the City and County of San Francisco, with an exhibitions program operated by the Asian Art Museum Foundation of San Francisco, a non-profit corporation organized under the laws of the State of California.

e) The Birmingham Museum of Art is a department of the City of Birmingham in the State of Alabama.

27

f)   The Boca Raton Museum of Art, Inc. is a not-for-profit corporation organized under the laws of the State of Florida.

g)   The Buffalo Fine Arts Academy is a non-profit corporation organized under the laws of the State of New York, d/b/a the Buffalo AKG Art Museum.

h)   The Chrysler Museum, Incorporated is a nonstock corporation organized under the laws of the Commonwealth of Virginia.

i)   The Cincinnati Museum Association is a non-profit corporation organized under the laws of the State of Ohio, d/b/a The Cincinnati Art Museum.

j)   The Cleveland Museum of Art is a non-profit corporation organized under the laws of the State of Ohio.

k)   The Columbus Museum of Art is a non-profit corporation organized under the laws of the State of Ohio.

l)   The Columbus Museum, Inc. is a non-profit corporation organized under the laws of the State of Georgia.

m)   The Contemporary Art Museum St. Louis is a non-profit corporation organized under the laws of the State of Missouri.

n)    The Corning Museum of Glass is a non-profit corporation organized under the laws of the State of New York.

o)    The Cranbrook Art Museum is part of the Cranbrook Educational Community, a non-profit corporation organized under the laws of the State of Michigan.

p)    The Crocker Art Museum Association ("CAMA") is a non-profit corporation organized under the laws of the State of California. CAMA and the City of Sacramento are Co-Trustees of the Crocker Art Museum, a public/private partnership.

q)    The Crystal Bridges Museum of American Art, Inc. is a non-profit corporation organized under the laws of the State of Delaware.

r)    The Currier Museum of Art is organized as a charitable trust under the laws of the State of New Hampshire.

s)    The Dallas Museum of Art is a non-profit corporation organized under the laws of the State of Texas.

t)    The Dayton Art Institute is a non-profit corporation organized under the laws of the State of Ohio.

14460953.6

u)    The Denver Art Museum is a non-profit corporation organized under the laws of the State of Colorado.

v)    The Dixon Gallery and Gardens is a public-benefit corporation organized under the laws of the State of Tennessee.

w)    The Edmundson Art Foundation, Inc. is a non-profit corporation organized under the laws of the State of Iowa, d/b/a The Des Moines Art Center.

x)    The Eli and Edythe Broad Art Museum is part of Michigan State University, a non-profit corporation organized under the laws of the State of Michigan.

y)    The Fine Arts Museums of San Francisco are a Charitable Trust Department of the City and County of San Francisco operated by the Corporation of the Fine Arts Museums, a non-profit corporation organized under the laws of the State California.

z)    The Flint Institute of Arts is a non-profit corporation organized under the laws of the State of Michigan.

aa)    The Frances Young Tang Teaching Museum and Art Gallery is part of Skidmore College, a non-profit corporation organized under the laws of the State of New York.

bb)  The Frick Collection is a non-profit corporation organized under the laws of the State of New York.

cc)  The Frist Art Museum is a public-benefit corporation organized under the laws of the State of Tennessee.

dd)  The George Eastman Museum is a non-profit corporation organized under the laws of the State of New York.

ee)  The Georgia O'Keeffe Museum is a non-profit corporation organized under the laws of the State of New Mexico.

ff)  The Grand Rapids Art Museum is a non-profit corporation organized under the laws of the State of Michigan.

gg)  The High Museum of Art is a division of the Robert W. Woodruff Arts Center, Inc., a non-profit corporation organized under the laws of the State of Georgia.

hh)  The Hillwood Estate, Museum & Gardens is a non-profit corporation organized under the laws of the District of Columbia.

ii)  The Honolulu Museum of Art is a non-profit corporation organized under the laws of the State of Hawaii.

jj)    The Isabella Stewart Gardner Museum, Incorporated is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts.

kk)    The J. Paul Getty Trust is a charitable trust organized under the laws of California that operates, among other programs, the J. Paul Getty Museum.

ll)    The John and Mable Ringling Museum of Art Foundation, Incorporated is a not-for-profit corporation organized under the laws of the State of Florida and is a program of Florida State University.

mm)    The Kalamazoo Institute of Arts is a non-profit corporation organized under the laws of the State of Michigan.

nn)    The Kimbell Art Museum is owned and operated by The Kimbell Art Foundation, a non-profit corporation organized under the laws of the State of Texas.

oo)    The Metropolitan Museum of Art is a non-profit corporation organized under the laws of the State of New York.

32

pp)  The Minneapolis Society of Fine Arts is a non-profit corporation organized under the laws of the State of Minnesota, d/b/a The Minneapolis Institute of Art.

qq)  The Mint Museum of Art is a non-profit corporation organized under the laws of the State of North Carolina.

rr)  The Munson-Williams-Proctor Arts Institute is a non-profit corporation organized under the laws of the State of New York.

ss)  The Museum Associates is a non-profit corporation organized under the laws of the State of California, d/b/a The Los Angeles County Museum of Art.

tt)  The Museum of Contemporary Art, Cleveland is a non-profit corporation organized under the laws of the State of Ohio.

uu)  The Museum of Fine Arts, Boston is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts.

vv)  The Museum of Fine Arts, Houston is a non-profit corporation organized under the laws of the State of Texas.

ww)  The Museum of Latin American Art is a non-profit corporation organized under the laws of the State of California.

14460953.6

xx) The Museum of Modern Art is a non-profit corporation organized under the laws of the State of New York.

yy) The National Museum of Women in the Arts is a non-profit corporation organized under the laws of the District of Columbia.

zz) The Nelson Gallery Foundation is a non-profit trust organized under the laws of the State of Missouri, d/b/a The Nelson-Atkins Museum of Art.

aaa) The Newark Museum Association is a non-profit corporation organized under the laws of the State of New Jersey, d/b/a The Newark Museum of Art.

bbb) The Norman Rockwell Museum at Stockbridge, Inc. is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts, d/b/a The Norman Rockwell Museum.

ccc) The Oakland Museum of California is a non-profit corporation organized under the laws of the State of California.

ddd) The Palm Springs Art Museum, Inc. is a non-profit corporation organized under the laws of the State of California.

34

eee)  The Peabody Essex Museum, Inc. is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts.

fff)  The Philbrook Museum of Art is a not-for-profit corporation organized under the laws of the State of Oklahoma.

ggg)  The Phillips Collection is a non-profit corporation organized under the laws of the District of Columbia.

hhh)  The Portland Art Museum is a non-profit corporation organized under the laws of the State of Oregon.

iii)  The Salvador Dalí Museum, Inc. is a not-for-profit corporation organized under the laws of the State of Florida.

jjj)  The San Antonio Museum of Art is a non-profit corporation organized under the laws of the State of Texas.

kkk)  The San Francisco Museum of Modern Art is a non-profit corporation organized under the laws of the State of California.

lll)  The Seattle Art Museum is a non-profit corporation organized under the laws of the State of Washington.

mmm)  The Shelburne Museum, Incorporated is a non-profit corporation organized under the laws of the State of Vermont.

nnn) The Solomon R. Guggenheim Foundation was chartered by the New York State Board of Regents and incorporated in the State of New York as an education corporation.

ooo) The Sterling and Francine Clark Art Institute is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts.

ppp) The Tampa Museum of Art, Inc. is a not-for-profit corporation organized under the laws of the State of Florida.

qqq) The Telfair Museum of Art, Inc. is a non-profit corporation organized under the laws of the State of Georgia.

rrr) The Toledo Art Museum is a non-profit corporation organized under the laws of the State of Ohio.

sss) The Virginia Museum of Fine Arts is an agency of the Commonwealth of Virginia and part of the Education Secretariat.

ttt) The Whitney Museum of American Art is a non-profit education corporation organized under the laws of the State of New York.

36

Dated:  March 14, 2023

Respectfully submitted,

_/s/ Dennis R. Rose_____
*Counsel for* Amici Curiae

37

## ADDENDUM II

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

---

**Brokerarte Capital Partners, LLC,**
**Plaintiff-Appellant,**

**v.**

**The Detroit Institute of Arts,**
**Defendant-Appellee,**
and
**United States of America,**
**Intervenor-Appellee.**

---

## ON APPEAL FROM THE EASTERN DISTRICT OF MICHIGAN, Southern Division, Honorable George Caram Steeh, Case No. 2:23-cv-10066

---

**ADDENDUM to Brief *Amicus Curiae* of the Association of Art Museum Directors, American Alliance of Museums, and Individual Art Museums in Support of Defendant-Appellee**

---

Stephen J. Knerly, Jr. (Ohio 0025280)
Dennis R. Rose (Ohio 0039416)
Katie L. Steiner (Ohio 0096933)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114
Phone:  (216) 621-0150
Facsimile:  (216) 241-2824

Elisé K. Yarnell (Ohio 0093996)
**HAHN LOESER & PARKS LLP**
65 E. State St., Suite 2500
Columbus, Ohio  43215
Phone:  (614) 221-0240
Fax:  (614) 221-5909

*Counsel for* Amici Curiae

14460953.6

# TABLE OF CONTENTS

| Description | Pages |
|---|---|
| *Delocque-Fourcaud vs. L.A. Cnty. Museum of Art*, No. 2:03-cv-05027-R-CT (C.D. Cal. 2003)<br><br>First Amended Complaint | A1-17 |
| *Delocque-Fourcaud*<br><br>Motion to Dismiss First Amended Complaint | A18-44 |
| *Delocque-Fourcaud*<br><br>Notice of Voluntary Dismissal | A45-51 |
| *Deutsch vs. Metro. Museum of Art*, No. 04 Civ. 8587 (S.D.N.Y. 2004)<br><br>First Amended Complaint | A52-93 |
| *Deutsch*<br><br>Judgment | A94-96 |
| *Romanov vs. Fla. Int'l Museum*, No. 95-001285-CI-008 (Fla. Cir. Ct. Pinellas Cnty. 1995)<br><br>Complaint | A97-131 |
| *Romanov*<br><br>Final Order of Dismissal | A132-138 |

Respectfully submitted,

     */s/ Dennis R. Rose*

Stephen J. Knerly, Jr. (Ohio 0025280)
Dennis R. Rose (Ohio 0039416)

Katie L. Steiner (Ohio 0096933)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114
Phone:  (216) 621-0150
Facsimile:  (216) 241-2824
Email:  sjknerly@hahnlaw.com
           drrose@hahnlaw.com
           ksteiner@hahnlaw.com

Elisé K. Yarnell (Ohio 0093996)
**HAHN LOESER & PARKS LLP**
65 E. State St., Suite 2500
Columbus, Ohio  43215
Phone:  (614) 221-0240
Fax:  (614) 221-5909
E-mail:  eyarnell@hahnlaw.com

*Counsel for* Amici Curiae

40

1  Edward E. Klein [Pro Hac Vice App. Pending]
   Joseph P. Garland [Pro Hac Vice App. Pending]
2  KLEIN & SOLOMON, LLP
   275 Madison Avenue, 11th Floor
3  New York, New York 10016
   Telephone: (212) 661-9400
4  Facsimile: (212) 661-6606

5  E. Randol Schoenberg (SBN 155281)
   Donald S. Burris (SBN 68523)
6  Tara A. Davidoff (SBN 192845)
   BURRIS & SCHOENBERG, LLP
7  12121 Wilshire Boulevard, Suite 800
   Los Angeles, California 90025
8  Telephone: (310) 442-5559
   Facsimile: (310) 442-0353
9  E-mail: randols@bslaw.net

10 Attorneys for Plaintiff
   ANDRE MARC DELOCQUE-FOURCAUD

11

12                  UNITED STATES DISTRICT COURT

13                 CENTRAL DISTRICT OF CALIFORNIA

14

15 ANDRE MARC DELOCQUE-            CASE NO. CV03-5027 R(CTx)
   FOURCAUD,
16                                 FIRST AMENDED COMPLAINT FOR:
            Plaintiff,
17                                 1. Injunctive Relief Under
       vs.                            California Business &
18                                    Professions Code Section
   THE LOS ANGELES COUNTY             12200 and 12203;
19 MUSEUM OF ART,                  2. Damages Under California
                                      Penal Code Section 496;
20                                 3. Restitution Based on
            Defendant.                Unjust Enrichment;
21                                 4. Trespass to Chattel;
                                   5. Imposition of
22                                    Constructive Trust
                                      Under California Civil
23                                    Code 2223, 2224; and
                                   6. Declaratory Judgment
24

25                                 [JURY TRIAL DEMANDED]

26                                 ENTERED ON ICMS

27

28                                 JUN 25 2003

F:\2700\2728.001\Pleadings\First Amended Complaint.wpd

FIRST AMENDED COMPLAINT

A1

1    Plaintiff, ANDRE MARC DELOCQUE-FOURCAUD, by his
2  attorneys Klein & Solomon, LLP and Burris & Schoenberg, LLP,
3  as and for his Complaint against Defendant THE LOS ANGELES
4  COUNTY MUSEUM OF ART alleges as follows:

**NATURE OF THIS ACTION**

6    1.   This is an action brought pursuant to applicable
7  California law to enjoin the public exhibition of looted
8  artworks and to recover the amounts by which Defendant, a
9  major museum of art located in Los Angeles, has been, and
10  will continue to be, unjustly enriched to the detriment of
11  Plaintiff through Defendant's exhibition of artworks for
12  which Plaintiff is the true and rightful owner and which
13  were wrongfully looted by the Soviet government as is more
14  fully described below.

**JURISDICTION AND VENUE**

16    2.   Jurisdiction of this Court exists pursuant to
17  Article III, Section 2 of the United States Constitution and
18  pursuant to section 1332(a) of the United States Judicial
19  Code, 28 U.S.C. § 1332(a), in that the matter in controversy
20  exceeds $75,000, exclusive of interest and costs, and there
21  is complete diversity of citizenship between Plaintiff, a
22  citizen of France, and Defendant, The Los Angeles County
23  Museum of Art, an entity of unknown form that is believed to
24  be a citizen of the State of California where it maintains
25  its principal place of business.

26    3.   Venue exists in this district pursuant to sections
27  1391(a)(1) and 1391(a)(2) of the Judicial Code, 28 U.S.C.
28  § 1391(a)(1) and (2), because Defendant is located within

F:\2700\2720.001\Pleadings\First Amended Complaint.wpd

FIRST AMENDED COMPLAINT

A2

1  this jurisdictional district and at least a substantial

2  portion of the events giving rise to the claims asserted

3  herein occurred in the Central District of California.

**THE PARTIES**

4.    Plaintiff Andre Marc Delocque-Fourcaud (herein-

after referred to as "Plaintiff" or "Fourcaud") is the

grandson of and the heir to nine-sixteenths of the estate of

Sergei Ivanovich Shchukin.  Plaintiff is a citizen and

resident of the Republic of France.

5.    Defendant The Los Angeles County Museum of Art

(hereinafter referred to as "Defendant" or "LACMA") is an

entity of unknown form believed to have been organized and

to be operating under the laws of the State of California

with its principal place of business located in Los Angeles

County, California and within this judicial district.

**FACTS**

6.    Plaintiff is a grandson of Sergei Ivanovich

Shchukin (hereinafter referred to as "Mr. Shchukin").  Mr.

Shchukin was a prominent art collector in Moscow in the late

nineteenth and early twentieth century who died in 1936.

7.    Under applicable French laws of inheritance,

Plaintiff is entitled to nine-sixteenths of the estate of

Mr. Shchukin, which includes the Shchukin Collection (as

defined below).  He is the sole heir to the estates of both

his maternal grandmother Nadejda, who was Mr. Shchukin's

widow, and to his mother Irina, who was one of Mr. Shchu-

kin's daughters.  Both Nadejda (who died in 1954) and Irina

(who died in 1994) were heirs to one-quarter of Mr. Shchu-

Burris & Sch..berg, LLP
lawyers
12121 Wilshire Boulevard, Eighth Floor
Los Angeles, California 90025
Telephone • (310) 442-5559

1  kin's estate under applicable law.  In addition, Irina was
2  heir to a further one-sixteenth of the estate of Mr. Shchu-
3  kin (one-quarter of one-quarter) through her half-brother,
4  Ivan, who died in 1980 without leaving any issue.

5      8.    By 1918, Mr. Shchukin had assembled one of the
6  finest collections of modern art in the world, including
7  pieces by Claude Monet, Eduard Manet, Henri Matisse, Edgar
8  Degas, Paul Cézanne, and Pablo Picasso (the "Shchukin
9  Collection").  The Shchukin Collection was displayed in Mr.
10  Shchukin's home in Moscow.

11      9.    In 1918, the Russian Government seized the
12  Shchukin Collection as well as Mr. Shchukin's home.  No
13  compensation was ever paid to Mr. Shchukin or his family for
14  the real or personal property that was looted and seized.

15      10.   The Shchukin Collection was broken up by the
16  Russian and/or Soviet government and portions of it were
17  sent to the State Pushkin Museum of Fine Arts in Moscow
18  (known until 1937 as the Alexander III Museum of Fine Arts)
19  and the Hermitage Museum in St. Petersburg / Petrograd /
20  Leningrad / St. Petersburg.

21      11.   This case concerns those portions of the Shchukin
22  Collection that constitute part of the permanent collection
23  of the State Pushkin Museum.

24      12.   In 2002, the Museum of Fine Arts, Houston (herein-
25  after referred to as the "MFAH"); the State Pushkin Museum;
26  and the Foundation of International Arts and Understanding
27  assembled portions of the permanent collection of the
28  Pushkin Museum in order to develop an exhibition entitled

Burris & Sch..nberg, LLP
lawyers
12121 Wilshire Boulevard, Eighth Floor
Los Angeles, California 90025
Telephone • (310) 442-5560

A4

1 │ "Old Masters, Impressionists, and Moderns: French Master-
2 │ works from the State Pushkin Museum, Moscow" (the "Exhibi-
3 │ tion").

4 │     13.  The Exhibition traveled to the United States under
5 │ the sponsorship of Philip Morris Companies Inc., a publicly
6 │ traded United States corporation (now known as Altria Group,
7 │ Inc.).

8 │     14.  The Exhibition is scheduled to be on display at
9 │ Defendant's facility from July 27, 2003 through October 3,
10 │ 2003, where a separate admission of up to $20 for non-member
11 │ adults on weekends is to be charged for public viewings of
12 │ the Exhibition.

13 │     15.  Among the items that are part of the Exhibition
14 │ are numerous pieces that were part of the Shchukin Collec-
15 │ tion that was taken by the Russian government in 1918 from
16 │ Mr. Shchukin without compensation.  These pieces include:
17 │     (a)  "Dancer Posing for a Photograph," by Edgar Degas;
18 │     (b)  "Exercising Racehorses," by Edgar Degas;
19 │     (c)  "Pierrot and Harlequin," by Paul Cézanne;
20 │     (d)  "Mardi gras (Pierrot et Arlequin)," by Paul
21 │ Cézanne;
22 │     (e)  "The Pipe Smoker," by Paul Cézanne;
23 │     (f)  "The Aqueduct," by Paul Cézanne;
24 │     (g)  "Goldfish," by Henri Matisse;
25 │     (h)  "Nasturtiums and The Dance," by Henri Matisse;
26 │     (i)  "Calla Lillies, Irises, and Mimosas," by Henri
27 │ Matisse;
28 │     (j)  "The Rocks of Belle-Île," by Claude Monet;

Burris & Schönberg, LLP
LAWYERS
12121 Wilshire Boulevard, Eighth Floor
Los Angeles, California 90025
Telephone - (310) 442-5559

Burris & Sch…nberg, LLP

Law Offices
12011 Wilshire Boulevard, Eighth Floor
Los Angeles, California 90025
Telephone ▪ (310) 442-5559

1    (k) "White Water Lilies," by Claude Monet;

2    (l) "Vétheuil," by Claude Monet;

3    (m) "L'Avenue de l'Opéra, Snow, Morning," by Camille

4 Pissarro;

5    (n) "The Poor Fisherman," by Pierre Puvis de

6 Chavannes;

7    (o) "Woman by a Window," by Henri de Toulouse-Lautrec;

8    (p) "Portrait of Doctor Rey," by Vincent Van Gogh;

9    (q) "Eiaha Ohipa" ("Do Not Work"), by Paul Gaugin;

10    (r) "The Ford," by Paul Gaugin;

11    (s) "Portrait of Marthe Denis, the Artist's Wife," by

12 Maurice Denis;

13    (t) "Le Pont Saint Michel in Paris," by Albert

14 Marquet;

15    (u) "Notre-Dame in Winter (Snow, Winter)," by Albert

16 Marquet;

17    (v) "Jaguar Attacking a Horse," by Henri Rousseau;

18    (w) "The Castle," by André Derain;

19    (x) "Spanish Woman from Majorca," by Pablo Picasso;

20    (y) "The Violin," by Pablo Picasso; and

21    (z) "Château la Roche-Guyon," by Georges Braque.

22    16.   Plaintiff is the proper and rightful owner of

23 nine-sixteenths of all right, title and interest in the

24 aforementioned pieces, each of which constitute "material

25 objects," from the Shchukin Collection that are included in

26 the Exhibition.

27    17. As the organizer of the Exhibition, MFAH submitted

28 a request for Federal Immunity from Seizure to the United

1   States Department of State pursuant to the Federal Immunity

2   from Seizure Act ("FISA"), 28 U.S.C. § 2459, with respect to

3   the Exhibition, and such immunity was granted on or about

4   August 30, 2002.

5      18. Upon information and belief, the FISA request

6   submitted by Defendant or its agents failed to disclose the

7   fact that Plaintiff had made claims with respect to the true

8   ownership of those portions of the Exhibition that had been

9   part of the Shchukin Collection, although disclosure of that

10   fact was required by federal law.

11      19. As a result of the failure to disclose the fact

12   that Plaintiff had made claims with respect to the true

13   ownership of those portions of the Exhibition that had been

14   part of the Shchukin Collection, immunity was granted pursu-

15   ant to the FISA. Had that fact been disclosed Defendant

16   would not have been able to obtain such immunity.

17      20. As a result of the foregoing, the FISA immunity

18   afforded the Exhibition was improperly granted and such

19   immunity should be deemed null and void ab initio.

20          **AS AND FOR A FIRST CLAIM FOR RELIEF**

21       INJUNCTIVE RELIEF UNDER CALIFORNIA BUSINESS

22         AND PROFESSIONS CODE SECTION 17200

23      21. Plaintiff repeats and realleges the allegations of

24   paragraphs 1 through 20 as if fully set forth in this para-

25   graph.

26      22. The pieces from the Shchukin Collection that are

27   included within the Exhibition are unique. Their public

28   display by LACMA without the consent of Plaintiff will cause

Burris & Sch ...lberg, LLP
lawyers
...Wilshire Boulevard, Eighth Floor
Los Angeles, California 90025
Telephone (310) 442-5559

1    irreparable injury to Plaintiff.

2    23. As a result of its inclusion within the Exhibition
3    of pieces from the Shchukin Collection, LACMA proposed to
4    engage or has engaged in an unlawful, unfair, and fraudulent
5    business act or practice, as defined in section 17200 of the
6    Business and Professions Code of the State of California.

7    24. The acts or practices described herein constitute
8    unlawful business acts or practices within the meaning of
9    Business and Professions Code Section 17200. For example,
10   receiving and withholding stolen property violated Califor-
11   nia Penal Code section 496 and numerous other state, federal
12   and international laws and treaties. Pursuant to section
13   17203 of the California Business and Professions Code,
14   Plaintiff is entitled to an injunction enjoining Defendant
15   and its representatives from engaging in such unfair
16   practices by including any pieces from the Shchukin
17   Collection within the Exhibition while it is being displayed
18   in Los Angeles and within this judicial district.

19                    **AS AND FOR A SECOND CLAIM FOR RELIEF**

20              DAMAGES UNDER CALIFORNIA PENAL CODE §496

21   25. Plaintiff repeats and realleges the allegations of
22   paragraphs 1 through 24 as if fully set forth in this para-
23   graph.

24   26. Numerous works of art which form part of the
25   Exhibition were looted and stolen from Shchukin by the
26   Russian authorities and were obtained in a manner constitut-
27   ing theft or extortion.

28   ///

Burris & Schoenberg, LLP

12121 Wilshire Boulevard, Suite Four
Los Angeles, California 90025
Telephone : (310) 442-5559

F:\2780\2728.001\Pleadings\First Amended Complaint.wpd

FIRST AMENDED COMPLAINT

27. Before the receipt of such property, LACMA's representatives had knowledge that these works were looted and stolen in the manner described herein.

28. As a result of the foregoing, LACMA has violated section 496(a) of the California Penal Code which provides in pertinent part that any person who knowingly receives stolen property has committed an illegal act.

29. Plaintiff has been injured by LACMA's violation of section 496(a) of the California Penal Code. Pursuant to section 496(c) of the Code, Plaintiff is entitled to bring a private civil action and to recover treble the amount of damages that he has suffered, which amount is in excess of $75,000 and shall be determined at the trial of this action, together with the costs of suit and his reasonable attorney's fees.

### AS AND FOR A THIRD CLAIM FOR RELIEF

RESTITUTION BASED ON UNJUST ENRICHMENT

30. Plaintiff repeats and realleges the allegations of paragraphs 1 through 29 as if fully set forth in this paragraph.

31. LACMA has received and can be anticipated to continue to receive significant income from receipts for admissions to the Exhibition, which income is derived from the exploitation of various items of personal property for which Plaintiff is the legal and rightful owner and no portion of which income has been provided to Plaintiff.

///

///

A9

1    32.  As a result of the foregoing, LACMA has been

2  unjustly enriched at the expense of Plaintiff in an amount

3  to be determined at the trial of this case.

4            **AS AND FOR A FOURTH CLAIM FOR RELIEF**

5                    TRESPASS TO CHATTEL

6    33.  Plaintiff repeats and realleges the allegations of

7  paragraphs 1 through 32 as if fully set forth in this para-

8  graph.

9    34.  LACMA's conduct with respect to the pieces of the

10  Shchukin Collection that have been or will be included

11  within the Exhibition constitutes LACMA's intentional inter-

12  ference with the possession of personal property by Plain-

13  tiff.

14    35.  Plaintiff has been damaged as a result of LACMA's

15  interference with the possession of the pieces of the

16  Shchukin Collection that have been or will be included

17  within the Exhibition in that LACMA's intermeddling with

18  Plaintiff's chattel has deprived and will deprive Plaintiff

19  of the use of the chattel for a substantial time.

20    36.  As a result of the foregoing, LACMA has trespassed

21  upon Plaintiff's chattels and in the process injured Plain-

22  tiff.

23            **AS AND FOR A FIFTH CLAIM FOR RELIEF**

24              IMPOSITION OF CONSTRUCTIVE TRUST

25    37.  Plaintiff repeats and realleges the allegations of

26  paragraphs 1 through 36 as if fully set forth in this para-

27  graph.

28  ///

F:\2700\2728.001\Pleadings\First Amended Complaint.wpd

Burris & Sch nberg, LLP

A10

38.  By reason of the foregoing, LACMA has wrongfully detained those portions of the Shchukin Collection that are included in the Exhibition and as a result is an involuntary trustee thereof for the benefit of Plaintiff pursuant to section 2223 of the California Civil Code.

39.  By reason of the foregoing, LACMA has gained control over those portions of the Shchukin Collection that are included in the Exhibition by wrongful acts as described herein and is therefore an involuntary trustee thereof for the benefit of Plaintiff pursuant to section 2224 of the California Civil Code.

40.  Upon information and belief, Defendant is conducting the Exhibition as a for profit venture and intends to, and will, profit from the Exhibition of the artworks from the Shchukin collection.  Any purported immunity under FISA expressly pertains only to non-profit exhibitions, and does not protect profits obtained from the exhibition of stolen artworks.

41.  As a result of the foregoing, LACMA should be required to deposit the proceeds that it received from the Exhibition into a trust for the benefit of Plaintiff.

### AS AND FOR A SIXTH CLAIM FOR RELIEF

#### DECLARATORY JUDGMENT

42.  Plaintiff repeats and realleges the allegations of paragraphs 1 through 41 as if fully set forth in this para-graph.

43.  On August 30, 2002, the Exhibition received "federal immunity from seizure" pursuant to section 2459 of

Burris & Sch. nberg, LLP
lawyers
12121 Wilshire Boulevard, Ninth Floor
Los Angeles, California 90025
Telephone • (310) 442-5559

A11

1  the Judicial Code, 28 U.S.C. § 2459, as reported in the

2  Federal Register, 67 Fed. Reg. 169, at 55907 (Aug. 30,

3  2002).

4     44.  Under applicable rules for the granting of immu-

5  nity, the sponsor of an exhibition of art is required to

6  state in its application to the U.S. State Department wheth-

7  er it "know[s] or ha[s] reason to know of any circumstances

8  with respect to any of the objects that would indicate the

9  potential for competing claims of ownership" or, if it

10  cannot so state, the explain the circumstances concerning

11  such a challenge or potential challenge.

12     45.  The sponsoring institution for the Exhibition is

13  the Museum of Fine Arts, Houston.

14     46.  As sponsor of the Exhibition, the Museum of Fine

15  Arts, Houston applied to the State Department for a grant of

16  immunity from seizure.  In that application it stated:

17          The Museum of Fine Arts, Houston certifies
18     that it has undertaken professional inquiry –
       including independent, multi-source research –
19     into the provenance of the objects proposed for
       determination of cultural significance and
20     national interest.  The Museum of Fine Arts, Hous-
       ton certifies further that it does not know or
21     have reason to know of any circumstances with
       respect to any of the objects that would indicate
       the potential for competing claims of ownership.

22          The exhibition, *Old Masters, Impressionists,*
23     *and Moderns: French Masterworks from the State*
       *Pushkin Museum, Moscow,* will include seventy-six
24     paintings drawn from the collection of the State
       Pushkin Museum of Fine Arts in Moscow, Russia.
25     All the paintings were in Russian public or pri-
       vate collections before the Communist Revolution
26     of 1917, at which point they became the property
       of the new government.  The majority of works came
27     to the Pushkin Museum from five sources: the State
       Hermitage Museum, St. Petersburg; the N.B. Yusupov
28     collection; the S.M. Treryskov collection; the

Burris & Schnberg, LLP
LAWYERS
12121 Wilshire Boulevard, Eighth Floor
Los Angeles, California 90025
Telephone • (310) 440-5509

Ivan Morozov collection; and the Sergei Shchukin collection. The remaining works entered the Pushkin Museum via the Soviet government from other private Russian collections.

Following curatorial review and research undertaken by Janet Landay, Curator of Exhibitions at the Museum of Fine Arts, Houston, it was determined to the best of our knowledge that no individual painting in the exhibition is questionable with regard to its ownership or provenance.

47.    In fact, there were numerous facts that showed such a "potential for competing claims of ownership."

48.    The circumstances by which the Pushkin came into possession of the portions of the Shchukin Collection that are included in the Exhibition – the seizure of those works by Lenin – were such as to put the Museum of Fine Arts, Houston on notice of the potential for claims to be made with respect to the ownership of those works.

49.    In addition, Plaintiff and his mother had brought several actions in Europe seeking to recover pieces taken from the Shchukin Collection, and the Museum of Fine Arts, Houston either knew about some or all of such claims or would have learned of them had it undertaken an investigation of the provenance of those works.

50.    As a result of the foregoing, the application made to the U.S. Department of State for immunity for the pieces within the Exhibition pursuant to the Federal Immunity from Seizure Act, 28 U.S.C. § 2459, was false.

51.    Upon information and belief, immunity would not have been granted to the Exhibition pursuant to the Federal Immunity from Seizure Act, 28 U.S.C. § 2459, had the application therefor not been false.

Burris & Schoenberg, LLP

A13

1    52.   Upon information and belief, insofar as LACMA
2  itself sought immunity for the Exhibition, it did so based
3  upon the application of the Museum of Fine Arts, Houston.

4    53.   As a result of the foregoing, Plaintiff is
5  entitled to a declaration pursuant to section 2201(a) of the
6  Judicial Code that the immunity granted to the Exhibition by
7  the U.S. Department of State as reflected in the Federal
8  Register, 67 Fed. Reg. 169, at 55907 (Aug. 30, 2002), was
9  not properly obtained and that with respect to those pieces
10 of the Exhibition that come from the Shchukin Collection are
11 not immune from seizure under the Federal Immunity from
12 Seizure Act.

13                    **PRAYER FOR RELIEF**

14    WHEREFORE, Plaintiff prays for judgment as follows:
15    1.   Enjoining, pursuant to section 17203 of the
16 California Business and Professions Code, Defendant The Los
17 Angeles County Museum of Art and its officers, directors,
18 agents, servants, employees and attorneys, and persons
19 acting in concert with them, from including within the
20 Exhibition any pieces from the Shchukin Collection;

21    2.   Awarding judgment against Defendant The Los
22 Angeles County Museum of Art pursuant to Section 496(c) of
23 the California Penal Code for treble the amount of damages
24 that Plaintiff has suffered as a result of the Los Angeles
25 County Museum of Art's receipt of stolen property as alleged
26 herein, plus his costs of suit and his reasonable attorney's
27 fees pursuant to Section 496(a);
28 ///

Burris & Sch...berg, LLP

3.    Awarding judgment against Defendant Los Angeles County Museum of Art in an amount to be proved at trial for the amount by which that Defendant has been unjustly enriched as a result of its wrongful exploitation of property of which Plaintiff is the true and rightful owner;

4.    Imposing of a constructive trust on the proceeds from the exhibition of the Shchukin collection in favor of Plaintiff and directing Defendant to deliver said funds to Plaintiff;

5.    Declaring pursuant to section 2201(a) of the Judicial Code that the immunity granted to the Exhibition by the U.S. Department of State as reflected in the Federal Register, 67 Fed. Reg. 169, at 55907 (Aug. 30, 2002), was not properly obtained and that with respect to those pieces of the Exhibition that come from the Shchukin Collection are not immune from seizure under the Federal Immunity from Seizure Act; and

6.    Granting such other relief as the Court may deem just and proper.

///
///
///
///
///
///
///
///
///

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues triable to a jury.

Respectfully submitted,

Dated: July 23, 2003          KLEIN & SOLOMON, LLP

By: _____
                              Edward E. Klein
                              Co-Counsel for Plaintiff
                              ANDRE MARC DELOCQUE-FOURCAD

Dated: July 23, 2003          BURRIS & SCHOENBERG, LLP

By: _____
                              E. Randol Schoenberg
                              Co-Counsel for Plaintiff
                              ANDRE MARC DELOCQUE-FOURCAD

Burris & Sch...nberg, LLP
lawyers
12121 Wilshire Boulevard, Eighth Floor
Los Angeles, California 90025
Telephone • (310) 442-5559

F:\2700\2728.001\Pleadings\First Amended Complaint.wpd

16          FIRST AMENDED COMPLAINT

A16

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

4      I am employed in the County of Los Angeles, State of California. I am over the
age of 18 years and am not a party to the within action. My business address is 12121
Wilshire Boulevard, Suite 800, Los Angeles, California 90025. On July 23, 2003, I
5    caused the foregoing document described as **FIRST AMENDED COMPLAINT** to be
served on the interested parties in this action, as follows:

6

7                          Thadeus Stauber, Esq.
Los Angeles County Museum of Art
5905 Wilshire Boulevard
8                       Los Angeles, California 90036

9    ☐    by placing ☐ the original √ a true copy thereof enclosed in a sealed envelope
addressed as follows:
10

11   √    **BY MAIL**: I am "readily familiar" with the firm's practice of collection and
processing correspondence for mailing. Under that practice it would be deposited
12        with the U.S. Postal Service on that same day with postage thereon fully prepaid
at Los Angeles, California in the ordinary course of business. I am aware that on
13        motion of the party served, service is presumed invalid if the postal cancellation
date or postage meter date is more than one day after date of deposit for mailing in
14        the affidavit.

15   ☐    **BY FAX**: In addition to service by mail, I transmitted a copy of the foregoing
document this date via telecopier to the facsimile numbers shown above.

16
☐    **BY PERSONAL SERVICE**: I caused such envelope to be delivered by hand to
17        the offices of the addressees.

18       I declare under penalty of perjury under the laws of the State of California and the
laws of the United States that the foregoing is true and correct.

19

20   EXECUTED on July 23, 2003 at Los Angeles, California.

21

22

23                          Stacey Roehrich-Hoog

24

25

26

27

28

1 | DEBRA W. YANG
United States Attorney
2 | LEON W. WEIDMAN
Assistant United States Attorney
3 | Chief, Civil Division
ROBERT I. LESTER (State Bar #116429)
4 | Assistant United States Attorney
 300 North Los Angeles Street
5 | Federal Building, Room 7516
 Los Angeles, California 90012
6 | Telephone:  (213) 894-2464
 Fax:        (213) 894-7819
7 |
Attorneys for Defendant-in-Intervention
8 | United States of America

9 |             UNITED STATES DISTRICT COURT

10 |            CENTRAL DISTRICT OF CALIFORNIA

11 |                 WESTERN DIVISION

12 |

13 | ANDRE MARC DELOCQUE-FOURCAUD,  )    No. CV 03-5027-R(CTx)
                                   )
14 |      Plaintiff,               )    **NOTICE OF MOTION AND**
                                   )    **MOTION OF DEFENDANT-IN-**
15 |      v.                       )    **INTERVENTION UNITED**
                                   )    **STATES FOR ORDER**
16 | THE LOS ANGELES COUNTY MUSEUM  )    **DISMISSING THE FIRST**
     OF ART,                       )    **AMENDED COMPLAINT WITH**
17 |                               )    **PREJUDICE;**
      Defendant,                   )
18 |                               )    **MEMORANDUM OF POINTS AND**
         and                       )    **AUTHORITIES.**
19 |                               )
     UNITED STATES OF AMERICA,     )
20 |                               )    [REQUEST FOR JUDICIAL
      Defendant-In-Intervention.   )    NOTICE RE EXHIBITS FILED
21 | _____)    UNDER SEPARATE COVER]

22 |

23 |                                     DATE:  October 20, 2003
                                         TIME:  10:00 a.m.
24 |                                     CTRM:  Judge Manuel Real

25 |

26 |

27 |

28 |

A18

**TABLE OF CONTENTS**

PAGE

I   INTRODUCTION.................................................1

    A.   Summary Of Argument.................................1

    B.   The Exhibition.....................................2

    C.   Plaintiff.........................................2

II  STATUTORY BACKGROUND........................................4

    A.   The Act...........................................4

III FACTUAL ALLEGATIONS.........................................8

IV  THE COURT SHOULD DISMISS THE FIRST AMENDED
    COMPLAINT WITH PREJUDICE..................................10

    A.   Plaintiff's Action Is Precluded By Both The Plain Text
        And The Purpose Of § 2459...........................10

        1.   The Act.......................................10

        2.   The History Behind The Act.....................13

        3.   Plaintiff's Action Seeks Improperly To Deprive
            LACMA Of "Custody Or Control" Of The Contested
            Objects.......................................15

    B.   The State Department's § 2459 Determinations Are
        Unsuitable For Judicial Review In Any Event..........16

IV  CONCLUSION.................................................20

i

A19

## TABLE OF AUTHORITIES

### FEDERAL CASES

District No. 1 v. Maritime Administration,
    215 F.3d 37 (D.C. Cir. 2000) ........................... 18

Heckler v. Chaney,
    470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ..... 16

Helgeson v. Bureau of Indian Affairs,
    153 F.3d 1000 (9th Cir. 1998) ......................... 17

Lincoln v. Vigil,
    508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) ..... 17

Magness v. Russian Federation,
    84 F. Supp. 2d 1357 (S.D. Ala. 2000) ................ 11

Padula v. Webster,
    822 F.2d 97 (D.C. Cir. 1987) .......................... 19

Strickland v. Morton,
    519 F.2d 467 (9th Cir. 1975) .......................... 17

Webster v. Doe,
    486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) ... 18

### DOCKETED CASES

Romanov v. Florida International Museum, Inc.,
    Circuit Civ. No. 95-001285-CI-008 ................... 11

### FEDERAL STATUTES

5 U.S.C. §§ 701-706 ........................................ 16

5 U.S.C. § 701(a)(2) ....................................... 16

5 U.S.C. § 702 ............................................. 20

22 U.S.C. § 2459 ..................................... *passim*

ii

MISCELLANEOUS

67 Fed. Reg. 55907-01, 2002 WL 1988998 (Aug. 30, 2002) ....... 9

79 Stat. 985 (Oct. 19, 1965) ............................... 4

H.R. Rep. No. 89-1070 (Sept. 22, 1965), *reprinted in*
    1965 U.S.C.C.A.N. 3576 ................................. 6

The Mutual Educational and Cultural Exchange Act of 1961,
    Pub. L. No. 87-256, 75 Stat. 527 (Sept. 21, 1961),
    *codified at* 22 U.S.C. § 2451-2458a and 2460
    (West 1990) .......................................... 6

iii

1  **NOTICE OF MOTION AND MOTION OF DEFENDANT-IN-INTERVENTION**

2  **UNITED STATES FOR ORDER DISMISSING THE FIRST AMENDED COMPLAINT**

3  **WITH PREJUDICE**

4       TO ALL PARTIES:

5       PLEASE TAKE NOTICE that on October 20, 2003 at 10:00 a.m.,

6  or as soon thereafter as counsel may be heard, in the Courtroom

7  of the Honorable Manuel L. Real, United States District Judge,

8  located at 312 North Spring Street, Los Angeles, California

9  90012, defendant-in-intervention United States of America,

10  pursuant to 22 U.S.C. § 2459(b), will move to dismiss the

11  first amended complaint with prejudice, because the first amended

12  complaint fails to state a claim upon which relief can be

13  granted.  Fed.R.Civ.P. 12(b)(6).

14       This motion is based on this Notice of Motion and Motion,

15  upon the Memorandum of Points and Authorities, the request for

16  judicial notice and exhibits thereto (filed under separate

17  cover), and upon such arguments as the Court may allow at the

18  time of the hearing.

19  DATED: Sept. 5, 2003.    Respectfully submitted,

20                           DEBRA W. YANG
                             United States Attorney
21                           LEON W. WEIDMAN
                             Assistant United States Attorney
22                           Chief, Civil Division

23

24                           ROBERT I. LESTER
                             Assistant United States Attorney
25
                             Attorneys for Defendant-in-Intervention
26                           United States of America

27

28

                              iv

                             A22

1      MEMORANDUM OF POINTS AND AUTHORITIES

2           I

3         INTRODUCTION

4 A. **Summary Of Argument**

5   This action involves plaintiff's misinterpretation of

6 22 U.S.C. § 2459, and misunderstanding of how the United States

7 Department of State applies that statute.  When an American

8 museum complies with the requirements of § 2459, foreign museums

9 are able to lend art or other cultural objects to the American

10 museums for temporary display, without the lender or the borrower

11 having to risk the possibility that an American court -- at the

12 request of a third party -- might issue judicial process that

13 would deprive the borrowing museum of "custody or control" of the

14 objects.  Plaintiff is such a third party; he claims that he,

15 and not the Russian musem/lender from whose permanent collection

16 the art has been lent, has an ownership interest in some of the

17 art that LACMA borrowed.

18   However, the State Department has already published notice

19 in the Federal Register that the borrower of the art complied

20 with § 2459's requirements.  In justifiable reliance upon the

21 State Department's determinations, the art was brought to the

22 United States and has been exhibited in Houston, Atlanta, and

23 Los Angeles.  It would violate § 2459 and the purpose of the

24 statute if plaintiff could seek judicial review to undermine the

25 State Department's determinations.  Moreover, there are no

26 judicially manageable standards for the Court to evaluate the

27 State Department's determinations of § 2459 requests.  Thus,

28 plaintiff's action should be dismissed with prejudice.

1

A23

B. **The Exhibition**

On July 27, 2003, the Los Angeles County Museum of Art ("LACMA") opened an exhibition of French art entitled "Old Masters, Impressionists, and Moderns: French Masterpieces from the State Pushkin Museum, Moscow" ("the Exhibition"). These 76 works of art are on temporary loan to LACMA from the permanent collection of the State Pushkin Museum of Fine Arts in Moscow ("the Pushkin"). The Exhibition was shown by the Museum of Fine Arts, Houston ("MFAH") and the High Museum of Art, in Atlanta, Georgia before it arrived in Los Angeles. Approximately 53 of these works have never before been exhibited in the United States. LACMA is scheduled to close the Exhibition on October 13, 2003, at which point the 76 works will be returned to the Pushkin.

C. **Plaintiff**

On July 15, 2003, just before LACMA opened the Exhibition, plaintiff Andre Marc Delocque-Fourcaud of France filed this action. Plaintiff alleges that in 1918, Vladimir Lenin and the new Soviet government nationalized from his grandfather, Moscow textile merchant and art patron Sergei Shchukin, many valuable works of art, including 25 of the works in the Exhibition (the "Contested Objects"). Plaintiff asserts that Lenin's nationalization of that art was illegal, and therefore, as an heir to his grandfather's estate, plaintiff has an ownership interest in, among other art in the permanent collection of the Pushkin, the Contested Objects (and the Pushkin's claim to ownership of those objects is invalid).

1     Plaintiff or his relatives have unsuccessfully litigated
2  Lenin's nationalization of Shchukin's art for nearly 50 years,[1]
3  although plaintiff and his family have not brought suit every
4  time the art has temporarily left the Soviet Union/Russia.[2]
5  In this action, plaintiff seeks an order compelling LACMA

6

7     [1]  In 1954, Yakaterina Shchukina, plaintiff's aunt filed a
8  lawsuit in France concerning Picassos that the Soviets had lent
    for an exhibition by France's House of Human Civilisation.
9  Norman Palmer, *Art Loans*, p. 102 n.56 (Kluwer Law Int'l 1997)
    (hereafter, Palmer) (Exhibit 1); Mark M. Boguslavskij, *Irina*
10  *Shchukina's Suit (On the Decision of a French Court)*, 4 Int'l J.
11  Cultural Prop. 325, 334-35 (1995) (Exhibit 2).  In 1993, Irina
    Shchukina, plaintiff's mother, filed a lawsuit concerning a loan
12  of 21 works of art by the Hermitage Museum in St. Petersburg,
    Russia and the Pushkin for a Matisse exhibition at the Pompidou
13  Centre in France, some of which Russia had nationalized from
    Shchukin.  Ruth Redmond-Cooper, *Disputed Title to Loaned Works of*
14  *Art:  The Shchukin Litigation*, 1 Art Antiquity & L. 73, 73-74
15  (Feb. 1995) (hereafter, Redmond-Cooper) (Exhibit 3).  Most
    recently, in 2000, plaintiff himself filed a lawsuit concerning a
16  Matisse that was on loan from the Hermitage Museum for an
    exhibition in Rome.  Agence France-Presse, *Rome Court to Rule in*
17  *Dispute over Russian Painting* (June 9, 2000), avail. at 2000 WL
18  2811463 (Exhibit 4).

19     [2]  Plaintiff's mother declined to challenge an exhibition of
    art from Russia in Essen, Germany in 1993 that honored Shchukin
20  and another prominent Russian collector whose art the new Russian
    government had also nationalized in 1918.  David Galloway,
21  *A Tribute to Moscow Visionaries*, p. 7 (International Herald
22  Tribune Aug. 7, 1993), avail. at 1993 WL 9778451 (Exhibit 5);
    Peter Lennon, *Keeping it in the Family:  Rival Claims over the*
23  *Ownership of a Russian Collection Threaten to Disrupt the World*
    *of Art*, p. T7 (The Guardian July 5, 1993), avail. at 1993 WL
24  9919638 (Exhibit 6).  Additionally, plaintiff took no action
    when paintings formerly owned by his grandfather appeared
25  at a 2001 exhibition of art from the Hermitage in Las Vegas.
26  He attributed his forbearance then to a lack of resources
    to mount a challenge.  Marilyn Henry, *Lenin's Spoils Given Pass*
27  *by U.S. Officials; Exhibit Reopens Wounds for Heirs of Art*
    *Patron*, p. A1 (Washington Post Dec. 15, 2002) (hereafter,
28  Marilyn Henry), avail. at 2002 WL 104306497 (Exhibit 7).

3

1  to withdraw the Contested Objects from the Exhibition.

2  He also requests a judgment, apparently in the alternative,

3  (1) requiring LACMA to pay to plaintiff treble the proceeds

4  that LACMA will earn if the Contested Objects are included in

5  the Exhibition; and (2) declaring that the Contested Objects are

6  not entitled to § 2459(a) immunity from "seizure." Plaintiff

7  named only LACMA as a defendant; subsequently, the United States

8  intervened as a defendant.

9                       II

10                **STATUTORY BACKGROUND**

11  A.    **The Act**

12      Enacted in 1965,[3] 22 U.S.C. § 2459 provides the following:

13          Whenever any work of art or other object of

14          cultural significance is imported into the

15          United States from any foreign country,

16          pursuant to an agreement entered into between

17          the foreign owner or custodian thereof and

18          . . . one or more cultural or educational

19          institutions within the United States

20          providing for the temporary exhibition or

21          display thereof within the United States at

22          any cultural exhibition . . . administered,

23          operated, or sponsored, without profit, by

24

25       [3] The statute, which has no short title, is described in
26  the Act itself as "An Act to render immune from seizure under
      judicial process certain objects of cultural significance
27  imported into the United States for temporary display or
      exhibition, and for other purposes," Pub. Law No. 89-259,
28  79 Stat. 985 (Oct. 19, 1965) (Exhibit 8).

4

A26

1   any such cultural or educational institution,
2   no court of the United States, any State,
3   . . . may issue or enforce any judicial
4   process, or enter any judgment, decree, or
5   order, for the purpose or having the effect
6   of depriving such institution . . . of
7   custody or control of such object if before
8   the importation of such object the President
9   or his designee has determined that such
10  object is of cultural significance and that
11  the temporary exhibition or display thereof
12  within the United States is in the national
13  interest, and a notice to that effect has
14  been published in the Federal Register.

15  The Act facilitates American exhibition of cultural
16  objects borrowed from foreign countries by providing legal
17  assurances that no party (such as a purported owner of the
18  cultural objects or creditor of the lender or borrower) may use
19  the courts in the United States to deprive the borrower of
20  "custody or control" of the objects.

21  To this end, the Act provides that before cultural objects
22  are imported into the United States for temporary exhibition,
23  the borrower may request the President or his designee, i.e.,
24  the State Department[*] to determine that the cultural objects are
25  of "cultural significance," and that their temporary exhibition

26

27  [*] The responsibility has been delegated from the President
    to the Secretary of State and redelegated to specified State
28  Department officials.

5

A27

1  in the United States is in the "national interest."  If the State
2  Department makes such determinations and publishes them in the
3  Federal Register prior to importation of the objects into the
4  United States, then no court in the United States may issue any
5  order or any other process "for the purpose or having the effect
6  of depriving [the borrower] . . . of 'custody or control' of the
7  objects."  22 U.S.C. § 2459(a).
8      The Act was consistent with the State Department's policy
9            'to assist and encourage educational and
10           cultural interchange.  Its enactment would be
11           a significant step in international
12           cooperation in this year which has been
13           proclaimed by the President as International
14           Cooperation Year.
15  H.R. Rep. No. 89-1070 (Sept. 22, 1965), *reprinted in* 1965
16  U.S.C.C.A.N. 3576, 3578 ("House Report").  Exhibit 9.
17  By passing the Act, as well as previous legislation,[5] Congress
18  demonstrated its agreement with the State Department that
19  cultural exchange can produce substantial foreign relations
20  benefits.
21
22
23
24
25
26
27      [5]  *E.g.*, The Mutual Educational and Cultural Exchange Act of
    1961, Pub. L. No. 87-256, 75 Stat. 527 (Sept. 21, 1961), *codified*
28  *at* 22 U.S.C. § 2451-2458a and 2460 (West 1990).

6

A28

1    Congress's passing of the Act also signaled its acceptance
2 of the Justice Department's assertion[6] that most foreign lenders
3 would not make cultural objects available for exhibition in the
4 United States if there were no statutorily provided immunity from
5 judicial process for those objects.[7] Moreover, though not
6 acknowledged in the legislative history of the Act, § 2459
7 provides a corresponding protection for American borrowers,
8 most of which would not incur the substantial expense of mounting
9 an exhibition of foreign cultural objects in the face of a risk
10 that a third party could seek an order that would attach those
11 objects or otherwise interfere with the museum's ability to
12 exhibit the objects and to charge admission to defray the
13 expenses of mounting the exhibition.[8]

14    Section 2459 thus promotes cultural exchange between foreign
15 countries and the United States, while protecting the lenders and
16 the borrowers of the objects -- and doing nothing adverse to the
17 alleged interests of third parties.  Absent § 2459 protection,

18

19    ─────────────

20 [6] House Report, *supra* note 9, at 3578-79 (citing statement of the Justice Department).

21 [7] "[T]he question is vital in relation to security of
22 international loans of works of art; if doubt subsists on this
   issue, major international exhibitions will be impossible,
23 since owners will refrain from lending if they consider that
   their works may be placed in jeopardy by ownership claims from
24 third parties." Redmond-Cooper, *supra* note 3, at 74.

25 [8] "Aside from theft, or damage to the object, the emergence
26 of an unsuspected ulterior owner during the loan period is
   probably the situation most feared by borrowers." Palmer, *supra*
27 note 1, at 101.  The risk of financial loss to a museum from such
   litigation is "not only sizeable but effectively uninsurable."
28 *Id.* at 109.

7

A29

1   foreign lenders usually will not expose cultural objects to the
2   risk of suit in the United States. At the same time, plaintiff
3   and others who claim an interest in foreign cultural objects that
4   is adverse to the foreign lender are no worse off under the Act's
5   regime (which merely renders them unable to obtain a seizure
6   order or other relief in an American court).

7                                III

8                         **FACTUAL ALLEGATIONS**

9          The first amended complaint alleges the following:

10         In 1918, Vladimir Lenin, having come to power in the new
11   Soviet Union, nationalized the Shchukin's art collection. First
12   amended complaint ("FAC") ¶¶ 6-9. Some of Shchukin's collection
13   ended up in the permanent collection of the Pushkin. FAC ¶¶ 10-
14   11. Plaintiff, a French citizen and resident, is a grandson of
15   Shchukin and is the majority heir to his estate. FAC ¶¶ 4, 6
16   and 16.

17         In 2002, MFAH, along with the Foundation of International
18   Arts and Understanding, participated in the development of the
19   Exhibition. FAC ¶ 12. Some 25 of the 76 works of art that the
20   Pushkin lent for the Exhibition had been nationalized from
21   Shchukin, i.e., the Contested Objects. These 25 works include
22   paintings by French or French-influenced artists such as Cezanne,
23   Degas, Gaugin, Matisse, Monet, Picasso, Pissarro, and Van Gogh,
24   and include many masterpieces. FAC ¶ 15.

25         As part of the exhibition-development process, before the
26   76 objects composing the Exhibition were imported into the United
27   States, MFAH submitted a § 2459 request for immunity from
28   judicial process to the State Department. FAC ¶¶ 12 and 17.

                                8

The State Department made the § 2459 determinations in August
2002, FAC ¶ 17, and published a notice to that effect in the
Federal Register entitled State Department Notice 4114,
*Culturally Significant Objects Imported for Exhibition;*
*Determinations: "Old Masters, Impressionists, and Moderns:*
*French Masterworks from the State Pushkin Museum, Moscow."*[9]
The cultural objects from the Pushkin were scheduled to be
exhibited at MFAH from December 15, 2002 to March 9, 2003; the
High Museum of Art, Atlanta, Georgia from April 5 to June 29,
2003; and LACMA, from July 27 to October 3 [*sic* 13], 2003.[10]
FAC ¶ 14.

Plaintiff's principal allegation is that (i) MFAH failed
to disclose to the State Department that plaintiff and his family
have asserted claims of ownership as to many of the works
included in the Exhibition (that are adverse to the Pushkin's
asserted interest); (ii) such disclosure was required by Federal
law; and (iii) if the State Department had known about these
adverse claims of ownership, it would not have made the § 2459
determinations that MFAH requested. FAC ¶¶ 18-19. As a result,
plaintiff contends, the State Department's § 2459 determinations
in this case are void *ab initio*, FAC ¶ 20. Consequently,
plaintiff seeks an order compelling LACMA to withdraw the
Contested Objects from the Exhibition. He also requests a

---

[9]   *See* 57 Fed.Reg. 55907-01, 2002 WL 1988998 (Aug. 30, 2002)
A copy of the published notice is attached as Exhibit 10.
The determinations were actually made on August 22, 2002.  *Id.*;
*see also* FAC ¶ 43.

[10]   *See* Exhibit 10.  *See also* FAC ¶ 14.

9

A31

1  judgment, apparently in the alternative, (1) requiring LACMA
2  to pay to plaintiff treble the proceeds that LACMA will earn
3  if the Contested Objects are included in the Exhibition; and
4  (2) declaring that the Contested Objects are not entitled to
5  § 2459(a) immunity from "seizure."

6                                    IV

7        **THE COURT SHOULD DISMISS THE FIRST AMENDED COMPLAINT**
8                            **WITH PREJUDICE**

9  A.   **Plaintiff's Action Is Precluded By Both The Plain Text**
10       **And The Purpose Of § 2459**

11       1.   The Act

12       Congress intended § 2459 to prevent this very kind of
13  litigation from being brought.  Plaintiff seeks an order and
14  judgment that would have the "purpose" or the "effect" of
15  depriving LACMA of "custody or control" over the Contested
16  Objects.  Under the plain terms of § 2459, this Court has no
17  power to issue such an order or judgment.

18       Congress established a bright-line trigger for the Act's
19  protections: a cultural object is protected by § 2459(a) if the
20  State Department has made the "cultural significance" and
21  "national interest" determinations and published them in the
22  Federal Register before the object is imported.  Here, the State
23  Department made such determinations and published the appropriate
24  notice in a timely fashion.  Therefore, the Contested Objects are
25  entitled to immunity from judicial process.

26
27
28

                                    10

                                   A32

1    Plaintiff's principal contention is that the State
2  Department's publication of its § 2459 determinations should
3  somehow retroactively be declared invalid because the State
4  Department allegedly was not informed of the competing claims
5  to ownership of the Contested Objects by plaintiff and his
6  family.  That contention is meritless.  Section 2459's
7  protections do not turn on *how* the State Department made its
8  immunity determinations of "cultural significance" and "national
9  interest"; all that matters is *whether* those determinations
10 were made.

11    Indeed, the very purpose of the Act -- to provide advance
12 assurances of a safe harbor from litigation -- would be
13 undermined if the propriety of the State Department's
14 determinations were to be allowed to be called into question
15 after the objects have already been imported into the United
16 States.  Institutions such as LACMA and the Pushkin rely on these
17 determinations in arranging for exhibitions of cultural objects
18 in the United States.  Such reliance would be impossible if those
19 determinations could be retroactively overturned by the courts.

20    Precisely this conclusion was reached in Magness v. Russian
21 Federation, 84 F.Supp.2d 1357 (S.D. Ala. 2000), the only
22 published[11] decision construing § 2459.  In that case, a court

23

24    [11]  In Romanov v. Florida International Museum, Inc.,
Circuit Civ. No. 95-001285-CI-008, the court issued an
25 unpublished order on May 5, 1995 dismissing the action for
lack of subject matter jurisdiction.  The museum had obtained an
26 immunity notice from the Federal government.  R. Wallace Stuart,
Immunity from Seizure of Cultural Objects Imported for Temporary
27 Exhibition, SB 53 ALI-ABA 323, 328 n.2 (Mar. 20, 1997) (Exhibit
28 11).

11

A33

1  in Texas had entered a default judgment in 1999 of more than
2  $234 million against the Russian Federation.  *Id.* at 1358.
3  On January 26, 2000, the plaintiffs in the Texas case filed a
4  petition for writ of execution in the Southern District of
5  Alabama against the assets of the Russian Federation, which
6  assets were part of an exhibition that was temporarily exhibited
7  in Mobile, Alabama.  *Id.*  Plaintiffs claimed that the works were
8  not immune from judicial process notwithstanding the State
9  Department's having made the § 2459 determinations, arguing that
10  the grant of the § 2459 request "was unfounded at the time it was
11  issued."  *Id.* at 1360.  The court refused to entertain the
12  argument, holding that the cultural objects were immune from
13  execution because of the protection afforded by § 2459.  *Id.* at
14  1359-60.  The court reasoned:  "[T]his Court will not attempt to
15  go behind that determination and, thus, put in jeopardy the
16  Exhibition which was originally brought into this country in
17  reliance on such a determination."  *Id.*

18        As the court recognized in <u>Magness</u>, if persons such as
19  plaintiff are allowed to bring suit in American courts
20  challenging State Department determinations under § 2459, the
21  protections offered by the Act will soon be of little worth.
22  As a result, foreign institutions will be less willing to loan
23  cultural objects for display, American institutions will be
24
25
26
27
28

12

A34

1   less willing to host exhibitions of such objects, and ultimately
2   the American public will enjoy fewer opportunities to view and
3   learn from such exhibitions.[12]

4       2.   The History Behind The Act

5       The history behind the Act demonstrates that the statute
6   was intended to facilitate the exhibition of cultural objects
7   from foreign countries in the United States, even if there may be
8   competing claims to those objects.  Ironically, it was a
9   remarkably similar situation in the early 1960's, involving the
10  importation for temporary exhibition of cultural objects from the
11  Soviet Union, which gave rise to the enactment of § 2459:

12              A strong sponsor of the bill was Senator
13              Harry F. Byrd, Sr. of Virginia.  The
14              motivation for his staunch support of the
15              bill was a pending exchange between a Soviet
16              museum and the University of Richmond,
17              through which the Virginia gallery sought to
18              import several artworks that had been
19              appropriated by the Soviet government from
20              expatriots.  As a condition to the loan, the

21

22          [12] Both foreign and American museums have relied hundreds of
23  times since § 2459's enactment on the immunity from judicial
    process that it provides.  Cultural objects are now routinely
24  lent for temporary exhibition in the United States from all over
    the world under § 2459's protection; Russian museums have been
25  frequent lenders of cultural objects for American exhibitions.
    The residents of the Los Angeles area have especially benefitted
26  from the State Department-administered program:  18 of the 85
    exhibitions as to which the State Department made the § 2459
27  determinations in 2002 (including the instant exhibition) have or
28  will take place in museums in Los Angeles County.

                                13

A35

1           Soviets insisted on a grant of immunity from
2           seizure as protection against former Soviet
3           citizens who had valid claims to the title of
4           the works.  Thus, the enactment of the
5           statute was stimulated in part by a desire to
6           facilitate a pending exchange with the Soviet
7           Union, despite the presence of valid claims
8           to the artwork by United States citizens.

9  Rodney M. Zerbe, Comment, *Immunity from Seizure for Artworks on*
10 *Loan to United States Museums*, 6 Nw. J. Intl. L. Bus. 1121, n.21
11 (1984/85) (Exhibit 12).

12      The Department of Justice tells a similar history.  In the
13 early 1960s, it was "common knowledge that numerous art treasures
14 in the Hermitage [Museum] were **confiscated** from their former
15 private owners."  Memorandum from Assistant Attorney General
16 John W. Douglas to Deputy Attorney General Ramsey Clark, p. 2
17 (Aug. 6, 1965) (emphasis added).  Exhibit 13.  At that time,
18 the Department of Justice had received "numerous" inquiries as
19 to whether, given that history, the Justice Department could give
20 assurances that if cultural objects were lent by foreign museums
21 to American museums, the objects would be immune from seizure
22 in American courts.  *Id.*  Assistant Attorney General Douglas
23 opined that if then-Senate Bill 2273 were to become law,

24           those who have sought our assurances in the
25           past would presumably be satisfied with the
26           Congressional mandate to the courts.  They
27           could now represent to those foreign
28           governments who have acquired objects of art

14

A36

1          **through confiscation**, and who have so far
2          been reluctant to exhibit them in the United
3          States for fear of court proceedings, that
4          their objects of art will be safe in the
5          United States -- [at least until another
6          amendment is passed to the Foreign Assistance
7          Act of 1964].

8  *Id.* (emphasis added). Senate Bill 2273 became the Act later
9  that year. Thus, § 2459 was intended to protect precisely the
10 sort of objects at issue in this case.

11        3.   Plaintiff's Action Seeks Improperly To Deprive
12             LACMA Of "Custody Or Control" Of The Contested Objects

13 While plaintiff does not seek to seize the works at issue
14 outright, the protection by the Act extends well beyond "seizure"
15 to include "any judicial process . . . for the purpose of or
16 having the effect of depriving" an exhibiting institution
17 of "custody or control" of a cultural object. Plaintiff's
18 request for an order enjoining LACMA from exhibiting the
19 Contested Objects directly threatens LACMA's "control" over the
20 works.[13]

21 The damages and constructive trust sought by plaintiff also
22 would "have the effect" of depriving LACMA of control over the
23 Contested Objects, in that "control" over the objects must be
24 considered to include the ability to collect fees for their

25 _____
26     [13]  Of course, plaintiff's request for an injunction will be
   moot by the time of the hearing on this motion, October 20, 2003,
27 because LACMA is scheduled to close the Exhibition on October 13,
   2003.  For that reason alone, the injunctive relief portion of
28 the first amended complaint should be dismissed with prejudice.

15

A37

1  display.  The purpose of § 2459 is to ensure that cultural and
2  educational institutions such as LACMA are not deterred by the
3  threat of litigation from importing culturally significant
4  objects for temporary display.  Depriving a museum of the means
5  to recoup the costs of an exhibition has the same deterrent
6  effect in this sense as enjoining the museum from putting on the
7  exhibition at all.

8  B.   **The State Department's § 2459 Determinations Are Unsuitable**
9       **For Judicial Review In Any Event**

10       Not only would judicial review of the State Department's
11  immunity determination clearly run afoul of both the text and the
12  purpose of § 2459, it would also run contrary to principles of
13  administrative law.  To the extent that plaintiff seeks review
14  of the determination under the Administrative Procedure Act,
15  5 U.S.C. §§ 701-706 ("the APA"), such review is not available
16  here.  The APA generally allows district courts to "hold unlawful
17  and set aside agency action, findings, and conclusions found
18  to be arbitrary, capricious, an abuse of discretion, or
19  otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).
20  Judicial review of agency action is foreclosed, however,
21  where "agency action is committed to agency discretion by law."
22  5 U.S.C. § 701(a)(2).
23
24       Agency action is "committed to agency discretion by law"
25  when "the statute is drawn so that a court would have no
26  meaningful standard against which to judge the agency's exercise
27  of discretion."  Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct.
28

16

A38

1   1649, 84 L.Ed.2d 714 (1985) (citation omitted).[14]  "In such a

2   case, the statute ('law') can be taken to have 'committed' the

3   decisionmaking to the agency's judgment absolutely," Lincoln v.

4   Vigil, 508 U.S. at 191 (quoting Heckler v. Chaney, 479 U.S. at

5

6   830), and the court lacks jurisdiction to conduct any review of

7   that decisionmaking.

8       In this case, there is no standard set forth in § 2459 by

9   which a court could evaluate State Department determinations that

10  certain objects are of "cultural significance" and that their

11  exhibition in the United States is in the "national interest."

12  Indeed, these statutory terms "breathe discretion at every pore."

13
    Strickland v. Morton, 519 F.2d 467, 469 (9th Cir. 1975).  By not
14
    mandating a specific procedure for the President or his designee
15

16  to follow in making these determinations, or even defining the

17  general standards of "cultural significance" and "national

18  interest," Congress sought to leave these determinations to the

19  unfettered discretion of the Executive Branch.  Such broad

20  delegations of authority are common in matters concerning foreign
21
    policy, and are prototypical examples of delegations rendering
22

23  ─────────────────────────

    [14] *See also* Lincoln v. Vigil, 508 U.S. 182, 192, 113 S.Ct.
24  2024, 124 L.Ed.2d 101 (1993) (decision of Indian Health Service
    to discontinue program which had provided clinical services to
25  handicapped Indian children in the Southwest was "committed to
    agency discretion by law" and therefore not subject to judicial
26  review under the APA); Helgeson v. Bureau of Indian Affairs, 153
    F.3d 1000, 1003 (9th Cir. 1998) (BIA's decision that applications
27  did not offer reasonable prospect of repayment was unreviewable).

28

17

A39

1  agency action unreviewable under § 702(a)(2).  *E.g.*, Webster v.

2  Doe, 486 U.S. 592, 599-601, 108 S.Ct. 2047, 100 L.Ed.2d 632

3  (1988) (finding CIA's termination of an employee unreviewable

4  where statute authorized termination whenever CIA deemed

5  termination "advisable in the interests of the United States");

6  District No. 1 v. Maritime Administration, 215 F.3d 37, 42 (D.C.

7  Cir. 2000) ("Were we to decide whether the MarAd's order is

8  reasonable, we would necessarily be 'second guessing' . . .

9  [the Executive's] judgments on questions of foreign policy and

10 national interest.  These are not subjects fit for judicial

11 involvement.")[15]

12

13     Moreover, plaintiff cannot argue that, in the absence of any

14 judicially manageable statutory standard, the State Department's

15 own rules constrain its discretion and provide a basis for

16 judicial review.[16]  The first amended complaint cites to

17 unspecified "applicable rules" requiring an institution applying

18 for a grant of immunity under § 2459 to state whether it knows of

19

20

21  ───────────────

22     [15] Cultural exchanges between foreign countries and the
    United States play an important part in diplomatic relations.
23  Hence, State Department determinations made under § 2459 involve
    considerations of foreign policy.  For example, the State
24  Department may conclude that, in a given case, the exhibition of
    certain cultural objects in the United States might have a
25  deleterious effect on this nation's diplomatic relations with
    one or more foreign countries, and thus determine that the
26  exhibition is not in the "national interest."

27     [16] There are no regulations promulgated pursuant to the APA
28  with respect to § 2459.

18

any circumstances that would indicate "the potential for

competing claims of ownership" concerning the objects for which

immunity is sought. FAC ¶ 44. However, this language is taken

from a "Check List for Applicants" for § 2459 immunity found on

the State Department's web site.[17] The cited check list item

does not bind the State Department in any way; in particular,

contrary to the implicit suggestion in the first amended

complaint, see id. ¶ 51, it hardly requires the State Department

to reject an immunity request where the potential for competing

claims of ownership exists. See Padula v. Webster, 822 F.2d 97,

100 (D.C. Cir. 1987) ("Pronouncements that impose no significant

restraints on the agency's discretion are not regarded as binding

norms.").[18]

     In short, neither the Act itself, the legislative history,

case law construing the Act, nor State Department regulations

impose any judicially enforceable limits on the State

---

[17]   See http://www.state.gov/s/l/3196.htm.

[18]   Moreover, plaintiff's supposition that the State
Department would have necessarily denied MFAH's application had
it known that the Exhibition contained cultural objects subject
to competing ownership claims is absurd. Congress obviously did
not intend § 2459 to afford immunity from judicial process only
when such immunity is not needed, i.e., when there are no
competing claims of ownership to be immunized against. Indeed,
as discussed above, it was common knowledge as early as the
1960's that many works held by Soviet museums had been
nationalized from private individuals after the 1917 Revolution,
and it was specifically contemplated that § 2459 would provide
protection for such works.

19

1  Department's discretion to determine whether an object meets

2  § 2459's "cultural significance" and "national interest"

3  standards.  For this reason, such determinations are beyond the

4  ability of the courts to review.[19]

5                                IV

6

7                            CONCLUSION

8       For the foregoing reasons, this Court should dismiss the

9  first amended complaint with prejudice.

10  DATED:  Sept. 5, 2003.  Respectfully submitted,

11
                                DEBRA W. YANG
12                              United States Attorney
                                LEON W. WEIDMAN
13                              Assistant United States Attorney
                                Chief, Civil Division
14

15

16                              ROBERT I. LESTER
                                Assistant United States Attorney
17
                                Attorneys for Defendant-in-Intervention
18                              United States of America

19

20

21

22

23  _____

24       [19] Additionally, in order to have standing under the APA,
     a claimant must show he "suffer[ed] legal wrong because of agency
25   action, or [was] adversely affected or aggrieved by agency action
     within the meaning of a relevant statute."  5 U.S.C. § 702.
26   However, plaintiff is no worse off as a result of the State
     Department's § 2459 determinations.  Had those determinations not
27   been made, his grandfather's art would almost certainly not have
     been lent for exhibition in the United States.
28

                                20

                               A42

1          CERTIFICATE OF SERVICE BY FACSIMILE AND U.S. MAIL

2          I am over the age of 18 and not a party to the within

3     action.  I am employed by the Office of United States Attorney,

4     Central District of California.  My business address is 300 North

5     Los Angeles Street, Suite 7516,  Los Angeles, California 90012.

6     On **September 5, 2003**  I served

7     **NOTICE OF MOTION AND MOTION OF DEFENDANT-IN-INTERVENTION UNITED**
      **STATES FOR ORDER DISMISSING THE FIRST AMENDED COMPLAINT WITH**
8     **PREJUDICE; MEMORANDUM OF POINTS AND AUTHORITIES**

9     on each person or entity named below by facsimile and by

10    enclosing a copy in an envelope addressed as shown below and

11    placing the envelope for collection and mailing on the date and

12    at the place shown below following our ordinary office practices.

13    I am readily familiar with the practice of this office for

14    collection and processing correspondence for mailing.  On the

15    same day that correspondence is placed for collection and

16    mailing, it is deposited in the ordinary course of business with

17    the United States Postal Service in a sealed envelope with

18    postage fully prepaid.

19         Date of mailing: **September 5, 2003** Place of mailing:

20                     **See attached Service List**

21         I declare under penalty of perjury under the laws of the

22    United States of America that the foregoing is true and correct.

23         I declare that I am employed in the office of a member of

24    the bar of this court at whose direction the service was made.

25         Executed on: **September 5, 2003**, at Los Angeles, California.

26

27                              JOANNE MARIE LEGASPI

28


A43

## Delocque-Fourcaud v. The Los Angeles County Museum of Art, et al.

CV 03-5027-R(CTx)

**SERVICE LIST**

as of Sep 3, 2003

COUNSEL FOR PLAINTIFF:

Edward E. Klein
Joseph P. Garland
KLEIN & SOLOMON
275 Madison Avenue, 11th Floor
New York, NY 10016
Phone: (212) 661-9400
Fax:   (212) 661-6606
FEDERAL EXPRESS
Act. No. 8414 6684 0881

E. Randol Schoenberg
Donald S. Burris
Tara A. Davidoff
BURRIS & SCHOENBERG
12121 Wilshire Blvd.,
Suite 800
Los Angeles, CA 90025
Phone: (310) 442-5559
Fax:   (310) 442-0353


COUNSEL FOR LACMA:

D.M. "Chip" Rawlings
Susan L. Wines
Ezra A. Ross
QUINN EMANUEL URQUHART OLIVER & HEDGES
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
Firm:   (213) 624-7707
Fax:   (213) 624-0643


Thaddeus J. Stauber, Esq.
General Counsel
LOS ANGELES MUSEUM OF ART
5905 Wilshire Blvd.
Los Angeles, CA 90036
Phone:   (323) 857-6048
Fax:   (323) 857-6210

**ORIGINAL**



1   Edward E. Klein [Pro Hac Vice App. Submitted]
    Joseph P. Garland [Pro Hac Vice App. Submitted]
2   KLEIN & SOLOMON, LLP
    275 Madison Avenue, 11th Floor
3   New York, New York 10016
    Telephone: (212) 661-9400
4   Facsimile: (212) 661-6606

5   E. Randol Schoenberg (SBN 155281)
    Donald S. Burris (SBN 68523)
6   BURRIS & SCHOENBERG, LLP
    12121 Wilshire Boulevard, Suite 800
7   Los Angeles, California 90025
    Telephone: (310) 442-5559
8   Facsimile: (310) 442-0353
    E-mail: randols@bslaw.net

9

10  Attorneys for Plaintiff
    ANDRE MARC DELOCQUE-FOURCAUD
11

12              UNITED STATES DISTRICT COURT

13          CENTRAL DISTRICT OF CALIFORNIA

14  ANDRE MARC DELOCQUE-        )   CASE NO. CV03-5027 R(CTx)
    FOURCAUD,                   )
15                             )
            Plaintiff,          )   **NOTICE OF VOLUNTARY**
16                             )   **DISMISSAL BY STIPULATION**
        vs.                     )
17                             )
    THE LOS ANGELES COUNTY      )
18  MUSEUM OF ART,              )
                               )   THIS CONSTITUTES NOTICE OF ENTRY
19                             )   AS REQUIRED BY FRCP, RULE 77(d).
            Defendant,          )
20                             )
        and                     )
21                             )
    UNITED STATES OF AMERICA,   )
22                             )
            Defendant-in-       )
23          Intervention.       )
                               )
24  _____

25

26

27

28



FILED
CLERK, U.S. DISTRICT COURT
NOV 1 8 2003
CENTRAL DISTRICT OF CALIFORNIA
BY        DEPUTY

ENTERED
CLERK, U.S. DISTRICT COURT
NOV 1 9 2003
CENTRAL DISTRICT OF CALIFORNIA
BY        DEPUTY

LODGED

2003 NOV 14  PM 1:46
CENTRAL DIST. OF CAL.
LOS ANGELES

F:\2700\2728.001\Pleadings\Notice of Dismissal by Stipulation.wpd

NOTICE OF VOLUNTARY DISMISSAL

25

1    PLEASE TAKE NOTICE THAT pursuant to Rule 41(a) of the

2    Federal Rules of Civil Procedure, Plaintiff Andre Marc

3    Delocque-Fourcaud, Defendant the Los Angeles County Museum

4    of Art ("LACMA") and Defendant-in-Intervention United States

5    of America ("U.S.A.") hereby dismiss this action by

6    Stipulation with prejudice on the same basis as if full

7    evidence was presented at trial and the position of

8    Defendant, LACMA, and the Defendant-in-Intervention, U.S.A.,

9    was upheld in all factual and legal respects, and therefore

10    res judicata and collateral estoppel apply as if the

11    Defendant, LACMA, and the Defendant-in-Intervention, U.S.A.,

12    prevailed at trial on all issues, but only as to said

13    Defendant LACMA, Defendant-in-Intervention, U.S.A. and non-

14    parties The Museum of Fine Arts, Houston and the High Museum

15    of Art, Atlanta.

16    Dated: November    , 2003    KLEIN & SOLOMON, LLP

17

18                                By:  _____
                                      Edward E. Klein
19                                    Co-Counsel for Plaintiff
                                      ANDRE MARC DELOCQUE-FOURCAD
20    Dated: November 13, 2003    BURRIS & SCHOENBERG, LLP

21

22                                By:  _____
                                      E. Randol Schoenberg
23                                    Co-Counsel for Plaintiff
                                      ANDRE MARC DELOCQUE-FOURCAD
24    Dated: November    , 2003    LOS ANGELES COUNTY MUSEUM OF ART

25

26    IT IS SO ORDERED            By:  _____
                                      Thaddeus J. Stauber
27    DATE   Nov. 18, 2003            General Counsel for
                                      Los Angles County Museum of
28                                    Art

U.S. DISTRICT COURT JUDGE

Dismissal by Stipulation.wpd          2    NOTICE OF VOLUNTARY DISMISSAL

Burris & Schoenberg, LLP
Lawyers
12121 Wilshire Boulevard, Eighth Floor
Los Angeles, California 90025
Telephone • (310) 442-5559

Burris & Schoenberg, LLP

12121 Wilshire Blvd, Suite #1322
Los Angeles, California 90025
Telephone: (310) 442-5619

1    PLEASE TAKE NOTICE THAT pursuant to Rule 41(a) of the

2 Federal Rules of Civil Procedure, Plaintiff Andre Marc

3 Delocque-Fourcaud, Defendant the Los Angeles County Museum

4 of Art ("LACMA") and Defendant-in-Intervention United States

5 of America ("U.S.A.") hereby dismiss this action by

6 Stipulation with prejudice on the same basis as if full

7 evidence was presented at trial and the position of

8 Defendant, LACMA, and the Defendant-in-Intervention, U.S.A.,

9 was upheld in all factual and legal respects, and therefore

10 res judicata and collateral estoppel apply as if the

11 Defendant, LACMA, and the Defendant-in-Intervention, U.S.A.,

12 prevailed at trial on all issues, but only as to said

13 Defendant LACMA, Defendant-in-Intervention, U.S.A. and non-

14 parties The Museum of Fine Arts, Houston and the High Museum

15 of Art, Atlanta.

16 Dated: November    , 2003    KLEIN & SOLOMON, LLP

17

18                                By:

19                                   Edward E. Klein
                                     Co-Counsel for Plaintiff
                                     ANDRE MARC DELOCQUE-FOURCAD

20 Dated: November 13, 2003    BURRIS & SCHOENBERG, LLP

21

22                                By:

23                                   E. Randol Schoenberg
                                     Co-Counsel for Plaintiff
                                     ANDRE MARC DELOCQUE-FOURCAD

24

25 Dated: November    , 2003    LOS ANGELES COUNTY MUSEUM OF ART

26                                By:

27                                   Thaddeus J. Stauber
                                     General Counsel for
28                                   Los Angles County Museum of
                                     Art

F:\2700\2708.001\Pleadings\Notice of Dismissal by Stipulation.wpd

2    NOTICE OF VOLUNTARY DISMISSAL

TOTAL P.04

PLEASE TAKE NOTICE THAT pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, Plaintiff Andre Marc Delocque-Fourcaud, Defendant the Los Angeles County Museum of Art ("LACMA") and Defendant-in-Intervention United States of America ("U.S.A.") hereby dismiss this action by Stipulation with prejudice on the same basis as if full evidence was presented at trial and the position of Defendant, LACMA, and the Defendant-in-Intervention, U.S.A., was upheld in all factual and legal respects, and therefore res judicata and collateral estoppel apply as if the Defendant, LACMA, and the Defendant-in-Intervention, U.S.A., prevailed at trial on all issues, but only as to said Defendant LACMA, Defendant-in-Intervention, U.S.A. and non-parties The Museum of Fine Arts, Houston and the High Museum of Art, Atlanta.

Dated: November   , 2003    KLEIN & SOLOMON, LLP

By: _____
Edward E. Klein
Co-Counsel for Plaintiff
ANDRE MARC DELOCQUE-FOURCAD

Dated: November 13, 2003    BURRIS & SCHOENBERG, LLP

By: _____
E. Randol Schoenberg
Co-Counsel for Plaintiff
ANDRE MARC DELOCQUE-FOURCAD

Dated: November 13, 2003    LOS ANGELES COUNTY MUSEUM OF ART

By: _____
Thaddeus J. Stauber
General Counsel for
Los Angeles County Museum of
Art

F:\27001\2720.001\Pleadings\Notice of Dismissal by Stipulation.wpd

2    NOTICE OF VOLUNTARY DISMISSAL

Burris & Schoenberg, LLP
12121 Wilshire Boulevard, Suite 800
Los Angeles, CA 90025-1168
Telephone: (310) 442-5559

11/13/03  16:37 FAX 213 894 2535        US ATTORNEY'S OFFICE                    ☐004
Case 2:03-cv-05027-R-CT  Document 25  Filed 11/18/03  Page 5 of 7  Page ID #:29
NOV-13-2003  ;14:13        ● BURRIS & SCHOENBERG, LLP            310 442 0353    P.04/04

```
 1 | Dated: November      , 2003   QUINN EMANUEL URQUHART OLIVER &
   |                               HEDGES, LLP
 2 |
   |
 3 |                               By: _____
   |                                   D.M. Rawlings
 4 |                                   Attorneys for Defendant Los
   |                                   Angeles County Museum of
 5 |                                   Art
   |
 6 | Dated: November 13 , 2003     UNITED STATES ATTORNEY
   |
 7 |
   |                               By: _____
 8 |                                   Debra W. Yang
   |                                   Leon W. Weidman
 9 |                                   Robert I. Lester
   |                                   Attorneys for
10 |                                   Defendant-in-Intervention
   |                                   United States of America
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |
```

P \\Tool\2720.001\Pleadings\Notice of Dismissal by Stipulation.wpd

                        3    NOTICE OF VOLUNTARY DISMISSAL

TOTAL P.04

Sent by: quinn,emanuel                12136240643;            11/13/03  3:46PM; JetFax #50; Page 5/5
NOV-13-2003  14:19      BURRIS & SCHOENBERG, LLP            310 442 0353   P.04/04
Case 2:03-cv-05027-R-CT  Document 25  Filed 11/18/03  Page 6 of 7  Page ID #:23

```
 1 ║ Dated: November  13, 2003   QUINN EMANUEL URQUHART OLIVER &
 2 ║                             HEDGES, LLP
 3 ║                             By:  _____
 4 ║                                  D.M. Rawlings
   ║                                  Attorneys for Defendant Los
 5 ║                                  Angeles County Museum of
   ║                                  Art
 6 ║ Dated: November    , 2003   UNITED STATES ATTORNEY
 7 ║
   ║                             By:  _____
 8 ║                                  Debra W. Yang
   ║                                  Leon W. Weidman
 9 ║                                  Robert I. Lester
   ║                                  Attorneys for
10 ║                                  Defendant-in-Intervention
   ║                                  United States of America
11 ║
12 ║
13 ║
14 ║
15 ║
16 ║
17 ║
18 ║
19 ║
20 ║
21 ║
22 ║
23 ║
24 ║
25 ║
26 ║
27 ║
28 ║
```

**Burris & Schoenberg, LLP**

F:\2700\2729.001\Pleadings\Notice of Dismissal by Stipulation.wpd

                                   3   NOTICE OF VOLUNTARY DISMISSAL

A50

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

4        I am employed in the County of Los Angeles, State of California. I am over the age of 18
years and am not a party to the within action. My business address is 12121 Wilshire Boulevard,

5    Suite 800, Los Angeles, California 90025. On November 14, 2003, I caused the foregoing
document described as **NOTICE OF VOLUNTARY DISMISSAL BY STIPULATION** to be

6    served on the interested parties in this action, as follows:

7    D.M. RAWLINGS
         SUSAN L. WINES

8        QUINN EMANUEL URQUHART
             OLIVER & HEDGES, LLP

9        865 South Figueroa Street, 10th Floor
         Los Angeles, California    90017

10

11       Attorneys for Defendant
         Los Angeles County Museum of Art

12   DEBRA W. YANG
         United States Attorney

13       LEON W. WEIDMAN
         Assistant United States Attorney

14       Chief, Civil Division
         ROBERT I. LESTER, Esq.

15       Assistant United States Attorney
         300 North Los Angeles Street

16       Federal Building, Room 7516
         Los Angeles, California 90012

17

18       Attorneys for Defendant-in-
           Intervention United States of America

19

20   ☐    by placing ☐ the original ✓ a true copy thereof enclosed in a sealed envelope addressed
         as follows:

21   ✓    **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing

22       correspondence for mailing. Under that practice it would be deposited with the U.S.
         Postal Service on that same day with postage thereon fully prepaid at Los Angeles,

23       California in the ordinary course of business. I am aware that on motion of the party
         served, service is presumed invalid if the postal cancellation date or postage meter date is
         more than one day after date of deposit for mailing in the affidavit.

24
         I declare under penalty of perjury under the laws of the State of California and the laws of

25   the United States that the foregoing is true and correct.

26
     EXECUTED on November 14, 2003 at Los Angeles, California.

27

28                                    _____
                                          Dustin M. Baker

SUPREME COURT OF STATE OF NEW YORK
COUNTY OF NEW YORK

```
------------------------------- X          INDEX # 04100902
JORAM DEUTSCH,                   :
                 Plaintiff,      :            Original Filing Date:
                                 :              Jan. 20, 2004
           vs -                  :
                                 : Filing Date - 1st Amendment:
SOTHEBY's HOLDING INC.;          :            Jan. 26, 2004
a/k/a SOTHEBY's NEW YORK;        :
a/k/a SOTHEBY's LONDON;          :
METROPOLITAN MUSEUM OF ART;      :
A and M KALOKAIRINOS FOUNDATION; :
HISTORICAL MUSEUM OF             :
     CRETE IRAKLION;             :       1st AMENDED COMPLAINT
                 Defendants,     :        AND JURY DEMAND
------------------------------- X
```

Plaintiff, JORAM DEUTSCH, by his attorneys, EDWARD D.
FAGAN ESQ., as and for his amended complaint against defendants
herein, alleges the following, upon information and belief:

## INTRODUCTION & PROCEDURAL HISTORY

### Plaintiff Deutsch

1. At all times relevant hereto and material herein, plaintiff
   JORAM DEUTSCH was and is a resident of Switzerland.

2. At all times relevant hereto and material herein, plaintiff
   JORAM DEUTSCH had, has and continues to have business and
   property interests in the State of New York.

3. At all times relevant hereto and material herein, plaintiff
   DEUTSCH's father was one of the foremost lawyers in the
   world in the field of recovery and/or restitution of

--------------

*Deutsch v SOTHEBY's et al. – NYS Court Amended Complaint – Page 1*

property and/or the value thereof which was stolen, looted and/or destroyed by the Nazis during World War II.

4. At all times relevant hereto and material herein, plaintiff DEUTSCH's father had over 7000 restitution clients and 19 lawyers working for him in offices and businesses throughout the world, including in the United States and New York.

5. At all times relevant hereto and material herein, as a result of his professional and/or restitution activities, plaintiff DEUTSCH's father was a person who was respected by the victim community but despised by certain persons, entities and/or governments who/which found themselves as the targets and/or potential targets of actions brought by plaintiff DEUTSCH's father to recover property stolen by the Nazis and which were found in third persons hands after World War II or which were ultimately had to be paid for by persons, companies and/or governments.

6. At all times relevant hereto and material herein, plaintiff DEUTSCH's father was in the process of and/or had secured additional annual restitution and/or compensation monies, programs and/or benefits for Holocaust victims in general and worldwide.

7. At all times relevant hereto and material herein, plaintiff DEUTSCH's father became the target of a plot and conspiracy

------------

intended to frustrate, impede and/or interfere with restitution efforts in general and which were specifically designed to defraud plaintiff DEUTSCH's father of his rights and destroy his ability to represent Holocaust victims and/or other victims of Nazi persecution who sought to recover their property or the properties value.

8. At all times relevant hereto and material herein, The Painting was one of the targets of plaintiff DEUTSCH's father's recovery efforts.

9. At all times relevant hereto and material herein, plaintiff DEUTSCH's father was the attorney for the Hatvany's, in their efforts to recover The Painting and/or the value thereof and in fact had developed and secured certain important historical, factual, expert and legal victories in relation to The Painting.

10. At all times relevant hereto and material herein, plaintiff DEUTSCH has authority to bring this action in an attempt:
    a. to recover The Painting or the value thereof;
    b. to locate, secure and preserve evidence including but not limited to documents, witnesses and other evidence;
    c. to examine, inspect, photograph and videotape The Painting;

--------------

A54



    d. to examine, inspect and photocopy the ownership,
      transfer, trust, possessory and/or provenance related
      documents which are accompanying The Painting;

    e. to test and confirm the authenticity of The Painting;

    f. to have The Painting examined by a team of experts to
      determine the true condition of The Painting;

    g. to have The Painting independently appraised to
      determine its true value; and

    h. verify the credentials of The Painting.

11. At all times relevant hereto and material herein, plaintiff
DEUTSCH has authority to bring this action to recover
damages from the defendants herein.

12. At all times relevant hereto and material herein, in
addition to his representative authority, plaintiff DEUTSCH
also has a right to the relief sought herein as The
Painting is part of a collection and/or restitution monies
as to which DEUTSCH's father had an individual claim.

### Defendants

13. At all times relevant hereto and material herein, defendant
SOTHEBY'S HOLDINGS INC., a/k/a SOTHEBY's NEW YORK and a/k/a
SOTHEBY's LONDON (hereinafter "SOTHEBY's") was and is a
domestic corporation, duly organized, existing and/or



operating under and by virtue of the laws of the State of
New York and the United Kingdom.

14. At all times relevant hereto and material herein, defendant
SOTHEBY's maintains international headquarters, operating
and auction offices at 1334 York Avenue, New York, NY
10021.

15. At all times relevant hereto and material herein, defendant
SOTHEBY's shares are traded on the New York Stock Exchange
with a volume of 1,361,400 shares and a price of $14.86 per
share, as of January 23, 2004.

16. At all times relevant hereto and material herein, defendant
SOTHEBY's maintains international headquarters, operating
and auction offices in London at 34 - 35 Bond Street,
London W1A 2AA, UK.

17. At all times relevant hereto and material herein, defendant
SOTHEBY's maintains offices and representative agents in
Vienna Austria at Palais Wilczek, Herrengasse 5, Vienna A-
1010, Austria.

18. At all times relevant hereto and material herein, each of
the defendants SOTHEBY's NEW YORK and SOTHEBY's LONDON (i)
is/are managed, controlled and/or operated by, (ii) is/are
the alter egos of, (iii) is/are dependent upon and/or
incorporated into SOTHEBY's HOLDING INC. and as such
SOTHEBY's HOLDING INC. is ultimately responsible for the

--------------

acts of each of its, i.e. SOTHEBY's HOLDINGS INC.,
SOTHEBY's NEW YORK and SOTHEBY's LONDON, representative
agents around the world.

19. At all times relevant hereto and material herein, some of
the acts complained of herein and which give rise or
contributed to plaintiff's injuries and damages, occurred
during the period from 1988 - 1990 at a time when the
existing legal, corporate and/or management structure of
defendants SOTHEBY's HOLDINGS INC., SOTHEBY's NEW YORK and
SOTHEBY's LONDON may have been different than they are as
of the filing of this complaint. *Note: After plaintiff
receives discovery from defendants SOTHEBY's, plaintiff
expressly reserve the right to re-plead this section and to
also include the specific identities of defendant SOTHEBY's
managers, agents, officers and/or other representatives in
Austria, London and elsewhere who were involved in the
actions complained of herein and whose identities are
contained in the records of and known to defendants
SOTHEBY's.*

20. At all times relevant hereto and material herein, defendant
METROPOLITAN MUSEUM OF ART (hereinafter "THE MET") was and
is a domestic corporation duly organized, existing and/or
operating under and by virtue of the laws of the State of
New York.

----------------
*Deutsch v SOTHEBY's et al. – NYS Court Amended Complaint – Page 6*

A57

21. At all times relevant hereto and material herein, defendant THE MET maintains it offices and headquarters at Fifth Avenue and 82nd Street, New York, NY.

22. At all times relevant hereto and material herein, the A and M KALOKAIRINOS FOUNDATION was and is a Greek Foundation which "owned" and/or came to be in the possession of among other things paintings and works of art.

23. At all times relevant hereto and material herein, the HISTORICAL MUSEUM OF CRETE IRAKLION was and is a Greek historical entity which exhibits paintings and works of art.

24. At all times relevant hereto and material herein, the defendants A and M KALOKAIRINOS FOUNDATION and HISTORICAL MUSEUM OF CRETE IRAKLION maintain their offices in Greece but conduct business in and with other businesses in the State of New York and within the jurisdiction of this Court.

### The Painting & Events through January 24th, 2004

25. At all times relevant hereto and material herein, a master piece known as "Mt. Sinai" (hereinafter "The Painting") painted by El Greco was loaned by defendant A and M KALOKAIRINOS FOUNDATION to defendant HISTORICAL MUSEUM OF

---



CRETE IRAKLION a certain Greek museum, which in turn allowed the painting to be shipped to New York.

26. At all times relevant hereto and material herein, The Painting was on public display at THE MET up to and including January 12, 2004.

27. At all times relevant hereto and material herein, and upon information and belief, up until January 22, 2004 The Painting was still in New York at THE MET but was on its way to London where it was to be a part of an Exhibition at the National Gallery (the premier British Art Museum).

28. At all times relevant hereto and material herein, plaintiff made an emergency application so as to preserve evidence, which application included a request that, among other things, plaintiff be permitted to have The Painting examined by his experts. *See Affidavit of Joram Deutsch dated January 14, 2004 attached hereto as Exhibit 1.*

29. At all times relevant hereto and material herein, plaintiff explained in his request for emergent relief that if he and/or experts were not permitted to The Painting BEFORE it left New York, The Painting might disappear again and it might be unreasonably difficult and/or burdensome to secure and preserve evidence.

30. At all times relevant hereto and material herein, and as explained in greater detail below, in response to

------------



plaintiff's emergency application, defendant MET made
certain careless, reckless, negligent and/or misleading
statements without proper investigation into the truth or
known facts, including statements by Harold Holzer,
defendant MET's Vice President for Communications, who
publicly stated, among other things:

> "... (plaintiff's claims) were "invalid from the beginning ...";
>
> "... "this painting was not looted by the Nazis at all ..."; and
>
> "... "(the painting) was taken by the Soviets and sold back to the (Hatvany)
> family which kept it until they sold it ..."

> > See January 22, 2004 Associated Press, New
> > York Post, New York Newsday, 1010 WINS News
> > and WNBC articles attached hereto
> > collectively as Exhibit 2.

22. At all times relevant hereto and material herein, and as
explained in greater detail below, defendant MET's Holzer also
stated that:

> "... the information that the Met used, from sources like the Art Loss
> Registry, a database of stolen art, suggested that Baron Hatvany later
> repurchased the El Greco ..."

> > See January 24, 2004 New York Times article
> > attached hereto as Exhibit 3.

23. At all times relevant hereto and material herein, and as
explained in greater detail below, the statements by
defendant THE MET were careless, reckless, negligent and/or

were made so as to mislead the Court and to undermine the integrity of the plaintiffs claims.

24. At all times relevant hereto and material herein, plaintiff's emergency application was denied.

25. And, exactly as plaintiff predicted The Painting was not transported to London for exhibition at The National Gallery but was instead pulled from the exhibition and returned to Greece where it is virtually inaccessible to the plaintiff or any independent party.

### HISTORICAL FACTS ABOUT THE PAINTING

26. At all times relevant hereto and material herein, The Painting was part of a collection owned by the Hatvany family from Hungary.

27. At all times relevant hereto and material herein, The Painting was stolen from the Hatvany family by the Nazis in Budapest Hungary in 1944 and was, together with the rest of the Hatvany's immense painting collection, transported from Budapest to Berlin or Munich.

28. At all times relevant hereto and material herein, after the end of World War II, The Painting disappeared and remained hidden or missing for decades.

29. At all times relevant hereto and material herein, after the end of World War II, The Painting periodically surfaced

---

*Deutsch v SOTHEBY's et al. – NYS Court Amended Complaint – Page 10*

for private auctions through which certain auction houses
with expertise in transporting paintings internationally
and surreptitiously assisted the holders of The Painting in
transporting and disposing of The Painting.

30. At all times relevant hereto and material herein, The
Painting and the credentials that accompanied it, were
fake, forged, fraudulent and with any degree or exercise of
reasonable diligence and/or care potential promoters,
auctioneers, auction houses, purchasers and/or
intermediaries could have determined same so that the
title, rights and ownership of The Painting as represented
by whomever had it in their possession other than the
lawful Hatvany heirs, representatives, such as plaintiff
DEUTSCH's father, would or should have been suspect.

31. At all times relevant hereto and material herein, The
Painting had a very questionable history and trail until it
recently surfaced.

32. At all times relevant hereto and material herein, after The
Painting disappeared at the end of World War II, The
Painting was transported from Hungary to Berlin and/or
Munich; then The Painting showed up in the
seventies/eighties in Vienna Austria; next The Painting was
illegally transported out of Austria to London by having
custom declarations and statements listing The Painting as



a "fake"; then The Painting was "sold" in London by
defendants SOTHEBY's through a "private auction" to the
defendant A and M KALOKAIRINOS FOUNDATION in Greece in or
about 1989/1990.

33. At all times relevant hereto and material herein, in or
about the 1980s, The Painting showed up in Vienna Austria
at a market known as the "N a s c h m a r k t" — which is a
seedy sort of flea market and which is not exactly the type
of place one would expect to find a painting of this
pedigree and importance.

34. At all times relevant hereto and material herein, The
Painting was incredibly important and would have been
easily recognized because it was the ONLY El Greco to have
ever appeared in Austria at that time.

35. At all times relevant hereto and material herein, for The
Painting to appear in the "N a s c h m a r k t" caused
persons with knowledge to immediately conclude that it was
an original but a stolen painting belonging to the Hatvany
family and one of the key pieces in the collection that
Deutsch won back for the Hatvany's.

36. At all times relevant hereto and material herein, and as
explained in greater detail below, defendant SOTHEBY's
agents and/or representatives had either active or passive
involvement with the persons who were selling stolen

--------------
*Deutsch v SOTHEBY's et al. — NYS Court Amended Complaint — Page 12*



artwork to get the artwork out of Austria so that it could
be re-sold in London or other locations where the true
owners were unlikely to find the artwork, let alone make
claims for the return thereof.

37. At all times relevant hereto and material herein, and as
explained in greater detail below, defendant SOTHEBY's
agents and/or representatives had either active or passive
involvement with the seller of The Painting in making the
necessary applications, executing the necessary forms and
getting the export license by declaring The Painting a
"copy" or a "fake" or otherwise execute documents that made
it appear as if The Painting is NOT the real thing.

38. At all times relevant hereto and material herein, and as
explained in greater detail below, defendant SOTHEBY's
agents and/or representatives had either active or passive
involvement in removing, exporting and/or otherwise getting
The Painting out of Austria.

39. At all times relevant hereto and material herein, and as
explained in greater detail below, when The Painting
arrived in London in 1988/1989, defendant SOTHEBY's knew
that The Painting was NOT a "Fake" and was NOT a "Copy".

40. At all times relevant hereto and material herein, and as
explained in greater detail below, when The Painting
arrived in London in 1988/1989, defendant SOTHEBY's knew or



should have known that The Painting was part of the stolen Hatvany collection.

41. At all times relevant hereto and material herein, in or about 1988/1989, defendant SOTHEBY's sold The Painting to defendants A and M KALOKAIRINOS FOUNDATION and/or HISTORICAL MUSEUM OF CRETE IRAKLION for approximately 1 - 2 million dollars (it was reportedly sold for 12 million Austrian Schillings).

42. At all times relevant hereto and material herein, defendants A and M KALOKAIRINOS FOUNDATION and/or HISTORICAL MUSEUM of CRETE IRAKLION knew or should have known that The Painting was part of the stolen Hatvany collection.

43. At all times relevant hereto and material herein, The Painting had very special importance to and for the defendants A and M KALOKAIRINOS FOUNDATION and HISTORICAL MUSEUM OF CRETE IRAKLION.

44. At all times relevant hereto and material herein, The Painting was important to defendants A and M KALOKAIRINOS FOUNDATION and HISTORICAL MUSEUM OF CRETE IRAKLION because it was the only El Greco painting that they had or were seeking to acquire so that it could be place in the City of IRAKLION which was the home town of El Creco.



45. At all times relevant hereto and material herein, art experts and the state of knowledge and expertise related to The Painting was that The Painting was part of the Hatvany collection, that the seller in Austria who gave The Painting to defendant SOTHEBY's to sell, that defendant SOTHEBY's and that defendant A and M KALOKAIRINOS FOUNDATION and HISTORICAL MUSEUM OF CRETE IRAKLION had to know that title to and provenance of The Painting was suspect, the title was clouded and that The Painting was subject to a claim by the Hatvany's and plaintiff DEUTSCH's father.

46. At all times relevant hereto and material herein, the defendant SOTHEBY's choose to disregard the existing evidence and facts so that it could make the sale of The Painting to defendant A and M KALOKAIRINOS FOUNDATION and HISTORICAL MUSEUM OF CRETE IRAKLION.

47. At all times relevant hereto and material herein, defendant A and M KALOKAIRINOS FOUNDATION and HISTORICAL FOUNDATION OF CRETE IRAKLION chose to disregard the existing evidence and facts so that it/they could make the purchase of The Painting from defendant SOTHEBY's.

48. At all times relevant hereto and material herein, defendants SOTHEBY's, A and M KALOKAIRINOS FOUNDATION and HISTORICAL FOUNDATION OF CRETE IRAKLION knew or through the



exercise of reasonable diligence could have determined that
The Painting was the subject of a claim by Hatvany and
plaintiff's father DEUTSCH and that The Painting had been
stolen from the Hatvanys by the Nazis.

49. At all times relevant hereto and material herein, The
Painting is/was so well known that if it had ever been
displayed publicly during the 1950s, 1960s, 1970s, 1980s or
1990s it would or could have been spotted and seized.

50. At all times relevant hereto and material herein,
plaintiff DEUTSCH's father died in May 2002 and apparently
defendants A and M KALOKAIRINOS FOUNDATION, HISTORICAL
MUSEUM OF CRETE IRAKLION, THE MET and others believed it
was safe to transport the painting out of Greece.

51. At all times relevant hereto and material herein,
defendants A and M KALOKAIRINOS FOUNDATION and HISTORICAL
MUSEUM OF CRETE IRAKLION knew or should have known that
title of The Painting was tainted and/or knew and/or should
have known that The Painting was among the stolen Hatvany
collection and that claims were made by and/or awards had
been made to or through plaintiff's father for the return
of The Painting.

52. At all times relevant hereto and material herein, plaintiff
DEUTSCH is unaware of how or under what circumstances The



Painting came to be transported to and displayed at
defendant THE MET.

53. At all times relevant hereto and material herein,
defendant The MET negligently researched the provenance of
The Painting prior to allowing The Painting to be placed in
an exhibition which defendant THE MET promoted and from
which it earned significant revenues.

54. At all times relevant hereto and material herein,
defendants A and M KALOKAIRINOS FOUNDATION and HISTORICAL
MUSEUM of CRETE IRAKLION earned significant revenues and/or
other profits from The Paintings exhibition at defendant
THE MET.

**Plaintiff's Increased Burden Since The Painting Left New York**

55. At all times relevant hereto and material herein, and in
his prior application for emergent relief, plaintiff
explained that once the rights, title, interests,
provenance for and/or ownership of The Painting is in
question, and given The Painting's history, there was a
reasonable probability and virtual certainty that The
Painting would be returned to Greece and never be seen
again.

56. At all times relevant hereto and material herein, the
plaintiff and his experts should have had the opportunity



to examine and test The Painting before it was allowed to
leave the US.

57. At all times relevant hereto and material herein, before
The Painting left the United States the plaintiff and his
experts should have been permitted to:

    a. examine, inspect, photograph and videotape The
       Painting;

    b. examine, inspect and photocopy the ownership, transfer,
       trust, possessory and/or provenance related documents
       which accompanied The Painting;

    c. examine, inspect and photocopy the ownership, transfer,
       trust, possessory and/or provenance related documents
       upon which defendant THE MET claimed The Painting was
       the lawful property of defendants A and M KALOKAIRINOS
       FOUNDATION and HISTORICAL MUSEUM OF CRETE IRAKLION;

    d. test and confirm the authenticity of The Painting;

    e. examine the true condition of The Painting;

    f. independently appraise The Painting;

    g. verify the credentials of The Painting.

58. At all times relevant hereto and material herein,
plaintiffs explained that if The Painting left the United
States there was a reasonable likelihood and probability
that The Painting would be returned to Greece and might
never again come within the jurisdiction of this Court,



thereby increasing the burden on plaintiff to prove his
claims herein and to recover The Painting or secure
restitution therefore.

59. At all times relevant hereto and material herein, now that
The Painting left New York, there is an increased
likelihood and probability that evidence necessary and
related to plaintiff DEUTSCH's claims against the other
persons, entities and/or third parties whose identities are
both known and unknown will be more difficult and
burdensome to secure, if at all.

60. At all times relevant hereto and material herein, now that
The Painting left New York, when The Painting was permitted
to leave the New York, there was an increased likelihood
and probability that evidence necessary and related to
plaintiff DEUTSCH's claims for the recovery of The Painting
and/or restitution for the value thereof may be lost.

### AS AND FOR A FIRST COUNT AGAINST DEFENDANT SOTHEBY's

61. Plaintiff repeats and realleges each and every one of the
allegations set forth in the foregoing counts as if the
same were set forth fully and at length herein.

62. At all times relevant hereto and material herein, and as
explained further below, defendant SOTHEBY's had agents
and/or representatives in Austria because, among other



"seller", to help get such works of art out of Europe and to London so that it could be re-sold in locations where the true owners were unlikely to find the artwork, let alone make claims for the return thereof.

65. At all times relevant hereto and material herein, and based on information gathered and reasonable belief, defendant SOTHEBY's agents knew, had to know or with the exercise of proper diligence could know or suspect that paintings such as The Painting could not get proper expert licenses, especially in Austria, because of sensitive issues related to artwork that had been reported as having been stolen by the Nazis from Holocaust victims, mostly Jews, or were otherwise lost, missing or as to which there was questionable title of the offering "seller".

66. At all times relevant hereto and material herein, and based on information gathered and reasonable belief, defendant SOTHEBY's agents in Austria and/or in certain other countries in Europe knew, had to know or with the exercise of proper diligence could know or suspect that there was a "market to be made" and much money to be earned from the sale of such artwork, including artwork that been reported as having been stolen by the Nazis from Holocaust victims, mostly Jews, or were otherwise lost, missing or as to which there was questionable title of the offering "seller".



67. At all times relevant hereto and material herein, and based on information gathered and reasonable belief, defendant SOTHEBY's knew, had to know or with the exercise of proper diligence could know or suspect that Austria and certain other countries in Europe were locations where many of the aforesaid artwork that had been reported as having been stolen by the Nazis from Holocaust victims, mostly Jews, or were otherwise lost, missing or as to which there was questionable title of the offering "seller", were "kept" or could otherwise be "acquired" for re-sale or auction.

68. At all times relevant hereto and material herein, upon information gathered and reasonable belief, when The Painting showed up in Vienna Austria at a market known as the "N a s c h m a r k t", the agents for defendant SOTHEBY's learned of it and knew, had to know or with the exercise of proper diligence could know or suspect that The Painting did NOT belong in such a place.

69. At all times relevant hereto and material herein, upon information gathered and reasonable belief, defendant SOTHEBY's and its agents and/or representatives in Austria, knew, had to know or with the exercise of proper diligence could know or suspect that The Painting was incredibly important and would have been easily recognized because it was the ONLY El Greco to have ever appeared in Austria.

------------



70. At all times relevant hereto and material herein, for The Painting to appear in the "*N a s c h m a r k t*" caused or would or should have caused persons with knowledge to immediately conclude, suspect and/or believe, including defendant SOTHEBY's and its agents and/or representatives in Austria, that it was an original but stolen painting belonging to the Hatvany family and was one of the key pieces in the collection that DEUTSCH father won back for the Hatvany's.

71. At all times relevant hereto and material herein, based on information gathered and reasonable belief, defendant SOTHEBY's agents and/or representatives in Austria and elsewhere were, had to have been willing to assist and/or at a minimum had to have knowledge of suspect or clouded ownership of the offered art pieces by persons who were selling stolen artwork so that the artwork could be taken out of Austria and re-sold in locations where the true owners were unlikely to find the artwork, let alone make claims for the return thereof.

72. At all times relevant hereto and material herein, based on information gathered and reasonable belief, defendant SOTHEBY's agents knew, had to know or with the exercise of proper diligence could have known that paintings such as The Painting, which had questionable title or ownership at

best, could not get proper expert licenses from Austria because of sensitive issues in Austria and Germany related to stolen, looted or missing Jewish artwork.

73. At all times relevant hereto and material herein, based on information gathered and reasonable belief, defendant SOTHEBY's was actively, passively or otherwise involved in counseling, working with, advising and/or assisting the seller of The Painting with Austrian export licenses including such things as declaring or having knowledge of the declaration that The Painting a "copy" or a "fake" on official documents which made it appear as if The Painting is/was NOT the real thing so it could be taken out of Austria.

74. At all times relevant hereto and material herein, based on information gathered and reasonable belief, defendant SOTHEBY's was actively, passively or otherwise involved in counseling, working with, advising and/or assisting the seller of The Painting with the application or the application process for an export license to allow the Painting to be shipped from Austria to defendant SOTHEBY's offices in London where it was going to be auctioned, offered and sold by defendant SOTHEBY's.

75. At all times relevant hereto and material herein, based on information gathered and reasonable belief, defendant

SOTHEBY's knew, had to know or with the exercise of proper
diligence could have known that The Painting was NOT a copy
and was NOT a fake when they advised and/or helped the
seller transport, ship or move The Painting out of Austria.

76. At all times relevant hereto and material herein, based on
information gathered and reasonable belief, as a result of
defendant SOTHEBY's actively, passively or otherwise being
involved in the counseling, working with, advising and/or
assisting the seller of The Painting, the seller obtained
export documents, including Austrian government export
paperwork, insurance documents, customs declarations,
shipping forms, sales, auction and/or other documents so
that The Painting could be taken out of Austria and shipped
to London.

77. At all times relevant hereto and material herein, based on
information gathered and reasonable belief, as a result of
defendant SOTHEBY's actively, passively or otherwise being
involved in the counseling, working with, advising and/or
assisting the seller of The Painting, defendant SOTHEBY's
knew, had to know or with the exercise of reasonable and/or
proper diligence could have known that the export
documents, including Austrian government export paperwork,
insurance documents, customs declarations, shipping forms,
sales, auction and/or other documents that the seller

obtained so that The Painting could be taken out of Austria and shipped to London were false, inaccurate, misleading and/or fraudulently filled out.

78. At all times relevant hereto and material herein, based on information gathered and reasonable belief, defendant SOTHEBY's aforesaid active, passive or other involvement in the counseling, working with, advising and/or assisting the seller of The Painting regarding the securing of Austrian government export paperwork, insurance documents, customs declarations, shipping forms, sales, auction and/or other documents so that The Painting could be taken out of Austria and shipped to London, defendant SOTHEBY's was negligent, careless, reckless and/or engaged in fraudulent actions by others.

79. At all times relevant hereto and material herein, based on information gathered and reasonable belief, defendant SOTHEBY's had a duty to refrain from participating in the aforesaid active, passive or other involvement in the counseling, working with, advising and/or assisting the seller of The Painting regarding the securing of Austrian government export paperwork, insurance documents, customs declarations, shipping forms, sales, auction and/or other documents so that The Painting could be taken out of Austria and shipped to London.



80. At all times relevant hereto and material herein, based on information gathered and reasonable belief, and assuming the alternative that defendant SOTHEBY's had no part in the aforesaid actions, at a minimum it/they had a duty to report the activities of the seller of The Painting who sought to secure Austrian government export paperwork, insurance documents, customs declarations, shipping forms, sales, auction and/or other documents so that The Painting could be taken out of Austria and shipped to London, under false pretenses.

81. At all times relevant hereto and material herein, based on information gathered and reasonable belief, when The Painting arrived in London in 1988/1989, defendant SOTHEBY's had one of its own experts exam and appraise The Painting and knew or had reason to know that The Painting was NOT a "Fake" and was NOT a "Copy".

82. At all times relevant hereto and material herein, based on information gathered and reasonable belief, after The Painting arrived in London in 1988/1989, defendant SOTHEBY's knew, should have known and/or with the exercise of reasonable diligence could have discovered that The Painting was part of or had been reported as being part of the looted, stolen and/or missing Hatvany collection.

83. At all times relevant hereto and material herein, based on information gathered and reasonable belief, after The Painting arrived in London in 1988/1989, defendant SOTHEBY's had a duty to return The Painting to the Hatvany family and/or its/their representatives.

84. At all times relevant hereto and material herein, based on information gathered and reasonable belief, after The Painting arrived in London in 1988/1989 and defendant SOTHEBY's experts determined it was NOT a Fake and was NOT a Copy, it had a duty to conduct its own internal investigation and to take appropriate steps based on said investigation related to the activities of its agents and/or representatives in Austria regarding their involvement in the events surrounding The Painting and the events described herein, particularly The Painting being transported from Austria to London for sale and auction and defendants SOTHEBY's agents' involvement in Austria in getting The Painting OUT of Austria.

85. At all times relevant hereto and material herein, based on information gathered and reasonable belief, after The Painting arrived in London in 1988/1989, defendant SOTHEBY's had a duty to report, to proper authorities in Austria, London and elsewhere, the person who offered The Painting for sale to and through defendant SOTHEBY's.



86. At all times relevant hereto and material herein, based on information gathered and reasonable belief, after The Painting arrived in London in 1988/1989, defendant SOTHEBY's had a duty NOT to sell The Painting but to hold it or to turn it over to the proper authorities so that the Hatvany heirs could reclaim or make their claims to reclaim The Painting.

87. At all times relevant hereto and material herein, based on information gathered and reasonable belief, by virtue of its status as an international auction house defendant SOTHEBY's had an enhanced duty to safeguard The Painting for its rightful owners and NOT to allow The Painting to leave its control.

88. At all times relevant hereto and material herein, based on information gathered and reasonable belief, the actions of defendant SOTHEBY's agents and/or representatives in Austria, as described above and in particular with regard to their active, passive and knowledge of and inaction about actions, guidance, assistance and other advice that helped the "offering seller" of The Painting to help get The Painting out of Austria to London, were negligent, careless, reckless, wrongful and motivated by greed.

89. At all times relevant hereto and material herein, based on information gathered and reasonable belief, the actions of

------------
*Deutsch v SOTHEBY's et al. – NYS Court Amended Complaint – Page 29*

defendant SOTHEBY's agents and/or representatives in Austria, as described above and in particular with regard to their active, passive or knowledge of and inaction about guidance, assistance and other advice that helped the "offering seller" of The Painting get The Painting out of Austria to London, were negligent, careless, reckless, wrongful and motivated by greed and in disregard for their duties and obligations then and there existing.

90. At all times relevant hereto and material herein, based on information gathered and reasonable belief, the actions of defendant SOTHEBY's agents and/or representatives in Austria, as described above and in particular with regard to their active, passive or knowledge of and inaction about guidance, assistance and other advice that helped the "offering seller" of The Painting get The Painting out of Austria to London, were negligent, careless, reckless, wrongful and motivated by greed and were in total disregard for the acceptable standards and/or course of conduct then and there existing.

91. At all times relevant hereto and material herein, based upon information gathered and reasonable belief, defendant SOTHEBY's carelessly, recklessly and/or negligently failed to discharge their aforesaid duties.

------------
*Deutsch v SOTHEBY's et al. – NYS Court Amended Complaint – Page 30*



92. At all times relevant hereto and material herein, based on information gathered and reasonable belief, the above described events, related to The Painting which is artwork that had been reported as having been stolen by the Nazis from Holocaust victims, mostly Jews, or were otherwise lost, missing or as to which there was questionable title of the offering "seller", and for whom there was little likelihood any claims could ever be made, was/is offensive and should be deterred by the imposition of punitive or exemplary damages.

93. As a direct and proximate result of defendant SOTHEBY's carelessness, recklessness, negligence, breach of duties and obligations and/or violation of the accepted standards and course of conduct, plaintiffs suffered injuries and monetary losses.

94. **WHEREFORE, plaintiff demands judgment against defendant SOTHEBY HOLDING INC., a/k/a SOTHEBY's NEW YORK and a/k/a SOTHEBY's LONDON, jointly severally and/or in the alternative, for:**

    a. the reasonable current value of The Painting which is currently estimated to be between $ 15 - 20 million dollars and which will be determined by the ultimate trier of fact;



b. compensatory damages in the amount of Five Hundred
   Thousand Dollars ($500,000.00) plus interest from 1989;

c. punitive and/or exemplary damages designed to deter the
   offensive practice of trading in, acquiring, marketing,
   transporting and/or re-selling artwork of questionable
   or suspect origin, including artwork that had been
   reported as having been stolen by the Nazis from
   Holocaust victims, mostly Jews, or were otherwise lost,
   missing or as to which there was questionable title of
   the offering "seller", and for whom there was little
   likelihood any claims could ever be made and in the
   amount of $100 million dollars, which amount shall be
   used for the benefit of Holocaust victims relief and
   humanitarian programs worldwide; and

d. for attorneys fees and costs of this action.

### AS AND FOR A SECOND COUNT AGAINST DEFENDANT THE MET

95. Plaintiff repeats and realleges each and every one of the
    allegations set forth in the foregoing counts as if the
    same were set forth fully and at length herein.

96. At all times relevant hereto and material herein, in
    plaintiffs request for emergent relief that if he and/or
    experts were not permitted to The Painting BEFORE it left
    New York, The Painting might disappear again and it might



be unreasonably difficult and/or burdensome to secure and
preserve evidence.

97. At all times relevant hereto and material herein, in
response to plaintiff's emergency application, defendant
MET made certain careless, reckless, negligent and/or
misleading statements without proper investigation into the
truth or known facts, including statements by Harold
Holzer, defendant MET's Vice President for Communications,
who publicly stated, among other things

> "... (plaintiff's claims) were "invalid from the beginning ...";
>
> "... "this painting was not looted by the Nazis at all ..."; and
> "... "(the painting) was taken by the Soviets and sold back to the
> (Hatvany) family which kept it until they sold it ..."
>
> > See January 22, 2004 Associated Press, New
> > York Post, Newsday, 1010 WINS News and WNBC
> > articles attached collectively as Exhibit 2.

98. At all times relevant hereto and material herein, defendant
MET's Holzer also stated that:

> "... the information that the Met used, from sources like the Art Loss
> Registry, a database of stolen art, suggested that Baron Hatvany later
> repurchased the El Greco ..."
>
> > See January 24, 2004 New York Times article
> > attached as Exhibit 3.

99. At all times relevant hereto and material herein,
statements by defendant THE MET were careless, reckless,



negligent and/or were made so as to mislead the New York
Court.

100.

At all times relevant hereto and material herein, the
statements by defendant THE MET were careless, reckless,
negligent and/or were made so as to undermine the integrity
of the plaintiff's claims.

101.

At all times relevant hereto and material herein, the
statements by defendant THE MET were made with disregard
for the truth thereof.

102.

At all times relevant hereto and material herein, the
statements made by defendant THE MET were made in an
attempt to direct attention away from defendant THE MET,
which failed to properly and competently check the
provenance, historical records, ownership, rights and title
to The Painting before defendant THE MET publicized,
exhibited and profited from The Painting being on display
at THE MET.

103.

At all times relevant hereto and material herein, defendant
THE MET should have had systems and/or procedures by and/or
through which it properly and competently check the



provenance, historical records, ownership, rights and title
of paintings and/or artwork that are proposed for
exhibition at defendant THE MET.

104.

At all times relevant hereto and material herein, defendant
THE MET should have had systems and/or procedures by and/or
through which it properly and competently check the
provenance, historical records, ownership, rights and title
of paintings and/or artwork that are proposed for
exhibition at defendant THE MET so that in the event works
of art, such as The Painting, that were stolen, looted,
taken and withheld from their rightful owners, such as The
Painting which was looted by The Nazis, so that defendant
THE MET could inform the proper authorities when such works
of art were offered to it for exhibition.

105.

At all times relevant hereto and material herein, defendant
THE MET by virtue of its position and status in the art
world, has an enhanced duty to minimize, reduce and at a
minimum not to be a part of the instances of trafficking
and profiteering from looted works of art.

106.

At all times relevant hereto and material herein,
defendants THE MET and A AND M KALOKAIRINOS FOUNDATION

profited and/or benefited from The Painting being on
display at THE MET.

107.

At all times relevant hereto and material herein, defendant
THE MET failed to establish systems and/or procedures by
and/or through which it properly and competently check the
provenance, historical records, ownership, rights and title
of paintings and/or artwork that are proposed for
exhibition at defendant THE MET.

108.

At all times relevant hereto and material herein, defendant
THE MET disregarded the procedures that they did have to
properly and competently check the provenance, historical
records, ownership, rights and title of paintings and/or
artwork that are proposed for exhibition at defendant THE
MET.

109.

At all times relevant hereto and material herein, when The
Painting was proposed for exhibition to THE MET, defendant
THE MET had a duty to discover and report to the competent
authorities, including the International Commission for Art
Restitution, the fact that The Painting was scheduled to be
exhibited at THE MET so that the rightful owners could take
the appropriate and timely action for its restitution.

110.

At all times relevant hereto and material herein, defendant THE MET was negligent in and/or failed to perform its aforesaid duties.

111.

At all times relevant hereto and material herein, when the plaintiff made his claims, defendant THE MET made the aforesaid careless, reckless, negligent and/or misleading statements.

112.

At all times relevant hereto and material herein, as a direct and proximate result of defendant THE MET's aforesaid (a) negligence in and/or failed to perform its aforesaid duties and (b) careless, reckless, negligent and/or misleading statements, plaintiff was injured and sustained additional damages.

**113.**

**WHEREFORE, plaintiff demands judgment against the defendant THE MET, for equitable and monetary relief in an amount to be determined by the ultimate trier of fact for:**

a. the aforesaid negligent and/or disparaging statements made by defendant THE MET's representative Harold Holzer during the period of January 20 – 24, 2004 about plaintiff and plaintiffs claims to The Painting;



b. Proceeds earned by THE MET for the exhibition of The Painting;

c. For attorneys fees and costs of this action.

## AS AND FOR A THIRD COUNT AGAINST DEFENDANTS A AND M KALOKAIRINOS FOUNDATION & HISTORICAL MUSEUM OF CRETE

114.

Plaintiff repeats and realleges each and every one of the allegations set forth in the foregoing counts as if the same were set forth fully and at length herein.

115.

At all times relevant hereto and material herein, defendant A AND M KALOKAIRINOS FOUNDATION and HISTORICAL SOCIETY OF IRAKLION should have had systems and/or procedures by and/or through which it properly and competently check the provenance, historical records, ownership, rights and title of paintings and/or artwork that are proposed for purchase and/or exhibition.

116.

At all times relevant hereto and material herein, defendants should have had systems and/or procedures by and/or through which it properly and competently check the provenance, historical records, ownership, rights and title of paintings and/or artwork that are proposed for acquisition and/or exhibition at defendants A and M

KALOKAIRINOS FOUNDATION and HISTORICAL SOCIETY OF IRAKLION
so that in the event works of art, such as The Painting,
that were stolen, looted, taken and withheld from their
rightful owners, such as The Painting which was looted by
The Nazis, so that defendants could inform the proper
authorities when such works of art were offered to it for
purchase and/or exhibition.

117.

At all times relevant hereto and material herein,
defendants A and M KALOKAIRINOS FOUNDATION and HISTORICAL
SOCIETY OF IRAKLION by virtue of its/their position and
status in the art world, has an enhanced duty to minimize,
reduce and at a minimum not to be a part of the instances
of trafficking and profiteering from looted works of art.

118.

At all times relevant hereto and material herein,
defendants A and M KALOKAIRINOS FOUNDATION and HISTORICAL
SOCIETY OF IRAKLION profited and/or benefited from The
Painting being on display at its/their museum and from its
exhibition at other museums around the world, such as from
THE MET.

119.

At all times relevant hereto and material herein,
defendants A and M KALOKAIRINOS FOUNDATION and HISTORICAL

SOCIETY OF IRAKLION failed to establish systems and/or
procedures by and/or through which it properly and
competently check the provenance, historical records,
ownership, rights and title of paintings and/or artwork
that are proposed for acquisition and/or exhibition.

120.

At all times relevant hereto and material herein, defendant
A and M KALOKAIRINOS FOUNDATION and HISTORICAL SOCIETY OF
IRAKLION disregarded the procedures that they did have to
properly and competently check the provenance, historical
records, ownership, rights and title of paintings and/or
artwork and in particular the ownership of The Painting.

121.

At all times relevant hereto and material herein, when The
Painting was proposed for acquisition to defendants A and M
KALOKAIRINOS FOUNDATION and HISTORICAL SOCIETY OF IRAKLION
by defendant SOTHEBY's, defendants A and M KALOKAIRINOS
FOUNDATION and HISTORICAL SOCIETY OF IRAKLION had a duty to
discover and report to the competent authorities the fact
that The Painting was being offered for sale to it so that
the rightful owners could take the appropriate and timely
action for its restitution.

122.

At all times relevant hereto and material herein, defendant

--------------

A and M KALOKAIRINOS FOUNDATION and HISTORICAL SOCIETY OF
IRAKLION was negligent in and/or failed to perform its
aforesaid duties.

123.

At all times relevant hereto and material herein, defendant
A and M KALOKAIRINOS FOUNDATION and HISTORICAL SOCIETY OF
IRAKLION disregarded and/or failed to competently and/or
properly perform their aforesaid duties because they
instead sought to acquire The Painting, albeit improperly
so and in derogation of the rights, title and interest of
the Hatvany's and plaintiff DEUTSCH to The Painting or the
restitution thereof or the present value thereof.

124.

At all times relevant hereto and material herein, as a
direct and proximate result of defendants A and M
KALOKAIRINOS FOUNDATION and HISTORICAL SOCIETY OF IRAKLION
aforesaid (a) negligence in and/or failed to perform its
aforesaid duties and (b) careless, reckless, negligent
and/or misleading statements, plaintiff was injured and
sustained additional damages.

125.

**WHEREFORE, plaintiff demands judgment against the
defendants A AND M KALOKAIRINOS FOUNDATION and HISTORICAL
SOCIETY OF IRAKLION for:**



a. the restitution of The Painting or the reasonable
current value of The Painting in an amount to be
determined by the ultimate trier of fact; and

b. attorneys' fees and costs of this action.

### AS AND FOR A FOURTH COUNT AGAINST ALL DEFENDANTS

126.

Plaintiff repeats and realleges each and every one of the
allegations set forth in the foregoing counts as if the
same were set forth fully and at length herein.

127.

At all times relevant hereto and material herein, as a
direct and proximate result of each of the defendants
aforesaid acts, plaintiff has been damaged.

128.

**WHEREFORE, plaintiff DEUTSCH demands judgment against each
of the defendants SOTHEBY's HOLDING INC., THE METROPOLITAN
MUSEUM OF ART, A and M KALOKAIRINOS FOUNDATION and
HISTORICAL MUSEUM OF CRETE IRAKLION, and each of them,
jointly, severally and/or in the alternative, for relief as
follows:**

a. Examination, inspection, photographing and videotaping
of The Painting and all evidence related to the claims
herein;

--------------
*Deutsch v SOTHEBY's et al. – NYS Court Amended Complaint – Page 42*

A92



b. Examination, inspection and photocopying of ownership, transfer, trust, custody and/or provenance related documents related to The Painting;

c. Testing and confirming authenticity of The Painting and all related documents;

d. Permitting examination by a team of experts to determine true condition of The Painting;

e. Permitting independent appraisers to determine true current and market value of The Painting;

f. Permitting verification of credentials of The Painting;

g. Directing production of any and all documents in defendants' possession relating to The Painting;

h. For attorneys fees and costs; and

i. For such other relief as is just and equitable.

Dated: New York, New York
     January 26, 2004

        Yours etc.
        Edward D. Fagan Esq.
        Law Offices
        51 JFK Parkway
        1st Floor West
        Short Hills, NJ 07078
        Tel # (973) 422-1280
        Email efaganatty@aol.com

        - and -

16804

        *New NY Address:*
        11 Penn Plaza, 5th Floor
        New York, NY 10048
        Attorneys for Plaintiffs

        **PLEASE RESPOND TO NJ**

---------------

*Deutsch v SOTHEBY's et al. – NYS Court Amended Complaint – Page 43*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 55
--------------------------------------------------------------x

JORAM DEUTSCH,

                     Index # 04100902

           Plaintiff,

vs.                             Hon. Jane Solomon

SOTHEBY'S HOLDING INC.;
a/k/a SOTHEBY'S NEW YORK;
a/k/a SOTHEBY'S LONDON;          **JUDGMENT**
METROPOLITAN MUSEUM OF ART
A and M KALOKAIRINOS FOUNDATION
HISTORICAL MUSEUM OF CRETE
OF CRETE IRAKLION,

          Defendants.
--------------------------------------------------------------x

        Plaintiff Joram Deutsch ("Plaintiff") having appeared by his attorney

Edward D. Fagan, Esq., and having commenced this action against defendant Sotheby's

Holdings Inc. ("Sotheby's") by the filing of an Amended Summons and Amended

Complaint on January 26, 2004;

        Defendant Sotheby's having appeared by Weil, Gotshal & Manges LLP,

and having moved this Court by a Notice of Motion, filed on July 6, 2004, for an Order,

pursuant to CPLR 306-b, dismissing the Amended Complaint in its entirety as against

Sotheby's;

        By Decision and Order, dated July 21, 2004 and entered in the Office of

the Clerk of the Court on July 29, 2004 (a true copy of which is attached hereto), the

Court granted Defendant's motion in its entirety and directed the clerk to enter judgment

dismissing the Complaint and to enter judgment on the order of the court dated January,

21, 2004 (a true copy of which is attached hereto) denying the application of

FILED

AUG 6 - 2

COUNTY CLERK'S OFFICE
NEW YORK

NY1\12733\92\Q1\R @ PK01!.DOC\66\630.0205

A94

NOW, upon motion of Weil, ~~G~~nal & Manges LLP, it is hereby:

ADJUDGED, that the Amended Complaint ~~of Plaintiff be and the same~~ ~~hereby~~ is dismissed; and it is further

ADJUDGED, that the application of Plaintiff be and the same hereby is denied; ~~and it is further~~ and the matter is dismissed.

ADJUDGED, that Defendant Sotheby's Holdings Inc. shall recover from Plaintiff Joram Deutsch the sum of $ 200.00 as and for costs in this action, and Defendant shall have execution therefor.

Dated: New York, New York
August 6, 2004

ENTER:

_____
CLERK OF THE COURT

FILED

IAUG 6 -
COUNTY CLERK'S OFFICE
NEW YORK

* Joram Deutsch
  51 JFK Parkway
  1st Floor West
  Short Hills, NJ 07078

* Sotheby's
  1334 York Avenue
  New York, New York 10021

5 16802

Index No   04100902

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 55

JORAM DEUTSCH,

                    Plaintiffs,

          v.

SOTHEBY'S HOLDING INC.; a/k/a SOTHEBY'S NEW YORK; a/k/a SOTHEBY'S LONDON;
METROPOLITAN MUSEUM OF ART; A and M KALOKAIRNOS FOUNDATION; HISTORICAL
MUSEUM OF CRETE IRALION

                    Defendants.

## JUDGMENT

## WEIL, GOTSHAL & MANGES LLP

          *Attorneys for*

               767 FIFTH AVENUE
          BOROUGH OF MANHATTAN, NEW YORK, N.Y. 10153
                    (212) 310-8000

*To:*
*Attorney(s) for*

*Service of a copy of the within*                                        *is hereby admitted.*

*Dated:*

                         *Attorney(s) for*

                                                        DOCKETED BY

PLEASE TAKE NOTICE
Check Applicable Box

☐         that the within is a true copy of a
NOTICE OF   entered in the office of the clerk of the within named court on
ENTRY

☐         that an Order of which the within is a true copy will be presented for settlement to the Hon.
NOTICE OF                              one of the judges of the within named Court,
SETTLEMENT  *at*
          *on*

*Dated:*

                              **WEIL, GOTSHAL & MANGES LLP**
                         *Attorneys for*

                                   767 FIFTH AVENUE
                         BOROUGH OF MANHATTAN, NEW YORK, N.Y. 10153

*To:*

*Attorneys (for)*

                         **FILED AND
                         DOCKETED**

NY1 :12680720 21 R6G8021 DOC 66930 0208

                         AUG 6 - 2004
                    AT      12:10 P  M

A96

IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT OF THE
STATE OF FLORIDA, IN AND FOR PINELLAS COUNTY
CASE NO.: 95-1895-CI-8

PRINCESS ANASTASIA ROMANOV,
    Plaintiff

vs.

THE FLORIDA INTERNATIONAL
MUSEUM INCORPORATED
    Defendant

_____/

### COMPLAINT FOR RETURN OF FARBERGE EASTER EGG

COMES NOW, the Plaintiff, PRINCESS ANASTASIA ROMANOV, and
hereby files this her Complaint against Defendant THE
FLORIDA INTERNATIONAL MUSEUM INCORPORATED, for Return of the
Farberge Easter Egg, the gift of the Emperor Nicholas II to
his wife, Empress Alexandra Feodorovna at Easter 1913, and
in support of this Complaint alleges:

#### ALLIGATIONS COMMON TO ALL COUNTS.

1.   This is an action in Equity in excess of Dollar
15,000.00.

2.   The Plaintiff , PRINCESS ANASTASIA ROMANOV,
hereinafter called "ROMANOV", is a resident of Pinellas
County, Florida.

3.   The Defendant , "THE FLORIDA INTERNATIONAL MUSEUM
INCORPORATED" is a Florida Corporation and the
Representative is W. Richard Johnston, I Progress Plaza,

1

Barnett Tower, Suit 420, St. Petersburg Fl. 33701,

herinafter called "MUSEUM"

4.    All facts and circumstances pertaining to this
complaint occured in Pinellas County, Florida.

## C O U N T   I

5.    ROMANOV hereby incorporates and realleges by this
reference her allegations as contained within Paragraph 1
through 4, hereinabove.

6.    This is an action for return of the ROMANOV Faberge
Easter Egg given in 1913 at Easter by the Emperor Nicholas
II to his wife Empress Alexandra Feodorovna.

7.    The Plaintiff ROMANOV is the granddaughter of the
Empress Alexandra Feodorovna and the Emperor Nicholas II,
the only blood relative alive.

8.    The MUSEUM with his Posters and Pictures admits that
it has the Faberge Easter Egg in its custody in the
Treasures of the czars Exhibit since January 11, 1995.

9.    The Emperor Nicholas II and his wife Empress
Alexandra were murdered with some members of the imperial
family about July 1918. A scientiffic examination, under the
authority of the present Russian government, has been
underwey to identify certain human remains, found in the
area of the murder site, through DNA genetic coding and
comparisons.

10.    Plaintiff is informed that the Russian government
retained and authorized an Executive Agency of the British

2

Home Office, The Forensic Science Service  located at
Aldermaston, Reading, Berkshire, England, to provide and
conduct the necessary scientific procedures, under mandate.

11.   Plaintiff has been advised that DNA materials have
been supplied to Aldermaston from sources of excellent
scientific provenance, including from living members of
British royalty who are of the same genetic lineage as
members of the imperial family.

12.   Plaintiff is also informed that the Russian
goverment in April of 1993, the prosecutor issued an order
direction Dr. William R. Maples of the Universigty of
Florida to take appropriate tooth and bone samples for
mitochondrial DNA testing. In accordance with that order,
Dr. Mary-Clair King, Professor of Genetics and Epidemiology
at the University of California, Berkeley, California
received bone and teeth samples from Ekaterinberg.

13.   Dr. Mary-Claire King also received blood and tissue
samples from descendants of Tsar Nicholas II and his wife,
Alexandra.

14.   the Plaintiff is further informed that arrangements
have been made whereby the Armed Forces Institute of
Pathology in Washington, D. C. , will do a parallel DNA
determination and comparison to confirm the integrity of
Aldermaston's results and will have access to the genetic
data base used by Aldermaston, in cooperation with them.
Petitioner is informed that the Institutye may not be able

3

to undertake its analysis immediately, due to its primary
schedules in process. The Institute is believed willing to
conduct parallel tests, without charge, using the same
procedures and with access to the same comparative
materials, which Aldermaston has indicated they will
provide.

15.    At certain periods of the Plaintiff's life, ROMANOV
had also been known as "ELLEN, MARGARETE, THERESE ADAM
KAILING" and other Last names through marriage. The change
of name from ELLEN MARGARETE THERESE ADAM THOMAS to
ANASTASIA ROMANOV was in January 1993. At that point ROMANOV
The Plaintiff was sure that she was the Granddaughter of the
Emperor Nicholas II and his wife Empress Alexandra
Feodorovna, however other details were not known to ROMANOV.

16.    The Russian Government and Aldermaston have
confirmed the DNA relation of the remains as being those of
members of the imperial family, however the Russian Orthodox
church of Russia does not agree with the confirmation.

17.    Plaintiff ROMANOV is informed that she is the
daughter of Alexis, the Son of the Emperor Nicolas II and
his wife Empress Alexandra .

18.    Plaintiff ROMANOV is informed that the Defendant
MUSEUM has in its possession a Farbergee Egg, the very Egg
the Gift of the Emperor Nicholas II to his wife, Empress
Alexandra Feodorovna, at Easter 1913.

19.    Plaintiff acknowledges that she has no

4

documentations other then certain evidence supported by
Pictures and other Documents, and statements of other
parties disinterested in the claim.

20.   Plaintiff acknowledges that the MUSEUM stands in a
ficuciary capacity to the Moscow Kremlin Museum with respect
to the exibited Farberge Egg. Even after the death of
Nicolas II, to which circumstance the Excavation of the
Remains shed light and evidence of the murder, The avidence
is that 1 Girl and the young Alexei was not part of the
Bones excavated. The statute is not deficient of remedy for
cases in which there is evidence of murder and a direct
decendant of this murdered Empress-Alexandra in this case
the owner of this Egg,  the Granddaughter is next of kin by
blood and a natural hair to this Egg.

21.   The Court might require for a scientific
investigation. DNA testing of the Blood of ROMANOV is
possible through Dr. Mary-Claire King who in her Affidavit
of the 7th of December stated: "I would be pleased to
volunteer my time to conduct appropriate DNA testing on the
blood and tissue samples before the Court, subject to
whatever restrictions of confidentiality and reporting that
the Court may impose." "

22.   The Court has appropriate jurisdiction over the
Plaintiff in its fiduciary function as a custodian with
respect to any claim or request for access to the material
sought by the Plaintiff. Plaintiff asserts no duty or

A101

liability of any kind on the part of the MUSEUM to the
Moscow Kremlin Museums.

23.    Petitioner seeks the jurisdiction of this Court,
to reposses the Egg, because there is no other remedy at law
for the relief sought, "the existing statutes is not
deficient to cover the conditions and facts of these
circumstances. This Complaint for Return of the Egg has
jurisdiction in matters of fiduciary responsibilities and
their performance. This Court has jurisdiction to provide
care for the adequate representation of those unable and
less able to provide representation for their own interests,
including infants, incompetents, lunatics, idiots,
decendants' dead bodies, and removal of cemeteries inter
alia.

24.    Plaintiff had been seeking arrangements whereby
scientists from Berkley would establish direct DNA testing
with the Blood of ROMANOV send directly to Berkley. This
test did not take place, according to a letter sand from
Berlkey through Professor Potts.

WHEREFORE, Plaintiff respectfully Prays:
That this Court shall issue its order and decree:
A.    That the Court find that in this case, upon its facts
and the evidence, the MUSEUM is a mere custodian without
duty other than to act in accordance with the approval and
supervision of this Court; that no act done and no refusal
to act, occurring by reason of MUSEUM's compliance with

orders instructions of this Court, shall be grounds for any
claim of liability of MUSEUM, or of any of its officers,
directors, trustees, staff or agents to any other parties.

B.    That the appropriate Officers and staff of the Museum
be authorized and instructed to respond with specificity to
all reasonable requests concerning the Farbergee Egg.

C.    That the MUSEUM after being advised by the Court of
their respective needs with respect to the Egg, , report to
the Court any difficulties that might result from MUSEUM's
compliance, for further instructions from this Court: and,
the MUSEUM shall deliver to this Court a listing of all
materials requested for proof of ownership.

D.    That as promptly as possible, the MUSEUM exhibit to
the Plaintiff, who may appear personally at the facilities
of the MUSEUM, for the sole purpose to view the Easter Egg,
to determin that it is the Egg belonging to the Grandmother
Empress Alexandra Feodorovna since Easter of 1913.

E.    That the Court issue such further Orders, that the
Easter Egg can not leave this Pinellas County until the
Ownership of this Farberge Egg from 1913 is determant and
the Egg is in the hands of it propper owner.

F.    That as promptly as possible, the MUSEUM, deliver
this Farberge Easter Egg from 1913 to the Plaintiff ROMANOV.

AND that this Court issue such further orders and grant
such further relief as it shall find necessary or

7

A103

appropriate for the purposes sought by Plaintiff, ROMANOV,

or for the circumstances as determined by this Court; so

your Plaintiff will ever pray...

Respectfully submitted

*Anastasia Romanov*

Princess Anastasia Romanov
104 6th Ave., St.Pete Beach,
Florida 33706
1-813-360-9055

(a) For an oath or affirmation:
STATE OF FLORIDA COUNTY OF PINELLAS
sworn to (or affirmed) and subscribed before me this MAR    6 1995
day of March 1995 by *Yvonne Kayford*
Personally Known                    DEPUTY CLERK
Florida DL

8

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT OF THE
STATE OF FLORIDA, IN AND FOR PINELLAS COUNTY
CASE NO.: _95-1285-CI-8_

PRINCESS ANASTASIA ROMANOV
    Plaintiff

vs.

THE FLORIDA INTERNATIONAL
MUSEUM INCORPORATED
    Defendant
_____/

MEMORANDUM IN SUPPORT OF COMPLAINT FOR RETURN

OF THE FARBERGE EASTER EGG

I, PRINCESS ANASTASIA ROMANOV, the Granddaughter of
Empress Alexandra Feodorovna, also known as ELLEN MARGARETE
THERESE ADAM KAILING, submit this Memorandum in support of
my Complaint for Return of Farbergee Easter Egg. I am the
only legal protected party interested in the Farbergee
Easter Egg. Unless, I Princess Anastasia Romanov, am
permitted to represent my own case to the Court, then my
legal right protected by the Statute will not be protected.
Certainly I will make mistakes, however these mistakes
should not stand against me. The Courts duty is to protect
the legal right of the Blood decendant.

For these reasons, I Princess Anastasia Romanov, ask
that the Court protect my legal right to this Egg.

1

## B A C K G R O U N D

The issue is a Farbergea Easter Egg given by Princess
Anastasia Romanov's Grandfather the Emperor Nicholas II to
his wife, Empress Alexandra Feodorovna at Easter 1913 as a
present. This Egg is a personal present, it does not belong
to the Treasures of the State of Russia and to the Moscow
Kremlin Museums.

My Grandfather and my Grandmother were murdered in July
1918. My Father, the only son of the Empress vanished in the
russian Labor Camps and certainly could not demand the Egg.
It has to be taken as a fact that he does not live any more.
I am the daughter of this son, and I have a legal right to
this Egg.

### THE MOSCOW KREMLIN MUSEUMS

The Moscow Kremlin Museums have no right to the Egg. I is
comen knowlage that the Owner of this Egg war murdered and
no effort was put foreward to find the Decendant of the
Owner. A murder and taking posession does not knostitute
ownership.

1.  I, Princess Anastasia Romanov, am the Granddaughter
of Empress Alexandra Feodorovna, the owner of this Egg, and
I am protected by the Florida Statute in this action. I am
the decendent and the very next of kin by blood.

2.  I, Princess Anastasia Romanov, the Granddaughter of
the Emperor Nicolas II have certain rights: "According to
the Holy Scriptures... as well as history- former emperors,

kings, and tsars are not deprived of their office when they
are outside the country's administration." This is an
office given by God, through the blood of the Children and
childrens children. The Russian government now has no power
over me and over the belongings of my Family. The Bolsheviks
had seized power and had seized the property of my Family by
murder. This constitutes in every place of Earth a crime to
be punished. Certainly to allow the murderers of my Family
to keep the posession would state in fact: " Let us kill and
take what we want."

## THE FLORIDA INTERNATIONAL MUSEUM INCORPORATED

I, Princess Anastasia Romanov, have informed on May 10th,
1994 Mr. Jim Broughton that I am the doughter of Alexis
Romanov. I informed with this letter the Museum that I have
certain legal rights to the Treasures of the Czars. I also
infomred Jim Broughton personal during a meeting in down
Town St. Petersburg in the Presence of Witnesses. I was
simply ignored and no efforts were put foreward to find the
truth of my statements.

The fact that the Farbergee Egg was a gift from my
Grandfather to my Grandmother is known to the
representatives of the Museum and it can not be claimed by
the Museum that they did not have knollage that the Egg was
obtained through a murder.

In my opinion it is a crime to hord stolen goods and this
Egg certainly is a stolen good, belonging undisputable to

3

A107

the decendents of the Empress Alexandra. There is no statute
of limitation connected with murder.

EVIDENCE TO SUPPORT CLAIM

1. The Federal Rules of Evidence Rule 804: Hearsay
Exceptions, Declarant Unavailable.

(4) is unable to be present or to testify at the hearing
because of death ...

It is undisputable that my Grandmother is murdered.
It is undisputable that my Father died in a Labor Camp in
Russia.

It is a matter of fact that testimony to my identety can
not be brought by eather party.

2. Rule 804 (4) Hearsay Exceptions.
Statement of personal or family history. (A) A statement
concerning the declarant's own birth, adoption, marriage,
divorce, legitimacy, relationship by blood, adoption, or
marriage, ancestry, or other similar fact of personal or
family history, even though declarant had no means of
acquiring personal knowledge of the matter stated; or (D) a
statement concerning the foregoing matters, and death also,
of another person, if the declarant was related to the other
by blood, adoption, or marriage or was so intimately
associated with the other's family as to be likely to have
accurate information concerning the matter declared.

3. Rule 804 (5) Other exceptions. A statement not
spicifically covered by any of the foregoing exceptions but

4.

having equivalent circumstantial guarantees of
trustworthiness, if the court determines that (A) the
statment is offered as evidence of a material fact; (B) the
statement is more probative on the point for which it is
offered than any other evidence which the proponent can
procure through reasonable efforts; and (C) the general
purposes of these rules and the interests of justice will
best be served by admission of the statement into evidence.

## APLICATION OF LAW AND JURISDICTION

This Court is a tribune to protect the basic right of
Princess Anastasia Romanov because she lives here in
Pinellas County. This Court also has the right to order DNA
testing. This Test will make it possible to protect the
basic right to know with todays certainty through Genetic
Testing that  Princess Anastasia Romanov is who she claims
to be.

There were proper reasons for Anastasia Manahan and Mr.
Manahan, to beleave that the life of Princess Anastasia
Romanov and her Son Christopher Meiles Kailing was in
danger. The political changes in Russia took place after the
death of Anastasia Manahan and Mr. Manahan, who protected
Princess Anastasia Romanov. However, Mr. Manahan did leave
some evidence in his taperecording to his will.

I, Princess Anastasia Romanov have made many statements
before this controversy arose. I have changed my name, "ante
litem motam" to the name of ROMANOV to demonstrate to every

5

A109

one interested, that I am the Granddaughter of the Emperor
Nicolas II and Empress Alexandra.

A R G U M E N T

I, Princess Anastasia Romanov, am the Granddaughter of
The Empress Alexandra of Russia. I base my Complaint to this
action on my claim that I am ghe Granddaughter of the Owner
of this Farbergee Egg.

The emotional importence of this Farbergee Egg to ghe
Granddaughter is far supiriour then the historical and
curiosity speculations of the Florida International Museum
of St. Petersburg Florida.

The Interest of the Granddaughter Princess Anastasia
Romanov in the Farbergee Egg and in this Complaint is
protected through the Statute.

History has at all times maintained, that money in
England was responsible for the demise of my family.
Princess Anastasia Romanov was subject to many efforts to
eliminate her from any proceedings to prove who she is and
what rights she has. Blood send to Dr. Mary-Claire King was
not tested out of some mysterious reasons.
May be, St. Petersburg here in Florida, the Sister City of
St. Petersburg in Russia, will put the Glasslipper on the
Princess and find that it fitts.

For the reasons stated above, Princess Anastasia Romanov,
the Granddaughter of the Czar Nicolas II of Russia and his
Wife Alexandra respectfully requests that she is permitted

6

A110

to represent her won case to this Tribune and that the Court
will help her to overcome problems wich might arrise of her
own representation because she is not a graduate of any Law
School. It would be totally impossible to inform any
Attorney of the cercumstances surrounding the life of the
Plaintiff. This would take years, it would be
counterproductive, because the Farbergee Egg will only be
here in St. Petersburg until June 11, 1995, and I Princess
Anastasia Romanov do not think there is any Attorney willing
to do that.

                    Respectfully submitted

                    *Princess Anastasia Romanov*

                    Princess Anastasia Romanov,
                    104 6th Ave., St. Pete Beach,
                    Florida 33706
                    1-813-360-9055

7

A111

IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT OF THE
STATE OF FLORIDA, IN AND FOR PINELLAS COUNTY
CASE NO.: _95-1285 CI 8_

PRINCESS ANASTASIA ROMANOV
     Plaintiff

vs.

THE FLORIDA INTERNATIONAL
MUSEUM INCORPORATED
     Defendant

_____/

### NOTICE OF FILING AFFIDAVIT AND MEMORANDUM

PLEASE TAKE NOTICE that Princess Anastasia Romanov, pro

se, has this day filed her Memorandum in Support of her

Complaint for Return of the Farbergee Easter Egg and also

Affidavit with certain documentation, and copies of each

being mailed to counsel.

Respectfully submitted

_Princess Anastasia Romanov_

Princess Anastasia Romanov
104 6th Ave., St. Pete Beach,
Florida, 33706
1-813-360-9055

IN THE CIRCUIT COURT FOR THE SIXTH JUDICIAL CIRCUIT OF THE
STATE OF FLORIDA, IN AND FOR PINELLAS COUNTY
CASE NO. _95·1285 CI 8_

PRINCESS ANASTASIA ROMANOV
    Plaintiff

vs.

THE FLORIDA INTERNATIONAL
MUSEUM INCORPORATED
    Defendant

_____/

AFFIDAVIT OF PRINCESS ANASTASIA ROMANOV

STATE OF FLORIDA   )

COUNTY OF PINELLAS )  ss:

COMES NOW the Affiant, Princess AnasCasia Romanov, who,
being first duly sworn, and deposes and says:

1. I am a citizen of Germany above the age of
twenty-one. I reside permanently at 104 6th Ave., St. Pete
Beach, Florida.

2. I have been involved in a legal Action in
Charlottesville Virgina in 1993/1994. Case No. 8021.
Marina Dotkin Schweitzer, Petitioner v. Martha Jefferson
Hospital, Respondent and Russian Nobility Association, Inc.
and Anastasia Romanov a/k/a Ellen Margarete Therese Adam.
Kailing, Intervenors.

a. This Petition in Equity concerned Medical records
and other materials, certain tissue taken by resection from
the body of Mrs. Manahan while living. Anastasia Manahan was

1

A113

known to claim that she was the Grand Duchess Anastasia, nee
Romanov, daughter of Nicholas II.

b. I, Princess Anastasia Romanov, was looking for my
Identety.

c. I had been in a German Concentration camp, I had a
Number on my left Underarm. I had certain memories.

d. I was told in 1964 by my Step Aunt that I was a
Princess. This was at the Funeral of my Stepfather who had
died totally unexpected at age 56. I was told in 1984 by my
Stepmother the same Story, but she did not want to tell me
more. However she assured me that I would find out after her
death.

e. My Stepmother died in August of 1993. The Locator
Inc. from Charlottsville contacted me in September 1993 with
a Contract.

f. I tried to find the answers to this mystery on my
endless tripps. I had called Mother Alexandra, Abbess of
the Orthodox Monastery of the Transfiguration, in Ellwood
City, Pa. in 1988 but was not given any answers over the
phone. I was told to come to Pa. In April of 1990 In
California, I visited a church and I was given a Newspaper
Clipping. "Lost Treasures of the Czars surface in little old
Lady's Safety Deposit Box. Stella Kolechi, told me that this
belongs to me. "You have a picture with a Lion on yor Lapp."
This is the evidence. I have the Picture. The Lady was Vera
Parhomenko-Mihajlovic who had died without a will and no

2

A114

relatives claimed her estate. She was the daughter of the
personal physicion of my father, Alexis. In June of 1990 I
visited Mother Alexandra, who was the daughter of Queen Mary
from Romania. She told me that I was the same as Anastasia
Romanov. The only story I knew was that the entire family
was killed and this statement came as a shock to me. I
ordered the Book Anastasia the Riddle from Peter Kurth. I
knew Mr. and Mrs. Manahan. Mother Alexandra died in 1991 in
January and it was to late for me to find more answers.
Through russian friends I was connected with Matushka Carol
Dacha. She send to me this enclosed statement. I changed my
name to Anastasia Romanov in January 1993. Its meaning is
resurrected from the dead. I also wanted to honor Anastasia
for her fight of over 50 years. I wanted to go on with my
life. In September 1993 the Locator Inc send to me the
enclosed Contract. I contacted Charlottsville Newspaper.
Information from a Courtaction of the Manahan cousins
against Althea Hurth. Information I had gathered by now
affirmed that I was a Romanov. At first I thought I was
Anastasia Romanov's child, but could not find any reference.
Russia gave me the new information of Alexis who had
survived and it did not take long for me to put the peaces
of the pussel together.

I am Alexis daughter. I do not jet know the name of my
Mother, however I have a Picture of her and I think I have
some correct Information on her family.

3

A115

It turned out that Anastasia Manahan was not Anastasia
Romanov. Genetic testing was done. This came as a God send
to me. Now I do not need to fight all the Manahans and all
the German Counts and Attorneys who claimed to have
wills of Anastasia Romanov. I was told by Mr. Schweitzer in
Charlottsvill on my last time I was there in Court: "What
does it matter that you are the Romanov, we have the wills
and we get the money."

The Locator Service wanted 1/3 of every thing plus he wanted
me to purchase 5 Suitcases full of Government Bonds in Gold
with Interest. I said thanks, but no thanks.

A legal action was in progress, The Manahan Cousins were
taking Altheb Hurth to Court concerning the Inherretance of
Mr. Manahan. The Issue was the Manahan fortune and the
fortune in England.

Mrs. Scheitzer started the Action for Equity for tissues in
the Marther Jefferson Hospital. I filed a petition to
intervene in this Action and on December 7th, 1993 Judge
Swett Ordered Genetic testing. This legal Action was
stopped. Schweitzer withdrew the petition.

However I send to Dr. Mary Claire King through Bayfrond
Medical Center my Blood. In October of 1994 I was informed
that no Genetic testing took place, however new testing was
proposed at a later time in England.

I was through russian friends connected with Matushka Cerol
Klipa Bacha and she knew that I had visited Mother

4

A116

Alexandra, She was a long friend of Mother Alexandra.

3.   Information from a taperecording, transcribed by the
Valley Reporting Service 116, East Beverley Street,
Staunton, Virginia 24401, on Page 39, reflect the following:

Mr. Manahan.... "I have a child. My wife and I are very
happy. Something in here... I have a new child now.
Somewhere it's great praise of me....

4.   I had met Mr. Manahan many times and I had met Mrs.
Manahan many times. My Limoges Dishes are from the Manahans
and Mr. Manahan certainly had arranged for me to purchase
this my Beach-Place in 1973. And last but not least he was
in 1984 with me traveling to Germany. I had a disabilety. I
have a dificult time to recognize People, however, at all
times I thought: "I had seen these People many times
before".

5.   Dr. Georg Beaucamp knew who I was. I have a picture
were he is together with my Stepsisters and my Stepmother.
Maria von Trupp and Lillian Hellmann is on this Picture.
Emil von Dessonneck and it seems that Swetlana Stalin and
some one who looks like Stalin, but to young, is on the
picture. This is a picture of 1937 mad in Aahlbeck. I had
saved this picture, because the names of my Sisters were
spelled in english.

6.   Through legal manover Beaucamp did not want a
divorce. He knew that I was slowly poisoned with Arsenic in
my 7 Dental Crown. He just waited, and he would have had the

right to the english money. He has the documents. And now today I have to try to get divorced from him for the 3rd time.

7. Beaucamp had tried to kill me in Germany. It was covered up once as miningitis and in September I was through coincidence reading the medical report of this hospital stay, because the Physicion was called out for a long time. Then I knew and I barely escaped certain death in 1983.

8. This was not the first time. In 1979, at the same time as Anastasia Manahan was fighting for her life in the Martha Jefferson Hospital I was in the Hospital in Ocala, fighting for my life. We both made it.

9. Yes, there are all these Attorneys, Counts and what ever and they all see money in England. And here I am, I am in the way. I needed to be eliminated and Mr. Manahan and Anastasia did know about it.

10. Yes, Mr. Manahan protected me as good as he could. And I think it worked. He knew that every one was just after the Money.

11. Now, who is Anastasia Manahan. I know her story. It should stay with her, a secret she had figured out when she decided and married Mr. Manahan. She loved me and my Son, and she stayed away to protect our Life. She was the hero in this Story and she will be all times in my life the mystery Princess who might save Russia.

12. My mother was murdered during the Holocost in

A118

Germany. My Father vanished to Russia into one of the Labor Camps. My Grandparents and other Aunts vanished in unmarked Graves. I was raised by Stepparents. And certainly, they wanted to have the money.

13.  I have given birth to a boy. I had married a man who had the right Blood Group, O negative, to asure that he would not be a hemophiliac and would not be damaged because I was contaminated with antybodies against positive blood. Further Affiant saith not.

*Anastasia Romanov*
PRINCESS ANASTASIA ROMANOV

I, _____, a notary public for the State of Florida, do hereby certify that, on this 6th day of March, 1995, Princess Anastasia Romanov, known to me or who was Florida DL satisfactorily proved to be the person whose name is signed to theabove Princess Anastasia Romanov, appeared before me and acknowledged, under oath, that the Affidavit of Princess Anastasia Romanov is true, accurate and correct, to the best of her knowledge, information and belief.

GIVEN UNDER MY HAND this MAR 6 1995 day of March, 1995.

*Yvonne Rayford*
DEPUTY CLERK
NOTARY PUBLIC

(NOTARY SEAL)

A119

 Exhibit A

Matushka Carol Klipa Bacha
1051 Lee Road Apt. 30B
Orlando, Florida 32810
January 15, 1993
Repose of St. Seraphim of Sarov

TO WHOM IT MAY CONCERN:

It was in July of 1990 prior to her going to Romania,
and before her cardiac arrest and revival (end of July) that
Mother Alexandra (Princess Ileana of Romania), told me by
telephone from her son, Stefan's house in Michigan, that
she had had a meeting with a woman at her Monastery of
the Transfiguration in Ellwood City, Pennsylvania, that
"had a striking resemblence to Anastasia Romanov."

*Matushka Carol Klipa Bacha*

Matushka Carol Klipa Bacha

*Carolyn D. Ackey*

NOTARY PUBLIC, STATE OF FLORIDA.
MY COMMISSION EXPIRES SEPT. 3, 1995.
BONDED THRU NOTARY PUBLIC UNDERWRITERS.

*Carolyn D. Ackey*

A120

Exibit B

# Locators, Inc.

Box 3999          Charlottesville, Va 22903

800-395-9131 Toll Free
800-347-7639 FAX

August 18, 1993
Please refer to Case Number 92-096

Ellen Margarete Therese Adam
104 6th Avenue
St. Petersburg Beach, FL 33706

Dear Ms. Adam::       RE: Von Dessonneck

I have been trying to reach you.

When we last spoke, I did not realize you had called me back and
when I checked and found your message on my voice mail, I was
unable to reach you on the telephone.

I would appreciate your contacting me.

If you have questions please feel free to call TOLL-FREE
800-395-9131.

Sincerely,

Fred H. Quarles
Vice President

Missing Persons Located · Fast Action · Amazing Results

A121

Finders Fee Contract

I

KNOW ALL MEN BY THESE PRESENTS that this is a CONTRACT between
LOCATORS, INC 2005 Jefferson Park Avenue, Charlottesville,
Virginia, a Virginia corporation HEREINAFTER called RESEARCHER
AND
Anastasia Romanov , also Known as Ellen Margarete Threse Adam
Kailing HEREINAFTER called CLAIMANT

II

Whereas RESEARCHER and CLAIMANT have reason to believe that
CLAIMANT is the daughter of Anastasia Romanov, daughter of
Nicholas and Alexandra Romanov, Czar and Carinina of Russia, also
known as Czar Nicholas II and Alexandra his wife

III

CLAIMANT agrees that in the event that it is determined that
he/she is entitled to share in the estate identified as:

The estate of Nicholas Romanov, Alexandra Romanov, Anastasia
Romanov or other estates which these persons would be heir to
THEN

RESEARCHER will be entitled to A FEE of THIRTY THREE PERCENT
(33.3%) of CLAIMANT'S share of this estate for it's RESEARCH
EFFORT and other help in pursuing CLAIMANT'S claim.

IV

In the event that CLAIMANT is determined to be entitled to share
in the above estate, then this contract is authority to direct
the Court, Administrator, Executor, Personal Representative or
Attorney in Fact to pay to the order of LOCATORS, INC it's fee
from the distribution(s) of the estate, in whole or in part. It
is further agreed that this shall constitute a lien on the above
estate until paid.

V

Both parties agree that in the event that CLAIMANT is not
determined to be entitled to share in the aforementioned estate,
because of mistaken identification or otherwise then there is no
obligation on the part of either party.

VI

CLAIMANT agrees to cooperate fully to recover the property,
including documentation as necessary for proof of claim, blood
and DNA Testing and such other tests as may be necessary.
Both parties agree that CLAIMANT shall not have to advance any
costs incurred in the recovery of this estate, but that
RESEARCHER shall be entitled to recover reasonable costs incurred
in collecting this estate and RESEARCHER is authorized to advance
such funds as necessary to recover this estate. It is further
agreed that if distributions from the estate are made in whole or
in part, then costs shall first be recovered and then RESEARCHER
and CLAIMANT shall receive their pro-rata share at the same time.



Page 2 of 4

VII

Both parties agree to submit any dispute arising from this contract to a court of competent jurisdiction in Charlottesville, Virginia, USA. They further agree that this contract will be interpreted under the laws of the State of Virginia.

VIII

CLAIMANT HEREBY APPOINTS Fred H. Quarles or Ashley L. Quarles as his/her ATTORNEY IN FACT with full power of substitution, to pursue this claim. CLAIMANT further agrees that this appointment as ATTORNEY IN FACT is coupled with an undivided 33.3% interest in the proceeds of this estate.

IX

It is further agreed that in the event it is determined that CLAIMANT is a lawful heir of Czar Nicholas II and this in turn results in establishing CLAIMANT in a position of governmental authority in Russia, then as additional compensation and incentive, CLAIMANT agrees to order payment of Russian Government Bonds issued in 1916 and  enumerated on the attached Exhibit "A", together with acrued interest as the first official act under CLAIMANT'S government at a time and place that RESEARCHER may designate.

X

It is further agreed that any book, paperback, TV or movie, video or other rights that shall result from sale of  this story shall be considered a part of the above estate for the purpose of this contract and be included therein.  However it is hereby agreed that no publicity shall be sought until such time as DNA testing has been finished.  Both parties agree to avoid publicity until such time as this is complete.

XI

Both parties agree this is the entire agreement and may not be changed by either party except by agreement, in writing, by both of the parties.

WITNESS our signatures and seals

_____   RESEARCHER ___9/2/93___ DATE
Locators, Inc by
Fred H. Quarles, Vice President

_____   CLAIMANT _____ DATE
Anastasia Romanov, AKA Ellen Margarete Therese Adam Kailing

Page 3 of 4

State of Virginia          )
                          )  SS
City of Charlottesville )

Acknowledgement

Before me appeared, Fred H. Quarles, known personally to me, and
acknowledged the foregoing as his/her act, word and deed.  Subscribed and

Sworn to this ___2nd___ day of _____, 19__.

_____ NOTARY PUBLIC          SEAL

My commission expires _____

State of _____ )
                        )  SS
City of _____ )

Acknowledgement

Before me appeared, Anastasia Romanov, Also Known As Ellen
Margarete Therese Adam Kailing known personally to me, and
acknowledged the foregoing as her act, word and deed.

Subscribed and

Sworn to this _____ day of _____, 19____.

_____ NOTARY PUBLIC          SEAL

My commission expires _____

Page 4 of 4

Exhibit A

Russian Government Bonds issued 1916 bearing the following numbers



| # | 386718 | Cepir | I |
| # | 389340 | Cepir | II |
| # | 484944 | Cepir | II |
| # | 160755 | Cepir | II |
| # | 386736 | Cepir | III |
| # | 386737 | Cepir | I |
| # | 386738 | Cepir | I |
| # | 386729 | Cepir | I |
| # | 386730 | Cepir | I |
| # | 386743 | Cepir | I |
| # | 386775 | Cepir | I |
| # | 386770 | Cepir | I |
| # | 386769 | Cepir | I |
| # | 386735 | Cepir | I |
| # | 386713 | Cepir | I |
| # | 386714 | Cepir | I |
| # | 386715 | Cepir | I |
| # | 386716 | Cepir | I |

This list will be apended to with additional bonds owned by Lionel and Claire Metz, which shall not exceed 5 suitcases in volume which are not presently available for listing.

$Exibit\ C'$

**VIRGINIA:**

**IN THE CIRCUIT COURT
FOR
THE CITY OF CHARLOTTESVILLE**

In re:

**MARINA BOTKIN SCHWEITZER ,**

        **Petitioner,**

    v.

**MARTHA JEFFERSON HOSPITAL,**

        **Respondent.**

)
)
)
)
)
)
)
)
)
)
)

**Case No. 8021**

**AFFIDAVIT OF DR. MARY-CLAIRE KING**

**STATE OF CALIFORNIA**    )
                    )    ss:
**COUNTY OF** Alameda     )

COMES NOW the Affiant, Dr. Mary-Claire King, who, being first duly sworn, and deposes and says:

1. I am a citizen of the United States above the age of twenty-one. I reside at 961 Hilldale Avenue, Berkeley, California.

2. I submit this affidavit in support of the Petition to Intervene of the Russian Nobility Association, Inc.

3. I am a Professor of Genetics and Epidemiology at the University of California, Berkeley, California.

4. I received my doctorate degree in genetics in 1973 from the University of California at Berkeley.

5. I have been involved in genetics research for twenty-six (26) years.

A126

- 2 -

6.    In the forensic area, I have conducted DNA testing and analysis as a consultant to the Committee on the Disappearance of Persons for the Republic of Argentina to identifying children kidnapped between 1975 and 1983 in that country. I am consulting with the United Nations forensic team in El Salvador to try to identify the remains of the victims of a mass murder in the village of El Mozote. I have also worked with the United States Army in identifying the remains of the Missing-in-Action servicemen that have been returned by the governments of Vietnam and Korea as well as remains from World War II. Recently, at the request of the United States Army, I identified the remains of Wells Hangen, a television journalist who had been missing since the invasion of Cambodia in 1969.

7.    I was a member of the National Academy of Sciences Committee on DNA Technology in Forensic Science. The purpose of that Committee was to evaluate the role of DNA technology in forensic science.

8.    As a consequence of my research on that Committee I have testified as an expert in numerous criminal trials involving the use of DNA evidence to evaluate suspects in rape, murder and kidnapping cases.

9.    As indicated in *Nature Genetics, Volume 2, Number 2, pages 132-139 (October 1992),* our laboratory has perfected the technique for mitochondrial DNA ("mtDNA") testing of human remains. That technique entails the removal and concentration of DNA bearing material, such as blood, tooth pulp or bone marrow, and then the isolation and sequencing of the mtDNA.

10.    In using mtDNA testing and analysis, it is most important to have a maternally related individual who can be used as a comparison for the individual or individuals in question. In addition, in the event the first comparison yields a match, you must have a large series of individuals against which to compare the test

A127

- 3 -

sequences in order to determine whether the first set is the same because the are in fact relatives and not because of a "common" sequence which can be found in nonrelatives as well as relatives.

11.    I have been working for the past seven (7) months on the identification of the skeletal remains of nine (9) individuals believed to include Tsar Nicholas II and members of his family.

12.    These remains were obtained from Ekaterinberg under the authority of the prosecutor of the District of Sverdlovsk, who has official responsibility to conduct the investigation of the remains and requested that testing be conducted in this country.

13.    In April 1993, the prosecutor issued an order directing Dr. William R. Maples of the University of Florida to take appropriate tooth and bone samples for mitochondrial DNA testing. In accordance with that order, I received the following bone and teeth samples from Ekaterinberg:

        a.    a distal left tibia from Body Number 1;

        b.    a left femur from Body Number 2;

        c.    tooth number 32 from Body Number 3;

        d.    tooth number 27 from Body Number 4;

        e.    tooth number 32 from Body Number 5;

        f.    tooth number 32 from Body Number 6;

        g.    tooth number 22 and left tibia from Body Number 7;

        h.    left femur from Body Number 8;

        i.    tooth number 32 from Body Number 9.

A true and correct copy of the Evidence Record evidencing the transfer of these remains to my laboratory is attached.

A128

- 4 -

14. I have also received blood and tissue samples from descendants of Tsar Nicholas II and his wife, Alexandra.

15. Extraction and sequencing of mtDNA has been conducted by me and under my supervision from the Ekaterinberg remains and the other samples. All of this work was done in a scientifically correct manner and subject to the strictest standards of confidentiality.

16. I am in the process of preparing a report on my findings.

17. If any blood or tissue samples from Anna Manahan before the Court are used in mtDNA testing, they may be completely consumed in the process. There can be no guarantee that the samples at issue in this proceeding will yield sufficient genetic material to support conclusive mtDNA testing. From a scientific standpoint, therefore, the samples must be handled and tested responsibly for there to be the greatest likelihood that the mtDNA testing will be meaningful.

18. I believe that my colleagues and I are well qualified to conduct mtDNA extraction, sequencing and analysis on the samples that are before the Court. We have sufficient experience in the field to understand the problems involved in this sort of analysis. We are recognized throughout the world for our work in the area of mtDNA analysis. We have already conducted the sequencing and analysis of the remains from Ekaterinberg and are in a position to make the kinds of comparisons that are required for any conclusion to be drawn.

19. I am familiar with DNA research into the remains from Ekaterinberg being conducted by Dr. Peter Gill and his colleagues at the British Home Office (Aldermaston Laboratory in Britain).

20. In working with preserved DNA such as the samples at issue in this proceeding, interpretation of analysis is often difficult. If there is sufficient mtDNA

- 5 -

bearing material, it would be is ideal to have two (2) qualified laboratories carry out the mtDNA testing in parallel and compare their results.

21. I have spoken with Dr. Gill and would like the opportunity to work collaboratively with him in the analysis of the samples at issue in this proceeding.

22. I would be pleased to volunteer my time to conduct appropriate DNA testing on the blood and tissue samples before the Court, subject to whatever restrictions of confidentiality and reporting that the Court may impose.

23. In testing of this type, preserving the chain of custody is of critical importance. For the integrity of these samples to be protected, I suggest that the Court impose the protocol described by Dr. William Maples in his Affidavit and any supplements thereto recommended by Martha Jefferson Hospital, if any.

**FURTHER,** Affiant saith not.

mary Claire King
_____
Dr. Mary-Claire King

I, GULSHAN K. BAJAJ _____, a notary public for the state and subdivision aforesaid, do hereby certify that, on this __7th.__ day of December, 1993, Dr. Mary-Claire King, known to me or who was satisfactorily proved to be the person whose name is signed to the above Dr. Mary-Claire King, appeared before me and acknowledged, under oath, that the Affidavit of Dr. Mary-Claire King is true, accurate and correct, to the best of her knowledge, information and belief.

**GIVEN UNDER MY HAND** this __7th.__ day of December, 1993.

Gulshan K. Bajaj
Comm. #1007013
NOTARY PUBLIC CALIFORNIA
ALAMEDA COUNTY
Comm. Expires Aug 13. 1997

_____
Notary Public

**[Notary Seal]**

My Commission Expires: 15th AUG 1997

x:/alc/Anastasia/IMF/P-AfKing.001
15653-56969

A130

GENL. 2 REV. E/46 EVIDENCE RECORD

| | NAME OF STATION OR AGENCY | | NAME OF STATION OR AGENCY | | TERM, MESSAGE NO. & FILE | | NO. OF CONT. SHEETS |
|---|---|---|---|---|---|---|---|
| U F | 7/2/8 | CASE NUMBER | B C I | Consultant Wm Maple 7/2/8 | CASE NUMBER | DATE OCCURRED | LABORATORY CASE NO. |

| COUNTY OF OCCURRENCE | INVESTIGATING MEMBER | SUBMITTED BY Dr. Wm Maples |
|---|---|---|

**Lab USE ONLY**

NYSP
FSU

NAME (L/F/MI), ADDRESS & DOB OF DEFENDANT/VICTIM
Czar Nicholas II Case
9 skeletal remains

NAME (L,F,MI), AND ADDRESS OF COMPLAINANT/OWNER
Dist of Sverdlousk

NUMBER OF ADDITIONAL DEFENDANTS:

CHARACTER OF CASE: Homicide, multiple

DESCRIPTION OF EVENTS:

**EVIDENCE**

| ITEM # | DESCRIPTION | EXAMINATION REQUESTED | HELD AT STA. | RELEASE TO | TO LAB |
|---|---|---|---|---|---|
| 1 | Body 1 — distal ⓔ tibia | | | | ✓ |
| 2 | Body 2 — ⓛ femur Body 2 | | | | ✓ |
| 3 | Tooth #32 — Body 3 | [Ex Root tip - attach ē wax] | [capsule] | | ✓ |
| 4 | Tooth #27 — Body 40 | | | | ✓ |
| 5 | Tooth #32 — Body 5 | (wax - apex) | | | ✓ |
| 6 | Tooth #32 — Body 6 | (wax - apex) + alveolar bon | [capsule] | | ✓ |
| 7 | Tooth #22 — Body 7 (Bo 7) | | | | ✓ |
| 8 | ⓛ Tibia — Body 7 (Bo 7) | | | | ✓ |
| 9 | ⓛ femur — Body 8 (Bo 8) | | | | ✓ |
| 10 | Tooth #32 — Body 9 (Bdy 9) | | | | ✓ |

**TRANSFER RECORD**

| DATE | ITEMS INVOLVED | FROM | TO | SIGNATURE |
|---|---|---|---|---|
| 6/8/93 | 1 — 10 | Dr Wm Maples | Dr Lowell Levine | Nathan R. Maples / Lowell |
| 6/15/93 | 1 — 10 | Dr. Lowell Levine | Dr. Maryclaire King / Dr Charles Ginther | Man, CRC |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

INSTRUCTIONS TO EVIDENCE CUSTODIAN:

NAME AND ADDRESS OF LABORATORY:

FINAL DISPOSITION OF EVIDENCE: ITEM NUMBERS-DATE OF DISPOSITION

AUTHORITY FOR DISPOSITION:

LIST ADDITIONAL REPORTS OR PHOTOGRAPHS SUBMITTED TO THE LAB.

ADDITIONAL INFORMATION:

A131

IN THE CIRCUIT COURT FOR PINELLAS COUNTY, FLORIDA
CIRCUIT CIVIL NO. 95-001285-CI-008

PRINCESS ANASTASIA ROMANOV,

      Plaintiff,

vs.

THE FLORIDA INTERNATIONAL MUSEUM INC.,

      Defendant.

_____/

INST # 95-108666
MAY 5, 1995 9:13PM

OFF.REC.BK 8986 PG 1422
PINELLAS COUNTY FLA.

## FINAL ORDER OF DISMISSAL

THIS CAUSE, came before the Court on Defendant's, FLORIDA INTERNATIONAL MUSEUM, INC., Motion to Dismiss with Prejudice. The Court has reviewed the Motion, heard argument of the parties, and has otherwise been fully advised in this matter. It is, therefore,

ORDERED AND ADJUDGED that Defendant's motion is GRANTED and this action is hereby DISMISSED WITHOUT LEAVE TO AMEND for lack of subject matter jurisdiction.

DONE AND ORDERED in Chambers, at St. Petersburg, Pinellas County, Florida, this __5__ day of ___May___, 1995.

_____
CIRCUIT JUDGE

Copies furnished to:

V. James Dickson, Esq.
Princess Anastasia Romanov

107667

A132

ATTORNEY

COUNTY COURT, PINELLAS COUNTY, FLORIDA
CIVIL DIVISION
CASE NO. 95 001285 CI 008

ANASTASIA PRINCESS ROMANOV
PLAINTIFF(S),

VB.

FLORIDA INTERNATIONAL MUSEUM INCORPORATED
DEFENDANT(S).

FINAL DISPOSITION FORM
FORM 1.998

THIS FORM IS REQUIRED FOR THE USE OF THE CLERK OF THE COURT FOR THE PURPOSE
OF REPORT JUDICIAL WORKLOAD DATA PURSUANT TO FLORIDA STATUTE 25.075.

---

MEANS OF FINAL DISPOSITION

_____ DISMISSED BEFORE HEARING

_____ DISMISSED AFTER HEARING

_____ DISPOSED BY DEFAULT

__X__ DISPOSED BY JUDGE

_____ DISPOSED BY NON-JURY TRIAL

_____ DISPOSED BY JURY TRIAL

_____ OTHER

---

DATE 05/08/95

KARLEEN F. DE BLAKER
CLERK OF THE CIRCUIT COURT

BY
(DEPUTY CLERK)

A133

Form 1.998

Final Disposition Form

This form is required for the use of the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075. (See instruction on the reverse of the form.)

CASE STYLE

(Name of Court)   Circuit

Plaintiff       PRINCESS ANASTASI ROMANOV

Case #: 95-001285-CI

Judge:   CH08

Defendant       THE FLORIDA INTERNATIONAL
                MUSEUM, INC.

MEANS OF FINAL DISPOSITION      (Place an "x" in one box only)

☐  Dismissed Before Hearing

☒  Dismissed After Hearing

☐  Disposed by Default

☐  Disposed by Judge

☐  Disposed by Non-Jury Trial

☐  Disposed by Jury Trial

☐  Other

5/10/95

SIGNATURE OF ATTORNEY FOR
PREVAILING PARTY

V. JAMES DICKSON, Attorney for
Defendant

A134

For the Commission, by the Division of Investment Management, pursuant to delegated authority.

Margaret H. McFarland,
*Deputy Secretary.*
[FR Doc. 94-24171 Filed 9-29-94; 8:45 am]
BILLING CODE 8010-01-M

---

DEPARTMENT OF THE TREASURY

Customs Service

[T.D. 94-78]

Determination That Maintenance of Determination/Finding of July 7, 1992, Pertaining to Certain Tea Imported From the PRC Is No Longer Necessary

AGENCY: U.S. Customs Service, Department of the Treasury.

ACTION: Determination that Merchandise is no longer subject to 19 U.S.C. 1307.

SUMMARY: On July 7, 1992, the Commission of Customs; with the approval of the Secretary of the Treasury, issued a determination/finding that certain tea, described as Red Star Brand Tea, Red Star Tea, Farm Brand Tea, and any other tea produced by the Red Star Tea Farm in Guangdong Province, People's Republic of China, with the use of convict labor and/or forced labor, and/or indentured labor, was being, or was likely to be imported into the United States. The Commissioner of Customs, pursuant to 19 CFR 12.42(f) has now determined, based upon additional Customs investigation, that such merchandise is no longer being, or is likely to be imported into the United States in violation of Section 307 of the Tariff Act of 1930, as amended (19 U.S.C. 1307).

DATES: This determination shall take effect October 5, 1994.

FOR FURTHER INFORMATION CONTACT:
Thomas J. Tinger, Senior Special Agent, Office of Enforcement, Headquarters, U.S. Customs Service, 1301 Constitution Ave., N.W., Washington D.C. 20229
(202) 927-1510.

Determination

Pursuant to Section 12.42(f), Customs Regulations (19 CFR 12.42(f)), it is hereby determined that certain articles of the People's Republic of China are no longer being, or likely to be, imported into the United States, which are being mined, produced or manufactured with the use of convict, forced or indentured labor.

| Article schedule | Item number from the Harmonized Tariff (19 U.S.C. 1202) |
|---|---|
| Tea (manufactured by the Red Star Tea Farm). | 0902.10.00 0902.30.00 |

Approved September 9, 1994.

George J. Welse,
*Commissioner of Customs.*

John P. Simpson,
*Deputy Assistant Secretary (Enforcement).*
[FR Doc. 94-24237 Filed 9-29-94; 8:45 am]
BILLING CODE 4820-02-M

---

UNITED STATES INFORMATION AGENCY

Culturally Significant Objects Imported for Exhibition Determination

Notice is hereby given of the following determination: Pursuant to the authority vested in me by the Act of October 19, 1965 (79 Stat. 985, 22 U.S.C. 2459), Executive Order 11047 of March 27, 1978 (43 FR 13359, March 29, 1978), and Delegation Order No. 85-5 of June 27, 1985 (50 FR 27393, July 2, 1985), I hereby determine that the objects in the exhibit "Treasures of the Czars" (see list [1], imported from abroad for the temporary exhibition without profit within the United States are of cultural significance. These objects are imported pursuant to a loan agreement with the foreign lender. I also determine that the temporary exhibition of the objects at The Florida International Museum from on or about January 11, 1995, to on or about June 11, 1995 and possibly thereafter at other venues within the United States yet to be determined, is in the national interest.

Public notice of this determination is ordered to be published in the Federal Register.

Dated: September 27, 1994.

Les Jin,
*General Counsel.*
[FR Doc. 94-24269 Filed 9-29-94; 8:45 am]
BILLING CODE 8230-01-M

---

Convention on Cultural Property Implementation Act (Pub. L. 97-446); Import Restriction on Maya Artifacts From the Peten Region, Guatemala

AGENCY: United States Information Agency.

---

ACTION: Determination to Extend Emergency Restriction on Maya Artifacts from the Peten Region, Guatemala.

Pursuant to the authority vested in me under Executive Order 12555 and Delegation Order No. 86-3 of March 18, 1986 (51 FR 10137).

I find: Pursuant to the requirements of Section 304(c)(3) of the Act, 19 U.S.C. 2603(c)(3), with respect to the extension of an emergency import restriction on Maya artifacts from the Peten Region, Guatemala, and pursuant to the emergency provisions under Section 304(a)(1); and pursuant to a favorable recommendation from the Cultural Property Advisory Committee,—

(1) That the material is archaeological and is identifiable as part of the remains of the Maya civilization (approximately 1200 B.C.–1500 A.D) which developed a writing system and about which little is known except from limited scientific excavation of intact remains; that pillage continues to exist relative to these remains of the Maya culture, the record of which continues to be in jeopardy from pillage, dismantling, dispersal, or fragmentation which is, or threatens to be, of crisis proportions;

(2) That the application of the import restriction set forth on a temporary basis would continue, in whole or in part, to reduce the incentive for pillage.

Determination

Therefore, in accordance with the aforementioned authority vested in me, and pursuant to Section 304(c)(3) of the Act, 19 U.S.C. 2603(c)(3), and consistent with a favorable recommendation from the Cultural Property Advisory Committee, I determine:

(1) That the emergency condition continues to apply with respect to Maya artifacts from the Peten Region of Guatemala,

(2) That the emergency import restriction that went into effect on April 15, 1991, is extended for a period of three more years effective October 3, 1994.

Dated: September 23, 1994.

Penn Kemble,
*Deputy Director, United States Information Agency.*
[FR Doc. 94-24344 Filed 9-29-94; 8:45 am]
BILLING CODE 8230-01-M

---

[1] A copy of this list may be obtained by contacting Ms. Lorie Nierenberg of the Office of the General Counsel of USIA. The telephone number is 202/619-6064, and the address is U.S. Information Agency, 301 Fourth Street, SW., Room 700, Washington, DC 20547.

EXHIBIT A

A135

A136

(2) For purposes of this section, the term "Federal employee" means any employee as defined in subparagraphs (A) through (F) of section 7342(a)(1) of Title 5, but does not include a person described in subparagraph (G) of such section.

**(b) Foreign grants and other assistance not gifts for purposes of section 7342 of Title 5**

The grants and other forms of assistance with respect to which the consent of Congress is given in subsection (a) of this section shall not constitute gifts for purposes of section 7342 of Title 5.

**(c) Regulations**

The Director of the United States Information Agency is authorized to promulgate regulations for purposes of this section.

(Pub. L. 87-256, § 108A, as added Pub. L. 94-350, Title I, § 111, July 12, 1976, 90 Stat. 825, and amended 1977 Reorg. Plan No. 2, § 7(a)(2), 42 F.R. 62461, 91 Stat. 1637; Pub. L. 96-60, Title II, § 204(d), Aug. 15, 1979, 93 Stat. 400; Pub.L. 97-241, Title III, § 303(b), Aug. 24, 1982, 96 Stat. 291.)

### HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports**
1976 Act. Senate Report No. 94-703 and House Conference Report No. 94-1302, see 1976 U.S.Code Cong. and Adm.News, p. 1555.

1979 Act. Senate Report No. 96-116 and House Conference Report No. 96-399, see 1979 U.S.Code Cong. and Adm.News, p. 982.

**Amendments**
1979 Amendment. Subsec. (a) (2). Pub.L. 96-60 substituted "(F)" for "(E)" and "(G)" for "(F)".

**Effective Dates**
1979 Act. Amendment by Pub.L. 96-60 effective Oct. 1, 1979, see section 209 of Pub.L. 96-60, set out as a note under section 1469 of this title.

**Transfer of Functions**
"Director of the United States Information Agency" was substituted for "Director of the International Communication Agency" in subsecs. (a)(1)(C) and (c), pursuant to section 303(b) of Pub.L. 97-241, Title III, Aug. 24, 1982, 96 Stat. 291, set out as a note under section 1461 of this title.

Previously, "Director of the International Communication Agency" was substituted for "Secretary of State" in subsecs. (a)(1)(C) and (c), pursuant to Reorg.Plan No. 2 of 1977, § 7(a)(2), 42 F.R. 62461, 91 Stat. 1637, set out under section 1461 of this title, effective on or before July 1, 1978, at such time as specified by the President, which transferred all functions vested in the President, the Secretary of State, the Department of State, the United States Information Agency or the Director thereof, under this chapter, to the Director of the International Communication Agency, except (A) for such functions as are vested by sections 2452(b)(5), (10), 2454(a), (e)(1), (2), (f), (g), 2455(a), (b), (c), 2456(a) and 2458 of this title, (B) for such functions as are vested by sections 2454(b), 2455(c)(2), (f), and 2456(d), (f) of this title, to the extent that such functions were assigned to the Secretary of Health, Education and Welfare [now Secretary of Education] immediately prior to the effective date of Reorg.Plan No. 2 of 1977, and (C) for such functions as are vested by section 2456(b), (c) of this title to the extent that any such functions therein are vested in the President or Secretary of State.

36

---

### LIBRARY REFERENCES

**Administrative Law**
Procedures applicable, see 22 C.F.R. § 516.1 et seq.
**American Digest System**
Aid to other nations, see War and National Emergency ⊂=46.
Governmental powers in general, see United States ⊂=5.
**Encyclopedias**
Aid to other nations, see C.J.S. War and National Defense § 61.
Governmental powers in general, see C.J.S. United States §§ 4, 5.

### WESTLAW ELECTRONIC RESEARCH

United States cases: 393k [add key number].
War and national emergency cases: 402k [add key number].
See, also, WESTLAW guide following the Explanation pages of this volume.

## § 2459. Immunity from seizure under judicial process of cultural objects imported for temporary exhibition or display

**(a) Agreements; Presidential determination; publication in Federal Register**

Whenever any work of art or other object of cultural significance is imported into the United States from any foreign country, pursuant to an agreement entered into between the foreign owner or custodian thereof and the United States or one or more cultural or educational institutions within the United States providing for the temporary exhibition or display thereof within the United States at any cultural exhibition, assembly, activity, or festival administered, operated, or sponsored, without profit, by any such cultural or educational institution, no court of the United States, any State, the District of Columbia, or any territory or possession of the United States may issue or enforce any judicial process, or enter any judgment, decree, or order, for the purpose or having the effect of depriving such institution, or any carrier engaged in transporting such work or object within the United States, of custody or control of such object if before the importation of such object the President or his designee has determined that such object is of cultural significance and that the temporary exhibition or display thereof within the United States is in the national interest, and a notice to that effect has been published in the Federal Register.

**(b) Intervention of United States attorney in pending judicial proceedings**

If in any judicial proceeding in any such court any such process, judgment, decree, or order is sought, issued, or entered, the United States attorney for the judicial district within which such proceeding is pending shall be entitled as of right to intervene as a party to that proceeding, and upon request made by either the institution

37

Case: 23-1062   Document: 35   Filed: 03/14/2023   Page: 182

adversely affected, or upon direction by the Attorney General if the United States is adversely affected, shall apply to such court for the denial, quashing, or vacating thereof.

### (c) Enforcement of agreements and obligations of carriers under transportation contracts

Nothing contained in this section shall preclude (1) any judicial action for or in aid of the enforcement of the terms of any such agreement or the enforcement of the obligation of any carrier under any contract for the transportation of any such object of cultural significance; or (2) the institution or prosecution by or on behalf of any such institution or the United States of any action for or in aid of the fulfillment of any obligation assumed by such institution or the United States pursuant to any such agreement.

(Pub. L. 89–259, Oct. 19, 1965, 79 Stat. 985.)

## HISTORICAL AND STATUTORY NOTES

**Revision Notes and Legislative Reports**    change Act of 1961, which comprises
1965 Act. House Report No. 1070, see    this chapter.
1965 U.S.Code Cong. and Adm.News, p.
3576.

**Codifications**
Section was not enacted as a part of the Mutual Educational and Cultural Ex-

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11312

Ex.Ord. No. 11312, Oct. 14, 1966, 31    of State, was revoked by Ex.Ord. No.
F.R. 13415, formerly set out as a note    12047, Mar. 27, 1978, 43 F.R. 13359, set
under this section, which related to the    out under this section.
delegation of functions to the Secretary

### EXECUTIVE ORDER NO. 12047

Mar. 27, 1978, 43 F.R. 13359, as amended by Ex.Ord. No. 12388,
Oct. 14, 1982, 47 F.R. 46245

### IMPORTED OBJECTS OF CULTURAL SIGNIFICANCE

By virtue of the authority vested in me by the Act of October 19, 1965, entitled "An Act to render immune from seizure under judicial process certain objects of cultural significance imported into the United States for temporary display or exhibition, and for other purposes" (79 Stat. 985, 22 U.S.C. 2459) [this section], and as President of the United States of America, it is hereby ordered as follows:

Section. 1. The Director of the United States Information Agency is designated and empowered to perform the functions conferred upon the President

by the above-mentioned Act and shall be deemed to be authorized, without the approval, ratification, or other action of the President, (1) to determine that any work of art or other object to be imported into the United States within the meaning of the Act is of cultural significance, (2) to determine that the temporary exhibition or display of any such work of art or other object in the United States is in the national interest, and (3) to cause public notices of the determinations referred to above to be published in the Federal Register.

---

Sec. 2. The Director of the United States Information Agency, in carrying out this Order, shall consult with the Secretary of State with respect to the determination of national interest, and may consult with the Secretary of the Smithsonian Institution, the Director of the National Gallery of Art, and with such other officers and agencies of the Government as may be appropriate, with respect to the determination of cultural significance.

Sec. 3. The Director of the United States Information Agency is authorized

to delegate within the Agency the functions conferred upon him by this Order.

Sec. 4. Executive Order No. 11312 of October 14, 1966 is revoked.

Sec. 5. Any order, regulation, determination or other action which was in effect pursuant to the provisions of Executive Order No. 11312 shall remain in effect until changed pursuant to the authority provided in this Order.

Sec. 6. This Order shall be effective on April 1, 1978.

### CROSS REFERENCES

Exemption from provisions of Convention on Cultural Property Implementation Act, see 19 USCA § 2611.

### LIBRARY REFERENCES

**American Digest System**
Aid to other nations, see War and National Emergency ⚌46.
Governmental powers in general, see United States ⚌5.
**Encyclopedias**
Aid to other nations, see C.J.S. War and National Defense § 61.
Governmental powers in general, see C.J.S. United States §§ 4, 5.

### WESTLAW ELECTRONIC RESEARCH

United States cases: 393k [add key number].
War and national emergency cases: 402k [add key number].
See, also, WESTLAW guide following the Explanation pages of this volume.

## § 2460. Bureau of Educational and Cultural Affairs

### (a) Establishment; responsibilities

In order to carry out the purposes of this chapter, there is established in the United States Information Agency, or in such appropriate agency of the United States as the President shall determine, a Bureau of Educational and Cultural Affairs (hereinafter in this section referred to as the "Bureau"). The Bureau shall be responsible for managing, coordinating, and overseeing programs established pursuant to this chapter, including but not limited to—

(1) the J. William Fulbright Educational Exchange Program which, by promoting the exchange of scholars, researchers, students, trainees, teachers, instructors, and professors, between the United States and foreign countries, accomplishes the purposes of section 2452(a)(1) of this title;

(2) the Hubert H. Humphrey Fellowship Program which finances (A) study at American universities and institutions of higher learning, including study in degree granting programs,

A137

CIVIL COURT RECORDS
315 COURT STREET
CLEARWATER FLORIDA 34616-5192
(813) 464-3267

DATE: 05/05/95

TO:

RE: ADMINISTRATION ORDER H6-44 "CAPTION OF PLEADINGS".

CASE NO.        95001285CI-008

ROMANOV ANASTASIA PRINCESS
            PLAINTIFF(S).

TO 1

FILED
MAY 0 5 1995
Deputy Clerk

VS

FLORIDA INTERNATIONAL MUSEUM INCORPORATED
            DEFENDANT(S).

EFFECTIVE JULY 1, 1986, PURSUANT TO RULE 1.100(C) (3) AND ADMINISTRATIVE
ORDER 86-44, A FINAL DISPOSITION FORM, (FORM 1.998) SHALL BE FILED WITH THE
CLERK OF THE CIRCUIT COURT BY THE PREVAILING PARTY AT THE TIME OF THE FILING
OF THE ORDER AND/OR JUDGMENT WHICH DISPOSES OF THE ACTION.

THIS OFFICE IS IN RECEIPT OF AN ORDER OR JUDGMENT WITHOUT A FINAL DISPOSITION
FORM.  PLEASE BE ADVISED, AFTER A PERIOD OF TEN (10) DAYS FROM THE DATE OF
THIS LETTER, CONTINUED NONCOMPLIANCE WITH THIS RULE AND ADMINISTRATIVE ORDER,
THE CLERK OF THE CIRCUIT COURT SHALL BE COMPELLED TO NOTIFY THE ASSIGNED
JUDGE.

HOWEVER, IF YOU FEEL THE FINAL DISPOSITION FORM SHOULD NOT BE SUBMITTED AT
THIS TIME, PLEASE INDICATE BELOW AND RETURN THE SAME TO THIS OFFICE.

    1.  JUDGMENT/ORDER ONLY APPLICABLE TO THE FOLLOWING:
    ---------------------------------------------------------------------------
    ---------------------------------------------------------------------------

    2.  OTHER:_____
    ---------------------------------------------------------------------------

                            VERY TRULY YOURS,

                            Karleen F. De Blaker
                            **KARLEEN F. De BLAKER**
                            CLERK OF THE CIRCUIT COURT

# ADDENDUM III

## IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

**Brokerarte Capital Partners, LLC,**
**Plaintiff-Appellant,**

**v.**

**The Detroit Institute of Arts,**
**Defendant-Appellee,**
and
**United States of America,**
**Intervenor-Appellee.**

## ON APPEAL FROM THE EASTERN DISTRICT OF MICHIGAN, Southern Division, Honorable George Caram Steeh, Case No. 2:23-cv-10066

**ADDENDUM to Brief *Amicus Curiae* of the Association of Art Museum Directors, American Alliance of Museums, and Individual Art Museums in Support of Defendant-Appellee**

Stephen J. Knerly, Jr. (Ohio 0025280)
Dennis R. Rose (Ohio 0039416)
Katie L. Steiner (Ohio 0096933)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114
Phone:  (216) 621-0150
Facsimile:  (216) 241-2824

Elisé K. Yarnell (Ohio 0093996)
**HAHN LOESER & PARKS LLP**
65 E. State St., Suite 2500
Columbus, Ohio  43215
Phone:  (614) 221-0240
Fax:  (614) 221-5909

*Counsel for* Amici Curiae

14460953.6

## DESIGNATION OF LOWER-COURT DOCUMENTS

| RE. | Description | Page ID |
|-----|-------------|---------|
| 1 | Complaint | 1-10 |
| 2 | Motion for TRO | 11-28 |
| 5 | Order Pending Hearing | 33-34 |
| 12-2 | Shaw Decl. | 68-70 |
| 12-3 | H.R. Rep. No. 1070, 89th Cong. | 72-74 |
| 12-4 | Public Law 89-259 | 76-77 |
| 12-5 | Rodney M. Zerbe, *Immunity from Seizure for Artworks on Loan to United States Museums*, 6 Nw. J. Int'l L. & Bus. 1121, 1124 n. 21 (1984-1985) | 79-104 |
| 12-6 | Cover Letter | 106-107 |
| 12-7 | Schedule | 109-115 |
| 12-8 | Federal Register Vol 87, No. 134, Public Notice No. 11783 | 117 |
| 15 | Order | 138-148 |

Respectfully submitted,

 */s/ Dennis R. Rose*
Stephen J. Knerly, Jr. (Ohio 0025280)
Dennis R. Rose (Ohio 0039416)
Katie L. Steiner (Ohio 0096933)
**HAHN LOESER & PARKS LLP**
200 Public Square, Suite 2800
Cleveland, Ohio  44114
Phone:  (216) 621-0150
Facsimile:  (216) 241-2824
Email:  sjknerly@hahnlaw.com
            drrose@hahnlaw.com
            ksteiner@hahnlaw.com

14460953.6

Elisé K. Yarnell (Ohio 0093996)
**HAHN LOESER & PARKS LLP**
65 E. State St., Suite 2500
Columbus, Ohio 43215
Phone: (614) 221-0240
Fax: (614) 221-5909
E-mail: eyarnell@hahnlaw.com

*Counsel for* Amici Curiae

14460953.6

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2023, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system, which will cause a copy of said document to be electronically transmitted to all counsel of record.

*/s/ Dennis R. Rose*
*Counsel for* Amici Curiae

44

14460953.6